# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**RICHARD JORDAN and RICKY CHASE**                               *Plaintiffs*

**THOMAS EDWIN LODEN, JR.,**
**ROGER ERIC THORSON, and**
**ROBERT SIMON, JR.**

                                                                *Intervenors*

*VS.*                                              No.   **3:15-cv-00295-HTW-LRA**

**PELICIA E. HALL, Commissioner,**
**Mississippi Department of Corrections, in**
**her Official Capacity; EARNEST LEE**
**Superintendent, Mississippi State Penitentiary,**
**in his Official Capacity; THE MISSISSIPPI**
**STATE EXECUTIONER, in his Official**
**Capacity; an UNKNOWN EXECUTIONERS,**
**in their Official Capacities**                                 *Defendants*

## DECLARATION OF SUPPLIER 1

I, Supplier 1, declare as follows:

1.      I, Supplier 1, am over the age of 21 and competent to testify in this matter.   I have personal knowledge of the facts contained in this declaration.

2.      Supplier 1 is a licensed pharmacy located in Mississippi.

3.      Supplier 1 has been and is unable to obtain pentobarbital in any form.

4.      Supplier 1 has supplied and intends to continue supplying lethal injection chemicals to the Mississippi Department of Corrections for use in executions of death row inmates.

5.      The lethal injection chemicals Supplier 1 has supplied the Mississippi Department of Corrections with are FDA-approved drugs.   They are not compounded drugs.

6.      Supplier 1's decision to supply the Mississippi Department of Corrections with lethal



injection chemicals was and is contingent on Supplier 1's identity remaining secret.   If Supplier 1's identity is disclosed or revealed, Supplier 1 will no longer supply the Mississippi Department of Corrections with lethal injection chemicals.   Supplier 1 will not supply lethal injection chemicals to any states other than Mississippi under any circumstances.

7.      Supplier 1 reasonably fears that if its identity is disclosed or revealed, anti-death penalty advocates will harass and retaliate against Supplier 1, resulting in physical and/or financial harm to Supplier 1, its owner(s), and its employees.   Supplier 1 also reasonably fears that if its identity is disclosed or revealed, its business relationships with the sources from which Supplier 1 receives lethal injection chemicals will be endangered, and Supplier 1 will be subjected to retribution for providing lethal injection chemicals to the Mississippi Department of Corrections.

8.      Supplier 1's fears are based, in part, on documentary evidence of threats, harassment, and boycotts to which other suppliers of lethal injection drugs have been subjected as a result of their lawful decision to supply state correctional departments with drugs needed to carry out executions, including the information contained in Exhibits 1 through 16 attached hereto.

9.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the _11_ day of _August_ , 2017.



_Supplier 1_____

**Supplier 1**



_Jamie Shows McCann_ 8/11/17

NOTARY PUBLIC

MY COMMISSION EXPIRES

DJ Lees

From: donotreply@apothecarytulsa.com
Sent: Wednesday, January 29, 2014 9:16 AM
To: Sarah Lees; DJ Lees
Subject: Apothecary Tulsa Contact Us Form Submission

Name: Prof. Humez
Email: splorrian@earthlink.net
Phone: 4406222112
Message: Your site says nothing about pentobarbitol. Do you compound it for the state of Missouri's department of corrections, as has been publicly alleged in an AP story that ran this morning, and if so, now that that story has gone public, do you think that is prudent? Seems to me that manufacturing a drug expressly to kill people flies in the face of one of those commandments Moses got from Jehovah on Sinai, but maybe I'm just being old-fashioned. Still, were I you I'd at least want to beef up my security now that you've been put in the spotlight as a likely supplier and failed to issue a flat denial. As the folks at the federal building can tell you, it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual. In your place, I'd either swear to the nation that my company didn't make execution drugs of ANY sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk. Just sayin'.

1

05/16/2014  10:24  .5123288132

Sale of Pentobarbital

Dear Sirs or Madams:

On September 16, 2013 The Woodlands Compounding Pharmacy sold 8 vials of 50 mg/ml Pentobarbital (2.5 grams) to James Jones. [See attachment.] Strangely, Mr. Jones identified himself as being a representative with the Texas Department of Criminal Justice Huntsville Unit Hospital.

In fact, Mr. Jones is the Senior Warden of the Texas Department of Criminal Justice Huntsville Unit. He is not a doctor. He has not medical training whatsoever. I can't imagine that he had a legal prescription for Pentobarbital when he purchased it.

The drugs will not be used in the Huntsville Unit Hospital. In fact, there is no Huntsville Unit Hospital. These drugs will be used to kill fellow human beings. These drugs will be used on October 9, 2013 to kill Michael Yowell. These drugs will be used on October 29, 2013 to kill Arthur Williams, Jr. These drugs will be used on November 12, 2013 to kill Jamie Bruce McCoskey.

I quote from your website:
Compounding gives patients drug therapy that is customized to their individualized unique needs. At TWCP, compounding pharmacists will work closely with you and your physician to prepare medication in a dosage form that has been customized to your particular needs. You are violating these ideals.

Do no harm should apply to Compounding Pharmacies, too.

Ward Larkin

https://email.1and1.com/ox6/ox.html

2/19/2014

Discovery Provided 9/8/2015
Page 155

EXHIBIT 2

Disgust!

Dear Dr Lovoi

I am totally and completely aghast and disgusted to find out your company is supplying the TDCJ with the unlicensed drug to carry out it despicable executions.

What is even more abhorrent to me Sir, is that you are a Doctor, a man who took an sacred oath to preserve human life at all costs. The drug you have supplied has already been used to murder a man, who never even took anyone's life.

Your web site states under therapies, that you are able to customise medication for children "to make just about any medication tasts better" which makes it easier of children to take.

Can you provide a drug that will enable the children of the man who are ritualistically murdered by the State of Texas, to cope with that, can you make a drug to bring those who are actually innocent back from the dead. No Sir you can not. Have you looked in to the eyes of a child who's father is to be realistically murdered, no Sir you have not, because had you have done so, you would not provide this drug to the TDCJ and allow them to continue this barbaric method of so called justice.

The rest of the Western world has taken the decision to stop proving drugs for this dreadful use, I urge you as a doctor, a man who should be prolonging life and making things better, a man who's oath should prevent him from being party to such heinous practices, to look at your companies policies and think again.

Your sincerely

S. Shuffield
Sent from my iPad

https://email.1and1.com/ox6/ox.html

2/19/2014

000040

05/16/2014  10:24    5123208132                                          PAGE  06/11
    MURDER                                                               Page 1 of 1

    Did you know you were selling drugs to the Texas Department of Corrections for "MURDER?"

    Please consider "NOT" selling anymore drugs to be used for executions/MURDER!

    Thanks,
    Bella Murphy

https://email.1and1.com/ox6/ox.html                                    2/19/2014

05/16/2014  18:24    5123208132                                        PAGE  07/11
     letal drugs to kill human being                                  Page 1 of 1


     please mr and mrs who are working in this pharmacy, stop selling drugs to kill HUMAN
     BEINGS
     Our common dignity is concerned: Thank you. D.R.STEVEN from FRANCE


https://email.1and1.com/ox6/ox.html                                2/19/2014

                                  000042

                                          Discovery Provided 9/8/2015
                                                       Page 158

                                            EXHIBIT 2

05/16/2014  10:24    5123208132                                    PAGE  08/11
Inquiring                                                          Page 1 of 1

sir,

I'm Patrice Victor, a journalist from France. Please can you confirm (or infirm) that your
company has sold a drug to TDCJ in order to apply death penalty?

Sincerely

Patrice Victor

https://email.1and1.com/ox6/ox.html                                2/19/2014

000043

05/16/2014  10:24    5123288132                                    PAGE  09/11
                                                                   Page 1 of 1
Drugs

Your pathetic and infantile letter to the Texan authorities asking for the
return of your lethal poison sickened me and countless others.
Whatever happened to the Hypocratic oath?
I hope that you are all god-fearing Americans who are now begging for
mercy from your redeemer - and I hope above all that it won't be
granted.

07 70 19 10 76
www.timbroadbent.com

.....et dites NON à la corrida - que la torture s'arrête
.....NO to bullfighting - stop the bloody torture

https://email.1and1.com/ox6/ox.html                         2/19/2014

Discovery Provided 9/8/2015
Page 160

EXHIBIT 2

TDCJ

Mr Lovoi

I hope you now see what dreadful and underhanded people work for the TDCJ. Their people
will go to any lengths to murder those in their charge, even if its against the law.

There is a man call Michael who is due to be murdered tomorrow. I hope you get to hear
about it, I hope your staff hear about it, I hope you know you were all instrumental in
this mans death. Does that make you any better that any one of the man that reside within
theses cursed walls, no Sir it does not.

I hope you and your colleagues sleep well, listen in to execution watch see what happens.

Sent from my iPad

https://email.land1.com/ox6/ox.html

2/19/2014

05/15/2014  10:24    5123200132
You Are A Piece Of Shit

So I guess you're okay with murder as long as you don't get caught?

https://email.1and1.com/ox6/ox.html

2/19/2014

000046

Discovery Provided 9/8/2015
Page 162

EXHIBIT 2

Google Reviews
The Woodlands Compounding Pharmacy



**Stephanie Ellis**
4 months ago·
As a supplier of the "killing drug" to TDCJ, the integrity of this pharmacy should seriously be questioned.
Mr. Lovoi was perfectly fine with the transaction as long as he remained anonymous. So much for that
plan huh? Hope it was worth the money for you sir. Shame on you and your pharmacy. You aren't even
worthy of the star I was required to select.



**melissa monti**
4 months ago
Tomorrow I get to watch my friend get murdered by the state of Texas from drugs supplied by the
Woodlands Compounding Pharmacy. I cannot believe any professional in the health care field would think
it ok to intentionally end human life. What sickens me more is the fact that this pharmacy only had a
problem supplying this drug to TDCJ after the fact was made public, and think they can correct this wrong
by simply asking for the drug back for a refund. I am disgusted this pharmacy is in such close proximity to
my house; I will NEVER give my business to this pharmacy, and neither should you! Do the right thing,
Woodlands Compounding Pharmacy, and don't sell any more drugs to TDCJ that can be used as a
means to execute human beings!!



**Samantha Shuffield**
4 months ago·
I am totally disgusted and aghast to find out this company is supplying the TDCJ with the unlicensed drug
to carry out its despicable executions. What is even more abhorrent to me is that, the head of that
company, Dr. Lovoi is a man who took a sacred oath to preserve ALL human life at all costs. The drug his
company supplied has already been used to murder a man who never even took a life. their web site
states that they are able to customise medication for children, and I quote; "to make just about ay
medication taste better, so it is easier for children to take". Can they provide a drug that will enable the
children of parents ritualistically murdered by the State of Texas to cope with the aftermath, I somehow
doubt this very much. I invite you to look in to just one of those children's eyes and give your reasons Dr
Lovoi, if you dare. The rest of the Western world has taken the decision to stop providing drugs for this
barbaric use, come on America join them, the eyes of the world are watching.



**Pat Hartwell**
4 months ago
Recently, The Woodlands Compounding Pharmacy had compounded and sold to the Texas Department
of Corrections, a drug called Pentobarbital, which is used for the sole purpose of executions. Pharmacists
are bound by the "Code of Ethics", in which nowhere is listed for them to supply drugs for killing people.
The Woodlands Compounding Pharmacy received $2800.00 for eight vials of this drug. Lundbeck, the
former supplier, has stopped all shipments to the US when it is known that the Pentobarbital will be used
to kill people.



**Melissa Walters**
4 months ago-
Shame, shame, shame! There is no doubt that you would have continued to sell TDC vials of compounded drugs to end the lives of many men had you not been "outed". Further shameful than that, you are only off-put by the fact that your name is now out there and the attention you are receiving to supply Texas' killing machine is less than favorable. You, as a human being, and as a "company", should be ashamed of your questionable business practices!

**David W. Collingsworth**
4 months ago
Where are the morals and ethics in our society? I understand business as usual, and if a person was allergic to certain prescriptions and needed that script compounded to be able to ingest it, then that would be your job, but to compound a drug to be used to kill with or without FDA approval???? It's just wrong all the way around. TDCJ used you to get what they needed, and you just let them. You are guilty of murder. Yes you provided the murder weapon.

000048

## AFFIDAVIT OF BRAD LIVINGSTON

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF WALKER | § |

Before me, the undersigned authority, personally appeared Brad Livingston, who, being by me duly sworn, deposed as follows:

My name is Brad Livingston. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts as stated herein. I am currently employed as the executive director of the Texas Department of Criminal Justice (TDCJ) and have held that position since November 2004. Prior to that I was the Chief Financial Officer for TDCJ, a position I held from June 2001 to July 2005, and prior to that, I was the Deputy Chief Financial Officer from October 1997 to June 2001.

I have previously provided an affidavit in this case wherein I described the difficulties faced by TDCJ in procuring lethal injection chemicals for use in executions, and the rationale for my opinion that revealing the identity of pharmacists, pharmacies, other drug suppliers, and those involved in the supply of the drugs, including the drug testing company, would only serve to jeopardize their personal physical safety and the public safety. I have attached a copy of that affidavit as Exhibit A to this affidavit. My prior affidavit explains some of the circumstances surrounding my decision to seek a threat assessment from the Director of the Texas Department of Public Safety (TDPS), Steven McCraw. He has no vested interest in the outcome of this case and he does not report to me in my chain of command on any matters. Director McCraw is a professional acquaintance and in the past I have relied on him to assess threats related to the department of criminal justice. I am familiar with Director McCraw's law enforcement background and know that he is well respected in the law enforcement community. I rely on his opinions and assessment as he has substantial, current experience as a law enforcement officer and he is the head of the largest, most sophisticated police department in the state of Texas.

When I called Director McCraw and asked for his assistance, I wanted to know whether or not he agreed that there was a significant or substantial threat to a supplier of lethal injection drugs, based on recent information and circumstances

that lead to my concern. At that time, I knew that we were using a new drug supplier and knew that there would most likely be an open records request for the identity of the supplier. I also was aware of the short deadlines set out in the Public Information Act. The identity of the drug supplier is closely held information within the department. I knew the following about the threat environment:

1. There was a nexus between the public disclosure of at least two compounding pharmacies supplying lethal injection drugs and the immediate appearance of harassing emails and other threats, including a public demonstration outside of the Woodlands Compounding Pharmacy that was monitored by the TDCJ Office of Inspector General and a blog posting with a picture of an exploding head captioned with "The Pharmacist who approves the business of killing, but only under the veil of secrecy."

2. Over the years, I have received a number of death threats against me— one just prior to the assassination of the executive director of the Colorado prison system on March 19, 2013, and one shortly thereafter. As a result of such threats, I now have a security detail assigned to me to this day.

3. Once TDCJ was no longer able to procure lethal injection drugs from large pharmaceutical suppliers, the drugs were obtained from a retail compounding pharmacy operated by individuals who, by the nature of their operation, were more vulnerable than a faceless corporation.

4. In light of the threats seen in the strong anti-death penalty rhetoric and activism, the assassination of the executive director of the Colorado prison system, the violence perpetrated against providers of controversial services such as abortion and animals for research, as well as the generally increasing violence in the United States, I believe that there was and still is a substantial threat of physical injury to the drug supplier if the identity is disclosed.

Since the time I provided the attached affidavit (Exh. A), TDCJ retained the services of Larry Cunningham, a senior consultant with TorchStone Global, to provide a threat assessment relating to the supplier of pentobarbital for execution purposes. I have attached a true and correct copy of Mr. Cunningham's four-page bio to this affidavit as Exhibit B. I considered this bio and Mr. Cunningham's depth and breadth of current and past experience when we made the decision to

Affidavit of Brad Livingston
Executive Director, Texas Department of Criminal Justice
*Levin v. TDCJ*, Cause No. D-1-GN-14-00908
Page 2 of 4

Discovery Provided 9/8/2015
Page 39

EXHIBIT 3
Appellate Case: 16-3072    Page: 15    Date Filed: 09/23/2016 Entry ID: 4451561

retain Mr. Cunningham's services. Mr. Cunningham's testimony and opinions have reinforced my opinion and belief that pharmacies and other suppliers who supply lethal injection drugs to TDCJ face a substantial threat of physical harm if their identity is disclosed.

Mr. Cunningham was deposed on October 10, 2014. I have reviewed the transcription of Mr. Cunningham's deposition, along with his opinions outlined in the expert disclosure provided in this case. Mr. Cunningham's testimony and opinions reinforce my opinion that revealing the name of the provider of lethal injection drugs would result in a substantial threat of physical harm to the provider of such drugs. Mr. Cunningham made several key points:

1. Despite the threat to destroy the Oklahoma pharmacy with a fertilizer bomb similar to the bomb that destroyed the Alfred P. Murrah Federal Building in Oklahoma City, the Oklahoma pharmacy was in fact not bombed. Mr. Cunningham explained that the likely reason is that as soon as that pharmacy received that very serious threat, it stopped providing the lethal injection drugs for use by departments of corrections. This is in stark contrast to the violence, murders, destruction of soft targets, and protests associated with abortion clinics and providers and animal laboratories. Abortion clinics and animal laboratories historically stayed in business, despite the threats. As they stayed in business, abortion clinics and providers between 1977 and 2013 suffered eight murders, 17 attempted murders, 181 arsons, 42 bombings, and assorted mayhem.

2. Similarly, it is not surprising that the Woodlands Pharmacy did not actually experience any violence. As soon as its name was made public, the Woodlands Pharmacy ceased all business with TDCJ.

3. While threats and other communications standing alone may not be cause for heightened concern, when they are placed within the current threat environment, the threats and other communications must be taken very seriously. In the context of the publicity associated with compounding pharmacies, botched executions, and the threats and actual violence to directors of prison systems, including Oklahoma, Colorado, and Texas, events are moving in a very threatening direction. Given the history of the abortion clinics and animal laboratories over time, there is a substantial threat of physical harm to drug providers if their identity is disclosed.

Affidavit of Brad Livingston
Executive Director, Texas Department of Criminal Justice
*Levin v. TDCJ*, Cause No. D-1-GN-14-00908
Page 3 of 4

Discovery Provided 9/8/2015
Page 40

EXHIBIT 3

"Further affiant sayeth not."

Brad Livingston
Executive Director
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on this the 6th day of _November_, 2014.

Notary Public in and for the State of Texas

Angela Moore
Notary's Printed Name

ANGELA L MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 07-23-2017

Affidavit of Brad Livingston
Executive Director, Texas Department of Criminal Justice
*Levin v. TDCJ*, Cause No. D-1-GN-14-00908
Page 4 of 4

# The Woodlands Compounding Pharmacy

3200 Research Forest Dr. Ste. A3

The Woodlands, TX 77381

Phone: 281-419-1340

Fax: 281-419-2181

October 4, 2013

Judge Larry Gist
Board Member, Texas Board of Criminal Justice
Fax 512.305.9398

Brad Livingston
Texas Department of Criminal Justice
Fax 936.437.2123

Bryan Collier
Deputy Executive Director, Texas Department of Criminal Justice
Fax 936.437.8925

Jason Clark
Information Director, Texas Department of Criminal Justice
Fax 936.437.6055

Region I Regional Director Richard Alford
Texas Department of Criminal Justice
Fax 936.437.2651

Region I Deputy Director Robert "Jay" Eason
Texas Department of Criminal Justice
Fax 936.437.2651

Katherine D. Hayes
Assistant Attorney General
Fax 512.320.8132

Dear Sirs and Madam:

I am the owner and pharmacist-in-charge of the Woodlands Compounding Pharmacy, the pharmacy that has provided TDCJ with vials of compounded pentobarbital.

Based on the phone calls I had with Erica Minor of TDCJ regarding its request for these drugs, including statements that she made to me, it was my belief that this information

would be kept on the "down low" and that it was unlikely that it would be discovered that my pharmacy provided these drugs. Based on Ms. Minor's requests, I took steps to ensure it would be private. However, the State of Texas misrepresented this fact because my name and the name of my pharmacy are posted all over the internet. Now that the information has been made public, I find myself in the middle of a firestorm that I was not advised of and did not bargain for. Had I known that this information would be made public, which the State implied it would not, I never would have agreed to provide the drugs to the TDCJ.

I, and my staff, are very busy operating our pharmacy, and do not have the time to deal with the constant inquiries from the press, the hate mail and messages, as well as getting dragged into the state's lawsuit with the prisoners, and possible future lawsuits. For these reasons, I must demand that TDCJ immediately return the vials of compounded pentobarbital in exchange for a refund.

Please contact me immediately to arrange for the return of the drugs. Otherwise I may have to ask the Court in the prisoners' lawsuit to consider my concerns.

Sincerely,

Jasper Lovoi, RPh.

December 5, 2013

**HUFF POST CRIME**

# Texas Execution Drug Shortage: State Running Out Of Pentobarbital

By MICHAEL GRACZYK 08/01/13 09:57 PM ET EDT **AP**



This photo taken May 27, 2008 file photo shows the gurney in Huntsville, Texas, where Texas' condemned are strapped down to receive a lethal dose of drugs.

HUNTSVILLE, Texas -- The nation's most active death penalty state is running out of its execution drug.

The Texas Department of Criminal Justice said Thursday that its remaining supply of pentobarbital expires in September and that no alternatives have been found. It wasn't immediately clear whether two executions scheduled for next month would be delayed. The state has already executed 11 death-row inmates this year, and at least seven more have execution dates in coming months.

"We will be unable to use our current supply of pentobarbital after it expires," agency spokesman Jason Clark said. "We are exploring all options at this time."

Texas switched to the lethal, single-dose sedative last year after one of the drugs used in its three-drug execution process became difficult to obtain and the state's supply expired. Other death-penalty states have encountered similar problems after some drug suppliers barred the drugs' use for executions or have refused, under pressure from death-penalty opponents, to sell or manufacture drugs for use in executions.

No executions in Texas were delayed because of that shortfall.

"When Texas raises a flag that's it having a problem, obviously numerically it's significant around in the country because like they're doing half the executions in the country right now," Richard Dieter, executive director of the Washington-based Death Penalty Information Center, an anti-death penalty organization, said Thursday.

"The states really scramble to go all over to get drugs," he said. "Some went overseas, some got from each other. But these manufacturers, a number them are based in Europe, don't want to participate in our executions. So they've clamped down as much as they can," Dieter said.

Some death penalty states, most recently Georgia, have announced they're turning to compounding pharmacies, which make customized drugs that are not scrutinized by the Federal Drug Administration, to obtain a lethal drug for execution use.

Missouri wants to use propofol, the anesthetic blamed for pop star Michael Jackson's 2009 death – even though the drug hasn't been used to execute prisoners in the U.S. Its potential for lethal injection is under scrutiny by the courts and its first use isn't likely anytime soon. The Missouri Supreme Court has declined to allow execution dates to be set in that state until the legal issues are resolved.

Missouri Attorney General Chris Koster recently suggested that if a suitable execution drug can't be found, the state should consider the gas chamber. State law still allows for execution by lethal gas, though Missouri no longer even has a gas chamber.

A return to the gas chamber or electric chair anywhere would be difficult, Dieter said.

"Those things just raise the spectacle level and I don't think it's where states want to go," he said.

Pentobarbital, which has been used alone or in concert with other drugs in all executions in the U.S. the past two years, was more readily available because it was commonly used as a sedative.

"But I guess restrictions have been put on its distribution," Dieter said. "It's uncertain where all of this goes because it's inherently a medical kind of procedure involving some health professionals who are largely focused on keeping people alive. It runs into contradictions with executions – people strapped to a table. Executions aren't exactly what the medical model is."

Texas has by far executed more inmates than any other state in the U.S. since the Supreme Court allowed executions to resume. Since 1982, six years after the high court's order, Texas has executed 503 inmates. Virginia is a distant second at 110.

As of May 2012, Texas had 46 of the 2.5-gram vials of pentobarbital, presumably enough to execute as many as 23 prisoners since each execution requires a 5-gram dose. The execution Wednesday of an inmate convicted in two road-rage killings was the 20th lethal injection since that disclosure.

---

Associated Press writer Jim Salter in St. Louis contributed to this story.

*Filed by Hilary Hanson |*

Exhibit 2, Attachment A
EXHIBIT 4

**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Tennessee moves to single-drug executions despite pentobarbital shortage

Fri, Sep 27 2013

By Tim Ghianni

Sept 27 (Reuters) - Tennessee said on Friday that it will begin to use only pentobarbital to execute death row inmates despite a shortage of the drug.

The state will use the single-drug lethal injection method instead of the three-drug method it has used in the past, according to Tennessee Department of Correction spokeswoman Dorinda Carter.

"The Department of Correction had been unable to obtain the chemicals necessary to carry out an execution since 2011 due to a widespread shortage" of sodium thiopental, a drug used in the three-drug method, Carter said.

Sodium thiopental puts the prisoner to sleep, with another drug administered to paralyze the prisoner and a third to stop the heart.

In April 2011, Tennessee was among the states that turned over its supplies of sodium thiopental to authorities after concerns arose about how the supply of the drug was imported.

That move came after the company that produced sodium thiopental had bowed to European Union pressure to stop making the drug, creating a shortage. The death penalty has been abolished in all EU nations.

The sodium thiopental shortage forced U.S. states to switch to pentobarbital.

Seven states currently use pentobarbital alone for executions and more are planning to use it, according to Richard Dieter, executive director of the Death Penalty Information Center, a non-profit organization that provides information on capital punishment. Other states use it as part of the three-stage execution process.

Pentobarbital also is commonly used during surgeries and by veterinarians to euthanize animals.

"Given it's used by veterinarians and on humans for other purposes, there's probably a lot out there. But if you have to make a new order, it's hard to get for prisons," Dieter said.

Danish manufacturer Lundbeck and its American subsidiary, Akorn, are controlling the distribution of pentobarbital "and are not allowing its distribution if it is to be used for executions," Dieter said.

Dieter said some states that had been using pentobarbital were having to switch to other drugs or find new sources because of the shortage.

"Everybody that used (sodium thiopental) has switched and now they may have to switch again (from pentobarbital)," Dieter said.

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Exhibit 2, Attachment A
12/5/2013
EXHIBIT 4


**THE GLOBE AND MAIL**

# Untried sedative to be used in lethal injection tonight because of drug shortage

**TU THANH HA**
The Globe and Mail
Published Tuesday, Oct. 15 2013, 4:16 PM EDT
Last updated Tuesday, Oct. 15 2013, 5:27 PM EDT

Nearly a quarter of a century after he went to death row for rape and murder, William Happ was scheduled to be executed on Tuesday afternoon in controversial circumstances that underline how state executioners in the United States and Vietnam are now limited in their actions by a growing shortage of drugs for lethal injections.

## More Related to this Story

- With pentobarbital running out, Florida set to use untried drug for execution

- Vietnam Vietnam to try producing own lethal drugs for death sentences

Mr. Happ is to be taken to a chamber of the Florida State Prison, where he will be strapped to a gurney and hooked to an intravenous saline bag. At 6 p.m., the executioner will pump 500 milligrams of the sedative midazolam hydrochlride to knock him unconscious before two other drugs are injected to kill him.

However, midazolam hydrochloride, known by the brand name Versed, has never been used before in executions, raising concerns about whether it can effectively make the execution painless.

Florida decided to use the untried midazolam because drug companies no longer want to provide the barbiturates traditionally used for capital punishment.

The American protocol for lethal injections, which has also been used by Vietnam, is typically a three-drug process: an anesthetic renders the prisoner unconscious, then a muscle relaxant paralyzes the inmate and finally a dose of potassium chloride stops the heart.

Since 2011, the European Union has banned exports of products that could be used for capital punishment such as gallows and guillotines, but also sodium thiopental and other similar barbiturates. The sole American maker of sodium thiopental, Hospira, ended production in January, 2011, because its plant was in Italy and it did not want to be held liable. Six month later, H. Lundbeck A/S, a Danish pharmaceutical firm that produced another lethal-injection

Exhibit 2, Attachment A
EXHIBIT 4

sedative, pentobarbital sodium, at a plant in Illinois, stopped selling to prisons in U.S. states carrying out the death penalty.

To keep executing inmates, "prisons now have to scramble and improvise," Maya Foa, an investigator for the British human-rights group Reprieve, said in an interview.

The uncertainty with the drug supplies has led some states to suspend executions. Missouri was going to circumvent the shortage by using the anesthetic propofol, but on Friday, its governor, Jay Nixon, halted the scheduled execution of a triple murderer, Allen Nicklasson.

"In light of the issues that have been raised surrounding the use of propofol in executions, I have directed the Department of Corrections that the execution of Allen Nicklasson, as set for October 23, will not proceed," Mr. Nixon said in a statement on Friday. "I have further directed the department to modify the State of Missouri's execution protocol to include a different form of lethal injection."

Other states have been trying to keep executing by relying on compounding pharmacies, which mix customized, small amounts of drugs.

This more artisanal approach has in turn raised concerns about quality controls and the reliability of those special-order drugs.

If the anesthetic does not work properly, the subsequent dose of muscle relaxant would leave prisoners lucid but unable to move while they are injected with potassium chloride, which causes excruciating pain, Ms. Foa said. "You'll be paralyzed and people won't be able to see that you are suffering, so it's quite insidious," she said.

In Georgia, Warren Hill, who was convicted of the murder of his girlfriend and subsequently of the murder of another inmate, was scheduled to be put to death on July 19. However, the day before, a judge of the Superior Court of Fulton County suspended Mr. Hill's execution after ruling that a new state law, which kept secret the identities of those who supply Georgia's lethal-injection drugs, was not constitutional.

"The plaintiff still, today, cannot possibly determine whether the pentobarbital in question was somehow contaminated or otherwise improperly compounded," Judge Gail S. Tusan wrote in the ruling.

Similar worries emerged after Vietnam adopted lethal injections in 2011, just three months before the start of European controls on the exportation of barbiturates. With a backlog of more than 560 inmates waiting on death row, the country announced in January that it would try to produce its own pharmaceuticals to carry out death sentences.

Vietnam's first lethal injection took place in August, with the execution of Nguyen Anh Tuan, for the fatal stabbing of a woman who was robbed of her cellphone and the equivalent of $20 in her purse. The source of the lethal-injection drugs was not revealed.

"Some very tenacious states will try to find ways to kill people, no matter how underhanded," Ms. Foa said.

In Florida, when Mr. Happ was convicted in 1989, the state still relied on the electric chair and lethal injections would be introduced only in 2000.

Mr. Happ was found guilty of the murder and rape of Angela Crowley. She did not know him and had stopped to use a payphone when she was kidnapped from a parking lot in 1986. Her battered body was found in a canal in in central Florida. Mr. Happ was arrested after police matched his fingerprints and shoe prints to those at the crime scene.

By the time Mr. Happ gave up on legal appeals last month, Florida was running out of its stockpile of lethal-injection barbirates. According to a court filing *[http://floridacapitalresourcecenter.org/media/uploads/news_attachments/ferguson_pento_inte* obtained by the Florida Capital Resource Center, the Aug. 5 execution of John Ferguson, convicted of eight murders, used pentobarbital sodium made by Lundbeck and acquired in June, 2011, just before the firm stop selling to prisons. The drug had an expiration date in the fall of 2013.

The plan to switch to midazolam was revealed in a September court filing. Several Florida death -row inmates have now challenged its use in a filing in U.S. federal court. According to the Florida Department of Corrections, the state currently has 400 men and five women on death row.

While state executioners still try to circumvent the drug shortage, the situation has fuelled a necessary debate on the issue, Ms. Foa said. "There may be some rogue states, but we are seeing some changes. ... This discussion is an important one."

**Topics:**

- Vietnam
- Florida

Exhibit 2, Attachment A
EXHIBIT 4



npr home

news

arts & life

music

listen

donate

stations

shop

sign in / register

# Lacking Lethal Injection Drugs, States Find Untested Backups

by NPR STAFF

October 26, 2013   5:19 PM

**Listen to the Story**

All Things Considered                          11 min 27 sec



Amber Hunt/AP

The U.S. is facing a shortage of a drug widely used for lethal injections. With few options, states are turning to new drugs and compounding pharmacies, rather than overseas companies.

The move is raising safety concerns, and in some cases delaying executions. Other executions are proceeding, however, and advocates are asking whether the use of new drugs violates the inmates' Eighth Amendment protection from cruel and unusual punishment.

**A Witness To Lethal Injection**

In 1989, William Happ was sentenced to death for the murder and rape of 21-year-old Angie Crowley. For decades, Happ appealed and lost.

Exhibit 2, Attachment A
EXHIBIT 4

npr home

news

arts & life

music

listen

donate

stations

shop

sign in / register

His death sentence remained, but the method of execution had changed since his conviction. Since 1924, Florida had used the electric chair to execute prisoners, but in 2000, facing pressure from the Supreme Court, the state switched to lethal injection.

More than a quarter century after Crowley's murder, Happ's execution date was finally set for Oct. 15, 2013. But the state had a problem: Supplies of pentobarbital, a drug commonly used for executions, were running low. As the execution date approached, the state ran out of the drug altogether.

So the Florida Department of Corrections decided to use a new drug — a sedative called midazolam that had never been tested for execution. Nobody knew exactly how it would work.

Associated Press reporter Brendan Farrington was in the viewing room. "It's a very solemn, serious, quiet atmosphere. There's no talking," he tells *All Things Considered* host Arun Rath.



Phil Sandlin/AP

"They bring the witnesses in, and there's a screen across a long, rectangular window. And when they're ready to begin, the screen slowly rises," Farrington says. "The person conducting the execution will announce that the sentence is about to be carried out, tells this to the condemned, and asks if he has any last words."

Happ chose to speak, admitting to the crime and expressing shame for it. "[He said] he hopes God forgives him, and he realizes the family probably could not," Farrington says. "From there, the execution proceeds."

At 6 p.m. sharp, the execution began. Farrington had seen three other executions, none of which used midazolam. In those cases, he says, the prisoners' eyes closed "fairly quickly, and once their eyes closed, they usually stay closed."

"While it wasn't dramatically different than previous executions, it did seem like it took him longer to lose consciousness," Farrington says. "In Happ's case, his eyes were still opening two, three, four minutes into the process. Once they closed, about 10 minutes in, his head started moving kinda just around, and there was some motion."

Exhibit 2, Attachment A
EXHIBIT 2

npr home

news

arts & life

music

There's no way to know if Happ was in pain during his last moments. Some anesthesia experts have expressed concern that midazolam and other untested sedatives could fail to work properly during an execution. If that happened, condemned prisoners could die slowly or painfully, a violation of legal guidelines for executions.

Megan McCracken studies lethal injection drugs for the Death Penalty Clinic at the University of California, Berkeley, School of Law.

> **If the first drug does not in fact deeply anesthetize the prisoner, then he or she could be conscious and aware of being both paralyzed and able to experience pain and the experience of cardiac arrest.**
>
> *- Megan McCracken, U.C. Berkeley Law School*

"If the first drug does not in fact deeply anesthetize the prisoner," she says, "then he or she could be conscious and aware of being both paralyzed and able to experience pain and the experience of cardiac arrest."

### In Search Of Drugs

NPR's Kathy Lohr has been covering the shortage of lethal injection drugs for years. She says the issue started when the drug company Hospira stopped making one of the most common drugs used in lethal injections, sodium thiopental. The anesthetic was used as part of a three-drug protocol.

"The company was the only maker of the drug in the United States," Lohr says. "But by 2011, the company stopped manufacturing it. In part, it really wanted to distance itself from executions."

The move caused a shortage, she says, "which basically led states to search for the drug wherever they could find it."

Some states began trading between themselves. Once the supply either runs out or expires, states are forced to come up with new protocols, find new drugs, or simply postpone the execution.

Missouri recently canceled an execution because it had planned to use propofol, a widely used anesthetic in U.S. hospitals. The drug is manufactured in Europe by the German company Fresenius Kabi. That potentially could have caused larger problems.

Exhibit 2, Attachment A

EXHIBIT 4

Appellate Case: 16-3072      Page: 27      Date Filed: 09/23/2016 Entry ID: 4451561

"The European Union has a statute that does not allow the export of any product that might be used in capital punishment," says company spokesman Matt Kuhn.

npr home

**More From NPR On The Death Penalty**

arts & life



Politics
**The Death Penalty's Slow But Seemingly Sure Decline**

listen



Law
**Once On Death Row, He Now Fights To Defeat The Death Penalty**

shop

sign in / register

So when Fresenius Kabi got word of Missouri's plan to use the drug for capital punishment, it began limiting how the propofol would be distributed in the U.S. Kuhn says it supplies about 90 percent of the U.S. market for the drug.

"If propofol was used in an execution, then the likelihood of sanctions or a ban exporting it from the European Union would become a reality," he says. "And in turn, that would lead to a shortage of the product that's used 50 million times a year in the U.S."

Missouri announced Tuesday it would not use propofol; it's going to use pentobarbital instead.

Richard Dieter, who opposes the death penalty and directs the Death Penalty Information Center, says Missouri made the right decision in switching drugs.

"I think Missouri wisely got out of that whole crisis area and now finds a local pharmacy that will make a different drug, and joins Texas and some other states like Ohio and Georgia in this process," he says.

**Compounding The Issue**

But now there's another issue: Missouri and a number of states are now getting their drugs from compounding pharmacies. That bypasses the big European drug manufacturers altogether. The U.S. Food and Drug Administration doesn't regulate them, either.

"The drugs they're producing, including this pentobarbital, are not made specifically for executions and ... no court has actually reviewed this process," Lohr says. "So if the drugs cannot be validated as effective, this could be a violation of an inmate's Eighth Amendment right against cruel and unusual punishment."

If the drugs cannot be validated as effective, this could be a violation of an inmate's Eighth Amendment right against cruel and unusual punishment.

-NPR's Kathy Lohr

npr home

news

arts & life

music

listen

donate

stations

shop

sign in / register



U.S.
Georgia Death Penalty Under Renewed Scrutiny After 11th-Hour Stay

Texas, Ohio and Missouri all have announced plans to use compounding pharmacies just this month.

"I think we should be using the best practice — not what's available," Dieter says. "And that's what we've come down to: What can the states get a hold of from the backroom of local pharmacies, rather than what's recommended by medical experts."

In addition, states are withholding details about the compounding pharmacies. Georgia inmate Warren Lee Hill is challenging the state's claim that the information should be kept secret.

"His attorneys say they need this information about where the drug is coming from and how it's manufactured — even to know if they can mount a legal challenge," Lohr says.

The states argue that the pharmacies may not want to sell the drugs if it's made public that they're contributing to capital punishment. A lack of sellers — and therefore drugs — could get in the way of carrying out executions.

"So that issue is now making its way through the courts in Georgia, and the execution of an inmate here, Warren Lee Hill, is on hold," Lohr says. "Also, more legal challenges are expected on this issue across the country."

©2013 NPR

NORTHEAST FLORIDA'S NEWS & OPINION MAGAZINE

CONTACT US | ADVERTISE | LOG IN | ARCHIVE | NEWSLETTER


ADVANCED



NEWS

# Drug Shortages  Could Kill Lethal Injections

*Court challenges say substitutes don't meet constitutional protections against inflicting unneeded pain and suffering*

By Ron Word
Posted 12/4/13

NEWS
Fast-tracking Executions

NEWS
Life After Death Row?

For more than a dozen years, the state of Florida executed condemned inmates with a three-drug cocktail that first put them to sleep, then paralyzed their bodies and eventually stopped their hearts.

Now, the state is at another crossroads in implementing that protocol because one drug, pentobarbital, is no longer available from any source. Florida Department of Corrections switched to that drug in 2011 when sodium thiopental became scarce. The pentobarbital and sodium thiopental are designed to render inmates unconscious.

The same issue arose in the 31 other states that use lethal injection, when foreign suppliers refused to sell drugs for use in executions. Most of the problems have occurred since 2008, when the U.S. Supreme Court ruled that Kentucky's lethal injection method was constitutional.

Two death row inmates argued that Kentucky's three-drug lethal injection method would violate the

Eighth Amendment prohibition of cruel and unusual punishment. By a 7-2 vote, the Supreme Court upheld Kentucky's method, which used the same drugs that almost all states used for lethal injections.

However, now that some of the chemicals have changed, some states, including Florida, are looking for new drugs that pass constitutional muster.

"States started panicking," said Deborah Denno, a Fordham University law professor and expert on the death penalty.

Hikma Pharmaceuticals PLC issued a press release out of London on May 15, which stated, "Hikma strongly objects to the use of any of its products in capital punishment. The company is putting in place concrete steps to restrict the supply of its products for unintended uses." The release continues, stating Hikma had ceased the sale of phenobarbital to U.S. departments of corrections.

Because of decisions made by foreign companies to forbid use of their drugs for executions, states are scrambling to come up with alternatives, which is prompting a new round of legal challenges, including one in federal court in Jacksonville from four death row inmates.

Florida switched to midazolam hydrochloride when it could no longer get pentobarbital for its three-drug cocktail on Oct. 15. When the state Department of Corrections abandoned the electric chair and first began using lethal injection in 2000, it used the same drugs as other states, including Texas and Oklahoma.

"Midazolam is not intended for use as an anesthetic," the federal lawsuit states. "Its use in this context is wholly untested."

U.S. District Court Judges Marcia Morales Howard and Timothy J. Corrigan in Jacksonville tossed out the federal challenge, but granted the inmates 60 days to file new briefs and gave the attorney general's office 30 days to respond.

Corrigan questioned the lack of medical evidence statements from both sides. Assistant Attorney General Scott Brown argued that the new drug was effective.

"If it's so great, why weren't they using it before?" Corrigan asked, as reported by the Associated Press.

In a letter to Gov. Rick Scott, Department of Corrections Secretary Michael D. Crews wrote, "The procedure has been reviewed and is compatible with evolving standards of decency that mark the progress of a maturing society, the concepts of the dignity of man, and advances in science, research, pharmacology and technology. The process will not involve unnecessary lingering or the unnecessary or wanton infliction of pain and suffering. The foremost objective of the lethal injection process is a humane and dignified death."

According to the Mayo Clinic website, the drug "is used to produce sleepiness or drowsiness and to relieve anxiety before surgery or certain procedures." It belongs to a group of medicines called central nervous system depressants, which slow down the nervous system.

"Florida used a drug that no state had ever used before," Denno said. "That execution did not go well."

Denno was referring to the Oct. 15 execution of William Happ, who had been on Death Row for 27 years. Reporters witnessing the execution said it appeared Happ remained conscious longer and made more body movements after losing consciousness than other people executed recently by lethal injection using the old formula.

One of the inmates challenging the new drugs is Etheria Verdel Jackson, who was sentenced to death for the Dec. 3, 1985, strangulation and stabbing death of 64-year-old Jacksonville furniture storeowner Linton Moody.

Richard Dieter, executive director of the Death Penalty Information Center in Washington, said the legal challenges may slow some Florida executions, though a new state law has increased the number from three last year to seven this year.

"There are challenges working their way through the courts which could be a roadblock," Dieter said. "Florida has gone off course with this drug."

For states, the problem is how to carry out an execution that's quick, effective and meets constitutional standards by not inflicting unneeded pain and suffering.

Mark Elliott, executive director of Floridians for Alternatives to the Death Penalty in Tampa, opposes all

| Thursday | Dec 5 |
|---|---|
| **Job Fair** University Center (Universi... | 3:00 pm |
| **Open Mic** Trade Winds Lounge | 5:00 pm |
| **Sound Effects: Music at MOCA** MOCA - Museum of Conte... | 5:00 pm |
| **Friday** | **Dec 6** |
| **Saturday** | **Dec 7** |

Exhibit 2, Attachment A
12/5/2013
EXHIBIT 4

executions.

"There is no humane way to commit an inhumane act, no right way to do the wrong thing," Elliott wrote in an email.

"Florida executions are political 'dog and pony' shows designed to appear as approved medical procedures. The reality is that the executioner is paid $150 to kill, and the state will find a way to do it," he continued.

"Our state officials like to claim it is 'humane,' 'dignified' and 'solemn.' It is none of that. It is legalized, premeditated murder."

An inmate who faces execution Dec. 27, Askari Muhammad, also known as Thomas Knight, lost an appeal Nov. 25 when Bradford County Circuit Judge Phyllis Rosier ruled the sedative midazolam hydrochloride is capable of preventing condemned inmates from experiencing pain during a lethal injection.

"There is no dispute that the dosage amount used in Florida's protocol is such that it would induce not only unconsciousness when properly administered, but also respiratory arrest and ultimately death," she wrote.

Knight's execution was originally scheduled for Dec. 3 but was delayed by the Florida Supreme Court. The case now goes back to the high court, which is scheduled to hear oral arguments Dec. 18.

Knight, 62, has been on Death Row for almost 40 years. He was convicted of fatally stabbing Corrections Officer Richard Burke with the sharpened end of a spoon in 1980. Knight was first convicted in the 1974 slaying of Sydney and Lillian Gans in Miami.

There are problems in other states where changes in lethal injection protocols have resulted in new legal challenges, Denno said.

Since 2010, 11 states have changed their protocols from three drugs to one drug, Denno said, while Florida continues to use three drugs.

"They have a very problematic procedure," Denno said of Florida's protocol.

The Missouri execution of white supremacist Joseph Paul Franklin was delayed for several hours Nov. 20 while his attorneys pressed their appeals, including the use of pentobarbital. His attorneys argued that its use would violate the constitutional ban on cruel and unusual punishment.

Missouri had planned to use the drug propofol, the surgical anesthetic made infamous by the death of pop star Michael Jackson. But there were concerns that European Union might halt shipments, leading to fears there would be an insufficient supply for medical purposes.

Missouri decided to use pentobarbital created by an unnamed compounding pharmacy, prompting Franklin's lawyers to argue it would raise the risk of contamination and a painful death.

Both Dieter and Denno believe new issues will continue to appear and be appealed as the death penalty becomes less popular.

"Death penalty opponents and medical professionals have long objected to lethal injection on the basis that the use of drugs to carry out executions links death to the practice of medicine," Denno wrote in an article to be published in 2014 in the Georgetown Law Journal. "Ironically, that reliance on drugs may end up accomplishing what countless legal challenges could not: Drug shortages have devastated this country's execution process to an unparalleled degree. Rather than masking the 'machinery of death,' the mimicry of medicine may end up dismantling it."

PRINT     EMAIL     Tweet                    0                    Share

TAGS: LETHAL INJECTION, DEATH PENALTY, RICK SCOTT, DEBORAH DENNO, MIDAZOLAM, DEATH ROW

## Other stories that might interest you

**Too Sexy for My Neighborhood**
Community members don't want sex shops, but ...

**Thank You Notes**
Folks in Northeast Florida find many reasons to be ...

**An Open Question**
Drinking in public spaces is allowed on certain ...

NO COMMENTS ON THIS STORY  |  ADD YOUR COMMENT

Exhibit 2, Attachment A
12/3/2013
EXHIBIT 2



MENU

# Helping pharmaceutical companies stop their medicines being used to kill

In the last three years the landscape of capital punishment in the United States has changed dramatically, largely as a result of action by responsible pharmaceutical companies and their investors.

In this time, the vast majority of affected drug manufacturers have acted to prevent their products being sold to prisons for use in executions by lethal injection (the method used by all states which retain the death penalty).

Manufacturer action on execution drugs

Because the drugs used in these executions were not designed to cause deadly harm and are administered in experimental dosages they are frequently botched, with recent examples including the disastrous executions of Dennis McGuire in Ohio, Clayton Lockett in Oklahoma, and Joseph Wood in Arizona.

Since 2011 more than a dozen pharmaceutical manufacturers ~~have~~ misuse of me~~dicines, often after close consultation~~

More stories

Mohsen Aboassy

DEATH PENALTY

Andy Tsege
Father from London kidnapped and held in secret detention

DEATH PENALTY

Abdul Basit
Paralyzed man facing hanging in Pakistan

DRONE STRIKES

Nabila and the Rehman family
Strike targeted grandmother and children

LETHAL INJECTION

The SLIP story

GUANTÁNAMO BAY

Nabil Hadjarab

By continuing to use the site, you agree to the use of cookies. more information    Accept

with informed and engaged investors. These companies have put controls in place to stop their drugs being sold to death rows, and these controls have been so effective that states are no longer able to purchase 'traditional' execution drugs. This has led a number to stop executing prisoners.

Huffington Post – Lethal injection drug shortage becomes more acute

Other states, however, are turning to experimental new execution drug 'cocktails', which rely on medicines produced by a handful of manufacturers which do not yet restrict sales of drugs to prisons for use in executions.

NPR: Lacking lethal injection drugs, states find untested backups

The risks for pharmaceutical companies

As the only manufacturers without distribution controls in place, pharmaceutical companies in this ever-smaller group risk becoming US states' 'go-to' suppliers of execution drugs – leaving them exposed to a range of commercial risks. Association with executions can be extremely damaging to corporate reputations, as demonstrated by media coverage of botched lethal injections in Ohio, Oklahoma, and Arizona.

Companies can be served with costly litigation, as in the case of Hospira, which is currently being sued by the family of a prisoner executed in Ohio. And companies associated with capital punishment are viewed increasingly warily by mainstream funds as well as ethical portfolios. Drug maker Mylan takes $70 million hit in battle over lethal injection

What can pharmaceutical manufacturers do?

Today, manufacturers can benefit from the experience

EXHIBIT 5

of several companies which have acted decisively to prevent their drugs being sold to prisons for use in executions.

These companies have designed and implemented restricted distribution systems which have proven to be effective at preventing abuse of medicines in executions. Such systems maintain access for legitimate medical users, while preventing drugs being sold to third parties which could sell them on to prisons for use in executions.

There are a number of models manufacturers can follow to achieve this outcome, which can be adapted to suit the drug in question's current distribution model and intended patient population. For two examples of successful distribution systems, click the link below. How manufacturers can prevent the sale of their drugs for use in executions

Reprieve has advised a number of global pharmaceutical manufacturers on implementing such controls in a way that suits their business model and preserves patient access. Reprieve continues to provide such support for any company that requires it on a confidential basis.

Any company seeking discreet, confidential advice should contact Maya Foa at maya.foa@reprieve.org.uk.



# Press Releases

## Second US state plans execution using 'DIY drugs'

November 13, 2012

South Dakota is joined by Pennsylvania, now the second state set to kill a prisoner using so-called 'DIY drugs' – produced in a compounding pharmacy of the same type thought to be responsible for the recent meningitis outbreak in the US.

## South Dakota covers up source of 'DIY' death penalty drugs ahead of execution

October 30, 2012

Prison authorities in South Dakota are refusing to release information on contaminated drugs made to order for an execution tonight (Tuesday 30 October).

## South Dakota carries out execution using contaminated compounded drugs

October 17, 2012

A prisoner who died this week in a potentially botched lethal injection was killed using drugs from a compounding pharmacy, it has emerged.

Read more

# Donate now

→

# Join our mailing list

→

# Take action

→

Death Penalty
Lethal Injection
Torture
Guantánamo Bay
Drones
Secret Prisons

Home
About
Press
Newsletter

Reprieve
PO Box 72054
London EC3P 3BZ

020 7553 8140

info@reprieve.org.uk

EXHIBIT 5



DJIA ▲ 18405.43  0.61% U.S. 10 Yr ▲ 5/32 Yield  1.636% Euro ▲ 1.1200  0.14%

Subscribe | Sign In

U.S.

# Drug Halt Hinders Executions in the U.S.

By NATHAN KOPPEL

Updated Jan. 22, 2011 12:01 a.m. ET

The sole U.S. maker of a key drug used in lethal injections halted its production amid a broad global campaign by opponents of the death penalty, a decision likely to cause a substantial delay in many executions across the country.

Journal Community

ENLARGE



This November 2005 photo shows the death chamber at the Southern Ohio Corrections Facility. Associated Press

The move by Hospira Inc. came after months of pressure by activists through a new campaign aimed at pressuring pharmaceutical companies whose products are used in lethal injections. The final decision came in the face of opposition from government figures in Italy, whose constitution prohibits the death penalty, after Hospira announced plans to shift production of the drug to a plant in Italy.

"We worried that if a drug made in Italy ended up in a lethal injection, it would put our facility and our employees at risk of liability," said Thomas Moore, president, U.S. region, of the Lake Forest, Ill., company.

The drug, sodium thiopental, is an anesthetic typically used to render a condemned inmate unconscious before other lethal drugs, including a paralytic agent, are administered. Lethal injection is the sole or primary execution method in the 35 states that carry out the death penalty.

### Previously

Law Blog: FDA Takes Stance on Lethal-Injection Drug (1/4/11)
Law Blog: A Death-Penalty First (12/17/10)
U.K. Limits Execution Drug's Export (11/30/10)
Animal Drug Clear for Okla. Executions (11/22/10)

Originally designed for a wide range of uses, including surgeries, sodium thiopental had become more associated with the executions as other anesthetics supplanted it.

EXHIBIT 6

Societies are judged based on how they treat their least desirable citizens. If our response is to kill those we cannot "deal" with, or understand, we stand up as a pathetic society.

*—Barack Goldwater*

Hospira has tried to distance itself from that association, even telling prison officials it opposed its use in the procedures.

Now that it has halted production altogether, experts said, states have few immediate alternatives. There are 3,261 inmates on death row in the U.S., according to the NAACP Legal Defense and Educational Fund.

"There is no quick fix in place for departments of corrections," said Deborah Denno, a death-penalty expert at Fordham University Law School in New York. "There will be more delays in the death penalty after such a major [drug] provider has backed out of the market."

A number of states, including Arizona, California, Kentucky and Tennessee, already had been struggling with a shortage of supply in sodium thiopental after Hospira halted production in 2009 because of manufacturing issues in a North Carolina plant. Until Friday, the company had planned to resume production early this year at a company plant in Liscate, Italy.

Texas, which leads the nation in executions, has enough sodium thiopental to cover two scheduled executions in February, according to Michelle Lyons, a spokeswoman for the Texas Department of Criminal Justice. But it will have to obtain an additional supply to carry out a lethal injection scheduled for May, she said.

ENLARGE



## Death Watch
### Number of executions in the U.S. since 1976

Executions by method used
SINCE 1976

| Method | Count |
|---|---|
| Lethal injection | 1,063 |
| Electrocution | 157 |
| Gas chamber | 11 |
| Hanging | 3 |
| Firing squad | 3 |
| Total number of executions | 1,237 |

Preliminary
Updated Jan. 14

Source: Death Penalty Information Center

Kent Cattani, an attorney with the Arizona Attorney General's Office, said the legal wrangling and publicity surrounding the sodium thiopental shortage have led to delays in a death-penalty process already burdened with problems. Arizona has obtained two shipments from the U.K. and likely has a sufficient supply to carry it through 2014, he said, but added that states could have to turn to other drugs or "other viable alternatives, like a firing squad."

Prison officials now will have no choice but to find overseas suppliers of sodium thiopental. But a growing number of lawyers, judges, and government officials on both sides of the Atlantic have already started to question whether it is legal to ship the drug from overseas.

Some states might also decide to use a substitute anesthetic but that would almost surely require court or legislative approval, according to legal experts. Late last year, a drug used to euthanize animals was approved for executions in Oklahoma, but the state was engaged in court battles for months.

Some officials were hesitant to predict what the impact would be of Hospira's decision. "We will

EXHIBIT 6

look at things and take the necessary time to review our options," said Dorinda Carter, a spokeswoman for the Tennessee Department of Corrections.

Lethal injection has been used in most of the 1,237 executions that have occurred in the United States since the Supreme Court allowed executions to resume in 1976 after a suspension.



Death chambers like the one at San Quentin State Prison in California could be dormant while states seek solutions to the shortage of a key drug. Associated Press

Thiopental is little more than a revenue rounding error for Hospira, which spun off from Abbott Labs in 2004 and is the world's largest manufacturer of generic injectable drugs. In 2009, thiopental generated about $6 million in U.S. sales, less than 0.25% of Hospira's total drugs sales that year, said a Hospira spokeswoman.

The thiopental shortage has prompted unprecedented scrutiny of the companies that make and distribute execution drugs. Court filings, for example, have revealed the names of thiopental makers and suppliers in Europe that distributed thiopental to prisons in Arizona and California, disclosures that have touched off protests by human rights advocates in Europe.

In November, a U.K. nonprofit called Reprieve, which lobbies against the death penalty, filed a lawsuit in London challenging overseas thiopental shipments. Shortly after the U.K. announced plans to ban thiopental exports to prisons to underscore its "moral opposition to the death penalty."

EXHIBIT 6

The European Commission is considering a European Union-wide ban on the export of execution drugs, according to London lawyers.

Executions in many states could be delayed after the lone maker of a key drug used in lethal injections has decided to permanently halt its production. WSJ's Nathan Koppel has the latest in an interview with Simon Constable.

Clive Stafford Smith, the head of Reprieve, also sent a letter to Sandoz, a unit of Novartis AG, saying that it appeared Sandoz-manufactured thiopental had been sent to U.S. prisons.

Jeff George, the head of Sandoz, said in an interview that he was unaware of the issue, and "ticked off" to hear about it. Sandoz makes thiopental because it is an important anesthetic, and a treatment for certain kinds of epilepsy, he said. "Capital punishment certainly is not an approved indication for this product," he said. Mr. George said Sandoz does not sell the drug directly to U.S. buyers and has asked its subsidiaries not to sell the drug to third parties who might, in turn, distribute it to the U.S.

Despite its recent notoriety, thiopental has been used as a surgical anesthetic for more than 70 years.

It has been largely supplanted in recent years by a newer, more effective anesthetics, doctors said.

It steadily grew in prominence in the criminal-justice world, however, since the late 1970s when Oklahoma became the first state to decide to use it for executions.

Death-penalty opponents, Mr. Smith said, now have a powerful new weapon in their quiver: identifying and pressuring pharmaceutical companies that supply execution drugs to prisons.

"I've yet to find any pharmaceutical company that says their corporate ethos is to go around and kill people," he said. "I've been doing [death-penalty] work for 26 years," he added. "I can't believe it just occurred to me to target drug companies."

Write to Nathan Koppel at nathan.koppel@wsj.com



Show More Archives

## POPULAR ON WSJ

## Most Popular Videos

EXHIBIT 6

1. Scientists Reveal Biblical Text From Ancient Scroll

2. Witness Recounts Man Being Shot at Charlotte Protest

3. State of Emergency Declared in Charlotte, N.C.

4. 2016 MacArthur Genius Grant Fellows in Science

5. And the Title of World's Best University Goes to…

## Most Popular Articles

1. Oxford Tops List of World's Best Universities

2. Clinton Leads Trump by 6 Points in New WSJ/NBC Poll

3. 'Pokémon Go' Ends Its Reign at No. 1

4. One Person Shot as Charlotte Protests Continue

5. Opinion: Party Loyalty Can't Make Me Vote for Clinton

TOP

Edition: U.S.
Text Size: Small
Subscribe NowSign In

WSJ Membership BenefitsDownload WSJ AppsCustomer CenterLegal Policies

Subscribe | Sign In

EXHIBIT 6

n   m   v   w   y

Privacy Policy
Cookie Policy
Copyright Policy
Data Policy
Subscriber Agreement & Terms of Use
Your Ad Choices
Copyright ©2016 Dow Jones & Company, Inc. All Rights Reserved.

EXHIBIT 6

http://www.wsj.com/articles/SB10001424052748704754304576093980790129692[9/22/2016 1:59:28 PM]

# TIME

Subscribe

NATIONAL

# The Hidden Hand Squeezing Texas' Supply of Execution Drugs

After lobbying by human-rights groups, European drug companies are increasingly unwilling to supply U.S. states with lethal medicine

By Josh Sanburn @joshsanburn    Aug. 07, 2013

   Read Later

By September, Texas will run out of the sole drug it uses in lethal injections thanks in part to an overseas effort that has persuaded a European pharmaceutical company to halt its supply to U.S. states for use in executions.

The Texas Department of Criminal Justice announced last week that the state's supply of pentobarbital — the sedative used in the lethal injections of its death-row inmates — would expire in September. Pentobarbital has become the most common drug in lethal injections in the U.S. Of the 23 executions this year, 22 of them used pentobarbital by itself or in combination with other drugs.

PAUL BUCK / EPA

The death chamber inside the Huntsville Unit in Huntsville, Texas, seen in 2000

**Email        Print        Share**

**Follow @TIME**

Texas is facing a depleted supply after a Danish drugmaker announced two years ago that it would no longer supply the drug for use in executions, thanks in part to pressure from multiple groups in Europe that have unexpectedly thrown up obstacles to U.S. states carrying out the death penalty.

In early 2011, Danish drugmaker Lundbeck, which at that time manufactured pentobarbital (sold under the name Nembutal), discovered that U.S. states were using its product in lethal injections. The complex international distribution networks of pharmaceuticals often make it difficult for manufacturers to know exactly where their products end up. But once pentobarbital's use in U.S. executions came to light, many in Denmark were upset that medicine made in a country that abolished the death penalty decades ago was being used for ending lives rather than saving them.

(**MORE:** Werner Herzog Dives Into the Abyss of the American Death-Penalty System)

By spring 2011, Danish newspapers were regularly publishing stories about pentobarbital's use as several human-rights organizations, including Amnesty International and U.K.-based Reprieve, issued press releases to highlight each new execution that used drugs made by Lundbeck. In June 2011, Dr. David Nicholl — a neurologist and human-rights activist — wrote an open letter to Ulf Wiinberg, the chief executive of Lundbeck. The letter, signed by more than 60 other doctors and academics urging the company to halt its U.S. supply, was published in the medical journal the *Lancet*.

EXHIBIT 7

"As clinicians and prescribers of Lundbeck's products, we are appalled at the inaction of Lundbeck to prevent the supply of their drug, Nembutal [pentobarbital], for use in executions in the USA," the letter stated. "Pentobarbital is rapidly proving to be the drug of choice for U.S. executions. Lundbeck should restrict distribution of pentobarbital to legitimate users ... but not to executioners."

Three weeks later, Lundbeck said it would no longer allow the drug to be used in U.S. executions and began reviewing all orders of the drug and denying U.S. prisons looking to order it. Now, states like Texas, Georgia and Missouri are grappling with how to continue their planned executions without their go-to drug.

"When I first approached this issue, I thought it would never work," says Nicholl, referring to the decision to apply pressure to drugmakers supplying states carrying out executions. "But our efforts have turned out to be quite effective. I don't think the pharmaceutical companies realized the bad p.r. that it was going to lead them to."

To halt its supply, Lundbeck worked with human-rights group Reprieve to simplify its distribution model, essentially taking out middlemen so the company could more easily identify who ended up with its products. Maya Foa, deputy director of Reprieve's death-penalty team, says her organization's goal isn't to end capital punishment in the U.S. but merely to get pharmaceutical companies to follow the Hippocratic oath to do no harm.

"Their reason to be is to make medicine to save lives," Foa says.

The struggle to obtain pentobarbital is the latest in a series of problems that have dogged lethal injection. In 2009, Hospira Inc., a drugmaker headquartered in Lake Forest, Ill., stopped making sodium thiopental, a general anesthetic often used in a three-drug method of lethal injection. That forced many states to look overseas, but both the U.K. and the E.U. blocked their own manufacturers from supplying it to the U.S. for executions.

(**MORE:** Articles of Faith: Is the Death Penalty in Keeping With Catholic Doctrine?)

The obstacles to getting sodium thiopental pushed states to rely even further on pentobarbital — but now it appears that states like Texas will once again have to find another drug to take its place. There are no generic versions of the drug, and the alternatives available have yet to be either tested or used in lethal injections.

John Hurt, the director of public information for the Texas Department of Criminal Justice, says the state is considering finding another supplier of pentobarbital, a different drug altogether or possibly working with a compounding pharmacy that could create the drug specifically for the state's executions. (Texas, which has executed 503 inmates since 1982, more than any other state by far, has two executions scheduled in September, two more in October and one in November.)

It's unclear where Texas would find another supplier. In December 2011, Lundbeck sold the rights to pentobarbital to Illinois-based Akorn Inc. The new company, however, signed an agreement saying it would follow the same distribution restrictions as Lundbeck.

Texas could turn to a compounding pharmacy, but according to the Death Penalty Information Center, those providers don't face oversight from the Food and Drug Administration. That often leads to questions about the drugs' safety and its intended effects of being a more humane alternative of execution.

EXHIBIT 7

"Compounding pharmacies are the underbelly of the industry," says Maurie Levin, who has represented death-sentence inmates for 20 years, referring to a sector of the pharmaceutical industry that often goes under the radar of federal and state regulators.

Hurt says the most likely scenario is that Texas will simply find another drug to replace pentobarbital, and he cites Missouri's intention to switch to the general anesthetic propofol, which gained notoriety when an overdose of the drug was blamed for singer Michael Jackson's death. But last year, German drug manufacturer Fresenius Kabi announced last year that it too would no longer sell the drug to states for executions, shifting its distribution with help from Reprieve.

The best hope for states like Texas is that a domestic manufacturer would agree to make drugs like propofol or pentobarbital, far from a continent that has largely done away with the death penalty. But it should be no surprise that pharmaceutical companies aren't racing to distribute drugs that are often associated more with death than life.

**MORE:** A Brief History of Lethal Injection

*Correction: An earlier version of this story stated that Fresenius Kabi is the only supplier of propofol in the U.S. Hospira and Teva Pharmaceuticals restarted manufacturing and selling the drug earlier this year.*

**Josh Sanburn** @joshsanburn

Josh Sanburn is a Time.com writer.

## Most Popular

**FROM U.S.**

1   Costly Flight Hours

2   The Navy SEALS' Dying Words

3   You're a SEAL Stranded in Hostile Territory: What's in Your Survival Kit?

4   The Surveillance Society

5   From Messiah to Hitler, What You Can and Cannot Name Your Child

**FROM TIME.COM**

1   Russian Forces Double Along Ukraine Border

## POPULAR AMONG SUBSCRIBERS    SUBSCRIBE

🔒 **Japan's Booming Sex Niche: Elder Porn**



🔒 **Young Kids, Old Bodies**



🔒 **Benedict Cumberbatch Talks Secrets, Leaks, and Sherlock**



🔒 **Obama's Trauma Team**

EXHIBIT 7



**2**    Gangs of 'Powerfully Built' Women Are Mugging Tourists on the Streets of Hong Kong

**3**    Putin Phones Obama To Discuss Ukraine, White House Says

**4**    Colbert Tweet Draws Accusations of Racism and #CancelColbert

**5**    There's A Scientific Reason for Why You Look Weird In Selfies

**Get all access to digital and print** SUBSCRIBE

## CONNECT WITH TIME



© 2016 Time Inc. All rights reserved.

DJIA ▲ 18407.82  0.62%  U.S. 10 Yr ▲  5/32 Yield  1.634%  Euro ▲  1.1203  0.17%

Subscribe │ Sign In



PHARMALOT

# Mylan Faces Investor Pressure Over a Drug to be Used for Executions

By ED SILVERMAN

Oct 21, 2014 2:05 pm ET

💬 0 COMMENTS

Mylan Laboratories is now the latest target of an advocacy group urging investors to sell their holdings in drug makers whose medicines could be used in executions by U.S. prisons.



*ERIC KAYNE FOR THE WALL STREET JOURNAL*

Reprieve, an advocacy group based in the U.K., is pressing investors to sell their holdings in Mylan. Why? The drug maker is the only U.S.-approved producer of a medicine known as rocuronium bromide, a paralyzing agent used in surgeries. But Mylan has allegedly not taken steps to prevent its use in executions.

For instance, the Alabama Department of Corrections reportedly plans to use the drug in a cocktail for executions. In response, DJE Kapital, an investment firm based in Pullach, Germany, recently sold about $60 million in Mylan holdings, a DJE Kapital spokeswoman writes us. The sale was first reported by The Financial Times.

EXHIBIT 8

As the paper notes, Alabama and other U.S. states have been forced to suspend executions in recent months because of a shortage of effective drugs and controversies over a series of executions that went awry. In one instance, a prisoner in Oklahoma died 43 minutes after medicines were administered.

A Mylan spokeswoman writes us that the drug maker "dedicated to upholding the highest standards of quality and integrity" and only distributed products "through legally compliant channels, intended for prescription by healthcare providers consistent with approved labelling." She did not respond to a question about what, if any, steps Mylan may take to restrict the use of its medicine for executions.

Over the past few years, more than a dozen drug makers have agreed to restrict the supply and use of their medicines for executions, including Fresenius, Hospira, Hikma, Lundbeck and Teva Pharmaceuticals. Their decisions have, in turn, made it more difficult for authorities in different states to use medicines for executions.

As The Birmingham News notes, Alabama has not carried out an execution for more than a year because of drug shortages but the state's attorney general last month asked its Supreme Court to set execution dates for nine prisoners after adopting a new cocktail of three medicines that includes the Mylan drug. We asked the department for comment and we were referred to the state attorney general. A spokeswoman for the attorney general declined to comment.

In a letter sent to Mylan, Reprieve wrote that "there is a very real risk that Mylan will become the go-to provider of execution drugs across the country. There are simple and effective controls that a company like Mylan can put in place to ensure its medicines are sold for legitimate medical purposes, and not sold to prisons for use in lethal injections."

In an e-mail, Reprieve director Maya Foa writes us that "more and more companies are putting controls in place to protect their medicines from misuse in lethal injection executions." But with other states, including Alabama, "now announcing their intention to use the paralytic agent in their execution protocols, Mylan's product is increasingly at risk of being sold for use in lethal injections."

She adds that "we are engaging" Mylan, but she was not more specific.

EXHIBIT 8

Share this: http://on.wsj.com/1ny889O

EXECUTIONS   FRESENIUS   HIKMA   HOSPIRA   LETHAL INJECTIONS

LUNDBECK   MYLAN LABORATORIES   TEVA PHARMACEUTICALS

‹ PREVIOUS

Vertex Faces a Litmus
Test for its Cystic Fibrosis
Combo Treatment

NEXT ›

Parkinson's Drugs Need
Warnings About
Compulsive Behaviors:
Study






## Editors' Picks



CAPITAL ACCOUNT

EXHIBIT 8



| DJIA | 18286.00 | -0.58% | U.S. 10 Yr | 2/32 Yield | 1.615% | Euro | 1.1232 | 0.21% |

PHARMALOT

# Akorn Takes Steps to Prohibit its Drugs From Being Used for Executions

By ED SILVERMAN

Mar 4, 2015 1:34 pm ET

💬 0 COMMENTS

Yet another drug maker is taking steps to ensure its medicines are not used for executions. Akorn Pharmaceuticals, which earlier this year stopped taking orders from prisons, is now requiring that its wholesalers agree to keep its medicines out of correctional institutions.



*ERIC KAYNE FOR THE WALL STREET JOURNAL*

As part of its effort, the drug makers sent letters about its policies to attorneys general and correction departments in states that currently execute inmates or have death row prisoners. Akron is also seeking the return of any of its medicines that may have been "inappropriately" purchased for executions, according to a statement.

The move comes after Akorn was targeted by Reprieve, an advocacy group in the U.K., for allowing its medicines to be used for executions. And the Death Penalty Information Center noted that midazolam and hydromorphone hydrochloride, the two drugs that Akorn is

EXHIBIT 9

restricting, have been used by some states for executions. [UPDATE: We should also note that New York State Comptroller Thomas DiNapoli last fall had issued a shareholder resolution asking Akorn to issue a report about its policy].

"We have been in consultation with a number of shareholders and external stakeholders to develop and formalize the policy covering midazolam and hydromorphone which publicly aligns us with a number of our peers," says an Akorn spokesman. The drug maker sent this letter to DiNapoli.

Akorn is only the latest drug maker to make such a move in the face of growing controversy over the use of prescription medicines for executions. Over the past few years, several others – including Hospira, Fresenius Kabi and Lundbeck – have made similar commitments.

Last fall, Reprieve began urging investors to sell shares in drug makers that allow their medicines to be used for executions and, in particular, targeted Mylan Laboratories for not taking steps to ensure one of its drug is not used for this purpose. DiNapoli filed a similar shareholder request with Mylan.

A Mylan spokeswoman says its drugs are sold through "legally compliant channels, intended for prescription by health care providers with approved labeling and applicable medical standards of care." Its rocuronium bromide is made by a third party in India but is not marketed for use in lethal injections, and is not distributed directly to prisons. She adds Mylan is not aware of the drug being used for executions.

As more drug makers prohibit the use of their medicines for executions, though, officials in some states have looked elsewhere for medicines. Georgia, for instance, reportedly purchases pentobarbital from a compound pharmacy. However, the state had to postpone a pair of executions this week because its supply became 'cloudy,' according to reports.

Share this: http://on.wsj.com/1aLBiNv

AKORN PHARMACEUTICALS    DEATH PENALTY    DEATH ROW    EXECUTIONS

FRESENIUS KABI    HOSPIRA    LETHAL INJECTIONS    LUNDBECK

MYLAN LABORATORIES    REPRIEVE

‹ PREVIOUS    NEXT ›

EXHIBIT 9

A University's Clinical
Trial Oversight Practices
are Skewered





Pharmalot, Pharmalittle:
We're Reading About
AbbVie, Bristol-Myers
and Much More!!



## Editors' Picks



IN DEPTH

An Era in Hong Kong Is Ending, Thanks
to China's Tight Embrace

EXHIBIT 9



MIDDLE EAST

Kingdom Comedown: Falling Oil Prices
Shock Saudi Middle Class ⚷



MARKETS

Wall Street Bonus Outlook: Blah, Except
for Techies ⚷



PERSONAL TECHNOLOGY: REVIEW

iOS 10 Lock Screen: Battling Apple's
Frustrating Change

EXHIBIT 9



THE NUMBERS

Congress Gives Itself Extra Time, Then Asks: What's the Rush? 🔑



A-HED

At 13 Pounds, This Novel is Bound to Be the Season's Biggest



BUSINESS

De Beers Bets Big on Canadian Mine 🔑



ARTS & ENTERTAINMENT

The Magnificent Seven: A Western for a New Generation?

EXHIBIT 9

## POPULAR ON WSJ

## Most Popular Videos

1.   Great Wall of China Repairs Provoke Outrage 

2.   Best Moments in Presidential Debate History 

3.   Police Release Footage of Deadly Tulsa Shooting 

4.   Fix iOS 10's Frustrating Lock Screen 

5.   Clinton's 'Funny or Die' Bid for Millennials 

## Most Popular Articles

1.   Hillary Clinton Proposes 65% Top Rate for Estate Tax ⊶ 

2.   Facebook Overestimated Key Video Metric for Two Years ⊶ 

3.   Kingdom Comedown: Falling Oil Prices Shock Saudi Middle Class ⊶ 

4.   Opinion: The Year of the Reticent Voter ⊶

5.   Yahoo Says Breach Affected at Least 500 Million Users ⊶ 



Edition: U.S.

Subscribe NowSign In
WSJ Membership BenefitsDownload WSJ AppsCustomer CenterLegal Policies

Subscribe | Sign In

n     m     v     w     y

Privacy Policy
Cookie Policy
Copyright Policy
Data Policy
Subscriber Agreement & Terms of Use
Your Ad Choices
Copyright ©2016 Dow Jones & Company, Inc. All Rights Reserved.

EXHIBIT 9



# Politics

| Search |

Home  Video  **Politics**  U.S.  Opinion  Entertainment  Tech  Science  Health  Travel  Lifestyle  World

STATES RIGHTS

# Texas refuses to give back lethal drugs, proceeds with execution



By **Barnini Chakraborty**  ·  Published October 09, 2013  ·  FoxNews.com



The gurney in the death chamber is shown in this May 27, 2008 file photo from Huntsville, Texas.  (AP)

WASHINGTON —  A Texas man convicted of killing his parents was executed as planned Wednesday night despite a growing controversy over the drug used to carry out the punishment.

Last week, state prison officials refused a request from the compounding pharmacy that created and sold Texas the pentobarbital — a single-dose drug used in executions — to return the drug.

Jasper Lovoi, owner of The Woodlands Compounding Pharma[cy]
the middle of a firestorm" of protesters, hate calls and press re[cords]



eight 2.5-gram doses of pentobarbital to the state for upcoming executions.

Lovoi says he had been promised anonymity by the state.

But Jason Clark, a spokesman for the Texas Department of Criminal Justice, said the department bought the drug vials legally and won't return them.

Clark said the state has enough vials to carry out scheduled executions for the remainder of the year.

Death penalty states like Texas, which has executed 505 people since 1981, have been turning to compounding pharmacies to purchase lethal doses of barbiturates used in executions.

The switch comes after the drugs' primary makers shut off supplies to states following pressure from anti-death penalty advocates.

Compounding pharmacies allow certified specialists to mix ingredients for medicine themselves and sell them. For example, if there is only an adult-dose of a particular drug available, compounding pharmacists can manipulate the active ingredients and change the dosage or strength.

However, the U.S. Food and Drug Administration does not vouch for the validity, safety or effectiveness of drugs made in compounding pharmacies.

Earlier this year, these new go-to drug dens came under scrutiny following a deadly meningitis outbreak that was linked to contaminated injections made at a Massachusetts compounding pharmacy.

In Texas, attorneys for Michael Yowell, 43, had hoped to get a last-minute stay for their client. But minutes before he was taken to the death chamber, the U.S. Supreme Court rejected a lawsuit he and two other condemned prisoners had brought seeking execution delays on grounds the pentobarbital could cause unconstitutional pain and suffering.

He was pronounced dead at 7:11pm CDT (8:11 ET) in Huntsville, Texas.

Yowell was convicted of killing his parents, Johnny and Carol Yowell, in 1998 and setting fire to their home in Lubbock, Texas. According to court records, Yowell told authorities he shot his father and then beat, strangled and killed his mother. He then blew up the house.

Yowell's grandmother, who lived with them, was killed though Yowell was not convicted in her death.

Last month, the House passed legislation aimed at regulating compounding pharmacies. The bill, which is now in the Senate, would create a national set of standards to track the distribution chain of pharmaceuticals. Proponents say the bill closes a pretty wide gap between state and federal oversight of compounding pharmacies. In the Massachusetts meningitis outbreak, 64 people died and more than 700 people got sick across 20 states from a bad batch of steroids produced at the New England Compounding Center.

Other states like South Dakota and Georgia have had similar problems with purchasing drugs directly through manufacturers.

Georgia's first use of an execution drug obtained through a compounding pharmacy was put on hold in July after the condemned inmate challenged a new state law that bars the release of information about where Georgia obtains its execution drug.

Separately, on Tuesday, the 5th Circuit Court of Appeals rejected a motion made by Yowell's attorneys who asked to supervise "every step of the execution process."

*The Associated Press contributed to this report.*



EXHIBIT 10

EXHIBIT 10



sign in      search                                    jobs    US edition ▾

home  ›  world    UK    europe    americas    asia    middle east    africa    australia    ci  ≡ all

**Capital punishment**

# Pfizer death penalty drug decision welcomed by activists but states fight on

- Pharmaceutical giant lands major blow on capital punishment states
- Expert: 'We still have tremendous concerns about the source of drugs'
- Pfizer blocks use of its drugs in lethal injections
- Pfizer ban raises fears of alternative execution methods

EXHIBIT 11



The lethal injection chamber of the South Dakota State Penitentiary. Photograph: Amber Hunt/AP

**Tom Dart in Houston**
@Tom_Dart
Saturday 14 May 2016 15.43 EDT



This article is **4 months old**

"You got your justice right here," the convicted child-killer Pablo Vasquez said as the lethal injection took effect. He grew dizzy, snorted, dropped his head to the pillow on the gurney and took his last breaths.

## Pfizer blocks its drugs from being used in lethal injections in prisons

Read more

When he died on 6 April at the state penitentiary near Houston, Vasquez became the sixth person executed by Texas this year. Eight more judicial killings are scheduled in 2016 in the nation's most prolific death penalty state, but how much longer this brand of justice will continue to be enacted in Texas and elsewhere in the US is an open question.

Growing opposition to capital punishment and the increasing logistical problems states face in carrying it out were underlined when it emerged on Friday that Pfizer, the largest pharmaceutical company on the planet, is imposing firmer controls to stop its products from being used in executions.

Opposition among major drug companies is so complete that no Food and Drug Administration-approved manufacturer is willing to let its wares be used in lethal injections, campaigners say.

Pfizer's bolstered stance is the latest victory for activists and attorneys whose pressure has built a Europe-led boycott that has left states scrambling to locate their preferred drugs and turning to experimental drug cocktails from dubious providers – if they are still able to carry out lethal injections at all.

Yet while opponents are delighted at what they see as a substantial victory, it is impossible to say what the precise impact will be. For years, state prison agencies have resorted to desperate and questionable measures to replenish supplies, aided by lawmakers who allow officials to cloak the process in secrecy.

The result is that the gravest act a state can perform on its citizens – killing them – is also among its most secretive functions. Fundamental details such as who is facilitating and participating in the executions, and the origin and quality of the drugs, are hidden from public view.

With so little information available about the suppliers and makeup of drugs such as the sedative that killed Vasquez, the past, present and future usage of drugs linked to Pfizer is not measurable. Did Texas buy its compounded pentobarbital last month? Last year? From within the state, elsewhere in the US, or abroad? From a legitimate or shady source? That information is a state secret.

> ## No medical groups want anything to do with this. There's already a strong argument that the death penalty is broken
>
> **Megan McCracken, University of California, Berkeley**

"It's hard to quantify what the effect is going to be," said Robert Dunham, executive director of the Death Penalty Information Center. "It's been getting progressively more difficult for states to obtain these medicines for executions and Pfizer's stricter policy isn't going to make it any easier.

"If the states are not able to obtain medicines to use in executions from the manufacturer, they will have to look to compounding pharmacies [which make bespoke prescriptions]," he said.

"That carries its own set of problems because the compounding pharmacies are less

EXHIBIT 11

well regulated and the American Pharmacists Association and the International Academy of Compounding Pharmacists have both adopted resolutions urging their members not to participate in lethal injections ... Experience has shown that there are very significant safety risks."

A compounding pharmacy in Oklahoma that sold drugs for executions in Missouri, for example, was found to have committed nearly 1,900 violations.

Texas argues that privacy is essential both to protect the safety of employees who may be subject to threats and to ensure the state can continue to locate drugs that allow it to carry out the law. In a continuing court case, attorneys for two executed prisoners contend threat claims are overblown and that the name of the provider whose product killed the inmates should be released under public records laws.

Even if the compounding pharmacy's identity is made public, the revelation would only show who was providing drugs before last September, when a new state law making supplier details confidential went into effect.

"We still have tremendous concerns about the source of the drugs and the fact there's no way to determine whether a drug being used to put people to death in the state actually comports with the US constitution," said Kristin Houle, executive director of the Texas Coalition to Abolish the Death Penalty.

### Why Texas county known for death sentences has given none in 2015

Read more

A spokesman for the Texas department of criminal justice did not respond to a request for comment about the agency's current efforts to source drugs and whether the Pfizer decision would have an effect.

The clearest way to deliver a lethal blow to the death penalty would be a US supreme court decision striking it down. In a 5-4 decision in 2015, though justices Sonia Sotomayor and Stephen Breyer wrote stinging dissents, the court upheld the use of midazolam despite its role in several botched executions which critics argued violated the constitutional ban on cruel and unusual punishment.

Polls suggest a majority of Americans still support the death penalty. But the cumulative force of a series of smaller victories, such as Pfizer's statement and legal battles waged in individual states, appears to be having a substantial effect. The trend is that fewer prisoners are being put to death in fewer states, and death rows are not being replenished. Even in Texas, prosecutors are seeking the ultimate sentence less frequently, often for pragmatic reasons.

Court challenges and practical issues mean executions are now rare or nonexistent even

in many states that technically still allow the death penalty. California, the most populous state, has not held an execution since 2006. Ohio announced last year that it was placing all executions on hold until at least 2017 because it could not obtain the required drugs.

According to the Death Penalty Information Center, five states have carried out 14 executions this year: Texas (six), Georgia (five), and Florida, Missouri and Alabama (one each). That tally is half the nationwide total from 2015, but currently only Texas has more executions scheduled this year: eight between June and October.

The impact of Pfizer's move is also tough to gauge because hardcore death penalty states have shown a willingness to get creative and to consider extreme options. That has included opening the door to alternative methods – last year Utah reintroduced firing squads as a backup.

In 2012, with the boycott biting, Texas turned from a three-drug protocol to one using only pentobarbital. The following year, it sourced supplies from a compounding pharmacy. In the past couple of years, it has appeared to struggle to find enough compounded pentobarbital to carry out its lengthy slate of lethal injections and has flirted with the idea of finding backups.

Last year, Texas and Arizona tried to import sodium thiopental illegally from a dubious and obscure operation in India. The shipments were stopped at American airports by the FDA because the drug is not authorised for use by humans in the US, BuzzFeed reported.

Still, last fall, Texas evidently felt secure enough in its stocks to dispatch three vials of pentobarbital to Virginia as a thank you for its help in sending drugs to the Lone Star state in 2013. Last month, Virginia governor Terry McAuliffe stopped at the last minute a move to reintroduce the electric chair, given the difficulty of obtaining execution drugs.



The firing squad execution chamber at the Utah state prison in Draper, Utah. Photograph: Trent Nelson/AP

## Virginia governor rejects plan to revive electric chair as main execution method

Read more

In 2014, the Colorado Independent revealed email exchanges about shortages between officials in Texas and Oklahoma, who joked that they might help in return for college football tickets – "sideline passes for Team Pentobarbital", as they put it.

In 2011, it emerged that Arizona had been importing drugs from a British wholesaler operating out of a west London driving school. Also that year, lawyers for a Texas death row inmate alleged that the state was using the name of a nonexistent hospital as a delivery address for drugs that were in fact destined for the death chamber.

Megan McCracken, of the Death Penalty Clinic at the University of California, Berkeley, School of Law, said the Pfizer announcement was "a sign of unity".

"We see now the pharmaceutical industry does not want its products used in executions," she said. "The medical field does not want to be involved in executions, the nursing field does not want to be involved in executions, the paramedic field does not want to be involved in executions. No medical groups want anything to do with this.

"There's already a strong argument that the death penalty is broken and it doesn't function as it is intended to function ... [Drug shortages are] one of a myriad problems."

EXHIBIT 11

More news

# Topics

Capital punishment  Texas  Pfizer  Pharmaceuticals industry

Reuse this content

# View all comments >

# popular

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| election 2016 | | | | | | | | |
| US | | | | | | | | |
| world | UK | europe | americas | asia | middle east | africa development | australia | cities |
| opinion | | | | | | | | |
| sports | soccer | MLS | NFL | MLB | NBA | NHL | | |
| soccer | live scores | tables | competitions | results | fixtures | clubs | | |
| tech | | | | | | | | |
| arts | movies | tv & radio | music | games | books | art & design | stage | classical |
| lifestyle | food | health & fitness | love & sex | family | women | home & garden | | |
| fashion | | | | | | | | |

EXHIBIT 11

business

economics   sustainable         diversity & equality in        small
            business            business                       business

travel       USA   europe   UK   skiing

environment  climate        wildlife   energy   pollution
             change

science

media

crosswords   blog   editor   quick   cryptic   prize   quiptic   genius   speedy   everyman
             azed

video

world  ›  capital punishment

Email address

- Facebook
- Twitter
- jobs
- guardian labs
- subscribe
- all topics
- all contributors
- solve technical issue
- about us
- contact us
- complaints & corrections
- terms & conditions

EXHIBIT 11

- privacy policy
- cookie policy
- securedrop

© 2016 Guardian News and Media Limited or its affiliated companies. All rights reserved.

EXHIBIT 11

# TEXAS DEPARTMENT OF PUBLIC SAFETY

5805 N LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001
512/424-2000
www.dps.texas.gov

STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
ROBERT J. BODISCH, SR.
CHERYL MacBRIDE
DEPUTY DIRECTORS



COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
MANNY FLORES
STEVEN P. MACH
RANDY WATSON

March 7, 2014

Mr. Brad Livingston
Executive Director
Texas Department of Criminal Justice
PO Box 99
Huntsville, Texas 77342-0099

Dear Director Livingston:

The purpose of this letter is to provide you the results of our assessment of threats including a terrorist threat, to pharmacies who have been publicly identified as providing controlled substances to corrections departments including, the Texas Department of Criminal Justice for the purpose of fulfilling its statutory obligation to execute prisoners.

It is our assessment that some of the threats made to the Woodlands Compounding Pharmacy that we identified should be taken seriously and we recommend that all threats received by the Woodlands Compounding Pharmacy be reported to law enforcement officials as soon as they receive them and that the employees receive training on the detection and reporting of suspicious activity.

Pharmacies by design are easily accessible to the public and present a soft target to violent attacks. It is our assessment that publicly linking a pharmacy or other drug supplier to the production of controlled substances to be used in executions presents a substantial threat of physical harm to the pharmacy, other drug supplier and its personnel and should be avoided to the greatest extent possible.

If you should like a detailed briefing of our assessment, please contact me at (512) 424-7771.

Sincerely,

Steven C. McCraw
Director



DEFENDANT'S
EXHIBIT
C 46

EXHIBIT 12

## AFFIDAVIT OF BRAD LIVINGSTON

STATE OF TEXAS                    §
                                  §
COUNTY OF WALKER                  §

Before me, the undersigned authority, personally appeared Brad Livingston, who, being by me duly sworn, deposed as follows:

"My name is Brad Livingston. I am over 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts as stated herein. I am currently employed as the Executive Director of the Texas Department of Criminal Justice (TDCJ) and have held that position since November 2004. Prior to that I was the Chief Financial Officer for TDCJ, a position I held from June 2001 to Jul 2005, and prior to that, I was the Deputy Chief Financial Officer from October 1997 to June 2001.

As the executive director, I oversee the entire Texas prison system and as such, I am very familiar with issues concerning the procurement of lethal injection chemicals for use in the executions we are required by law to perform. TDCJ and selling pharmacies have long been concerned about the safety of the pharmacists providing the drugs used in executions, based on hate mail and threats to the pharmacists. TDCJ's present difficulty in procuring lethal injection chemicals arose after the names of the pharmacy and pharmacist involved in the 2013 sales to TDCJ of compounded pentobarbital were disclosed to the public.

When it came time to consider the purchase of more pentobarbital at the beginning of March of 2014, I consulted with Steven McCraw, Director of the Texas Department of Public Safety (TDPS), about providing a threat assessment of threats to pharmacies who have been publicly identified as providing controlled substances to corrections departments, including the Texas Department of Criminal Justice for use in executions. We had recently been made aware of a very recent threat to a pharmacist and their pharmacy wherein it was threatened to place a truck filled with fertilizer in front of the pharmacy and blow it up so that it would threaten the pharmacy building, the pharmacist, the employees of the pharmacy, along with anyone else in the immediate area with death and grave bodily harm, if the pharmacy supplied chemicals to be used in executions.

Mr. McCraw's assessment of that threat, and of other material made available to law enforcement, was that some of the threats made to the pharmacy involved in the 2013 sales of pentobarbital should be taken seriously and that all threats should be reported to law enforcement as soon as they are received. The assessment additionally included the conclusion that pharmacies are by design easily accessible to the public and present a soft target to violent attacks, and that publicly linking a pharmacy or other drug supplier to the production of controlled substances to be used in executions presents a substantial threat of physical harm to the pharmacy, other drug supplier, and their personnel. A true and correct copy of the threat assessment is attached to this affidavit.

1

Since the threat assessment provided by TDPS, TDCJ has been able to purchase pentobarbital only by ensuring that every effort would be taken to protect the identity and, thus, safety of the pharmacists involved. TDCJ sought the threat assessment because the level of potential harm to the suppliers of lethal injection drugs escalated from harassment to threats of substantial physical harm and death. One graphic example on the Internet, dated October 6, 2013, shows a graphic of the screaming and violently exploding head of the pharmacist who supplied TDCJ with lethal injection chemicals. A true and correct copy of that web page is attached to this affidavit and was downloaded March 26, 2014. The caption under the graphic is "The Pharmacist who approves the business of killing, but only under the veil of secrecy."

I believe that TDCJ is in a different position than it was in when TDCJ was ordered to publicly reveal the identities of the parties who participate in the process of supplying lethal injection chemicals for use in executions. The threats of harm have certainly escalated in degree and type, as I note in the previous paragraphs of this affidavit. I believe that revealing the identity of pharmacists, pharmacies, other drug suppliers, and those involved in the supply of the drugs, including the drug testing company, would only serve to jeopardize their personal physical safety and the public safety.

"Further affiant sayeth not."

Brad Livingston
Executive Director
Texas Department of Criminal Justice

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on this the 27th day of March 2014.

Notary Public in and for the State of Texas

Angela L. Moore
Notary's Printed Name

ANGELA L. MOORE
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 07-23-2017

2.

CAUSE NO. D-1-GN-14-000908

| MAURIE LEVIN, NAOMI TERR, | § | IN THE DISTRICT COURT OF |
| HILARY SHEARD, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
| *Defendant.* | § | 201st JUDICIAL DISTRICT |

## AFFIDAVIT OF STEVEN McCRAW

| STATE OF TEXAS | § |
| TRAVIS COUNTY | § |

"BEFORE ME, the undersigned notary public, personally appeared Steven C. McCraw, known to me to be the person whose name is subscribed below, who on his oath, stated and deposed as follows":

1. My name is Steven C. McCraw. I am over the age of 21 years and am fully competent to make this sworn statement. The facts stated below are true and correct and are based on my personal knowledge and the documents provided to me, as described below.

2. I have reviewed the petition filed by the plaintiffs and am generally familiar with the facts and claims in this lawsuit.

3. I received my undergraduate degree in political science with a minor in military science and my master's degree in psychology and sociology.

4. I am currently the Executive Director of the Texas Department of Public Safety (DPS) and have held that position for over five years. I began my law enforcement career in 1977 when I was hired as a DPS State Trooper and I was later promoted to Agent in the DPS Narcotics Service where I served until becoming a Special Agent in the Federal Bureau of Investigation (FBI) in 1983. I retired from the FBI in 2004 after 21 years of service to become the Director of Homeland Security in Texas. As Homeland Security Director I

established a state-wide, multi-disciplinary process to assess homeland security and public safety threats and vulnerabilities on terrorism, crime, pandemic disease, natural disasters and industrial accidents. I was selected as the Executive Director of the Texas Department of Public Safety (DPS) in 2009 and in my current position I oversee the Texas Highway Patrol; Texas Rangers; Criminal Investigations Division which conducts organized crime investigations targeting transnational criminal organizations and violent gangs; Intelligence and Counterterrorism Division; Capitol Security; Executive Protection; the state's Emergency Management Program and other Divisions including those that provide support to local law enforcement such forensic laboratories, radio communications and information technology systems such as the National Crime Information Center (NCIC) and the Texas Crime Information Center (TCIC).

5.  DPS routinely conducts threat assessments on people and places and produces state wide public safety and homeland security threat assessments in several areas. I have retained a high level security clearance issued by the federal government and routinely receive classified and unclassified material and briefings on current and future criminal and terrorism threats. I was asked to serve as a member of the International Association of Chiefs of Police (IACP) Committee on Terrorism and the Department of Justice Bureau of Justice Assistance' (BJA) Law Enforcement Forecasting Group and I benefit from access to threat information and access to national experts who serve on these committees.

6.  At the time of my retirement in 2004, I was the Assistant Director of the Inspection Division within the FBI and at that time reported directly to the FBI Director. I was responsible for evaluating the performance of the 56 FBI field offices, overseas offices and Divisions at FBI Headquarters. I was also assigned to revamp and assume responsibility for the internal investigations of misconduct in the FBI, strategic planning, the FBI's reengineer initiative and special investigations.

7.  In 2002, I was promoted to Assistant Director after serving as the Special Agent in Charge of the San Antonio Field Office for seven months and I was tasked by the Director of the FBI with establishing the FBI's Office of Intelligence which did not exist prior to 9/11 and I reported to the Deputy Director and later to an Executive Assistant Director.

2

8. In my career with the FBI, I was initially hired as a special agent, which is the entry level position and served in the Dallas, Pittsburgh and Los Angeles Field Offices working violent crime, organized crime and racketeering investigations on the Sicilian Mafia and La Cosa Nostra in Los Angeles, New York, and Italy.

9. In 1989 I was promoted to Supervisory Special Agent (SSA) which is a GS-14 level positon in the Los Angeles Field Office where I served as Drug Program Coordinator and was tasked to establish the Los Angeles Joint Drug Intelligence Group (JDIG) which continues after 25 years to serve as a multi-agency drug intelligence initiative responsible for assessing drug trafficking organizations and threats in Los Angeles and Orange Counties and providing direct analytical support to related investigations.

10. In 1991 I was laterally transferred to FBI Headquarters and served as a GS-14 Headquarters Supervisory Special Agent and tasked to improve the drug intelligence program within the FBI. I established an organizational threat process and oversaw threat assessments of major drug trafficking organizations including Colombian Cartels and emerging Mexican Drug Trafficking Organizations that resulted in a nation-wide operational initiative targeting the most significant drug trafficking organizations in the nation.

11. I was promoted to a GS-15 Unit Chief and oversaw the Policy, Planning and Analysis Unit within the FBI's Criminal Division and was selected by then Director of the FBI, Louis Freeh as his representative to the Office of Investigative Policies (OIAP) which was responsible for the assessment of disparate policies used by different federal law enforcement agencies and the development of new polices that addressed key issues such as the Department of Justice (DOJ) Use of Deadly Force Policy and the DOJ Policy on the Development and Operation of Confidential Informants and Cooperating Witnesses.

12. After serving in this positon for over a year, the FBI combined the Colombian Drug Trafficking Unit with the Mexican Drug Trafficking Unit into the Latin America and Caribbean Organize Crime/Drug Unit and I was selected to serve as its first Unit Chief while retaining my responsibilities the Director's representative to the OIAP. This was a lateral transfer and I remained at the GS-15 level. While serving in this positon I was tasked to oversee a combined DEA and FBI Threat Assessment Team that traveled to the Puerto Rico and the Virgin Islands to assess the violent crime in the Caribbean on behalf of the then Attorney General, Janet Reno. While serving in this position I was tasked by the Director to lead a team to conduct a review and assessment in

3

Ireland of a controversial police shooting of a citizen at the request of the Government of Ireland.

13. I was selected as the FBI's first Assistant Special Agent in Charge of the Tucson Resident Agency in the FBI's Phoenix Field Office. This was also a lateral move as the ASAC positon in the FBI is at the GS-15 level. I was responsible for all investigative programs, operations and personnel in Southern Arizona. A fundamental requirement was the development of a comprehensive threat assessment for Southern Arizona which I was responsible for overseeing to ensure the proper prioritization of resources in high threat program areas. While in this positon I served as the Inspector in Charge of a team investigating the loss of a substantial amount of evidence during a major undercover operation in another FBI Field Office. This required a detailed assessment of the threat environment in which the operation was conducted to identify decision gaps and presumed threats to Confidential Informants.

After serving two years in Tucson, I was promoted to the positon of full Inspector within the Inspection Division of the FBI which is a promotion to the Senior Executive Service at the level 3. Soon thereafter, I was selected by the FBI Director to serve as the Inspector in Charge of the Southeast Bomb Task Force with specific tasks including the conduct of a comprehensive assessment as to the likelihood that Eric Robert Rudolph had accomplices and whether he remained in the Appalachian Mountains of North Carolina. I was also tasked to identify the subjects responsible for shooting at FBI Agents at the FBI Command Post in Andrews, North Carolina and collect sufficient evidence for their indictment and conviction. After doing so I was promoted to Deputy Assistant Director in the Investigative Support Division which was a promotion to SES 4 level. In this positon I oversaw the FBI's Strategic Information and Operations Center (SIOC), Special Operations Group and FBI Aviation. In this position I conducted threat assessments on the new FBI Director and the new Attorney General.

After the attacks on 9/11, I was selected by the President to serve as the Director of the Foreign Terrorism Tracking Task Force (FTTTF) which was established in October, 2001 and I reported directly to Deputy Attorney General Larry Thompson at the Department of Justice. As Director I oversaw two threat assessments requested by the U.S. Attorney General. This was a lateral promotion and I remained at the SES 4 position until I became the FBI Special Agent in Charge (SAC) of the San Antonio Field Office and was elevated to SES-5. After serving seven months in this positon, I was requested

4

by the Director to establish an Office of Intelligence and an enterprise wide intelligence program within the FBI and was promoted to Assistant Director which was at the SES- 6 level. In this position I oversaw several threat assessments across the full spectrum of FBI responsibilities. I reported to the Deputy Director of the FBI and later to the Executive Assistant Director until my transfer to the Inspection Division.

14. The DPS conducts threat assessments on a variety of public safety issues including, but not limited to: pandemics, natural disasters, terrorism, border security, threats, and gang violence. A threat assessment may be relatively informal, such as those routinely performed by patrol officers, who must constantly assess suspects during traffic stops. The Texas Rangers and other DPS officers conduct threat assessments when determining whether to pursue a particular subject. Then there are more formal assessments such as when assessing a threat related to travel abroad by state officials.

15. In this case, Texas Department of Criminal Justice (TDCJ) Director Brad Livingston called me and requested a threat assessment pertaining to the potential disclosure of the identity of the compounding pharmacy that supplies pentobarbital to TDCJ. I was already generally familiar with this issue at the time when Mr. Livingston made the request.

16. It is not uncommon for the head of a state agency to call me directly to request a threat assessment. In some cases, I conduct the assessment myself, and in some cases other DPS personnel conduct a more formal threat assessment.

17. In this case, I conducted the threat assessment based on my training and experience received throughout my law enforcement career, including my training and experience of conducting threat assessments for the Attorney General of the United States and the director of the FBI. An advantage of personally conducting the assessment was limiting threats to DPS employees as this subject has generated extensive negative attention.

18. On or about March 7, 2014, I sent a letter to Brad Livingston, the Executive Director of the TDCJ, stating the result of my threat assessment and my opinion that publicly linking a pharmacy or other drug supplier to the production of controlled substances to be used in executions presents a substantial threat of physical harm to the pharmacy or other drug supplier and its personnel, and should be avoided to the greatest extent possible.

5

19. My threat assessment was based, among other things, on my review of an email threat to the apothecary shop in Oklahoma when it was revealed as a supplier of execution drugs; review of the email and blog posts setting out excoriating criticisms of the Woodlands Pharmacy and Mr. Lovoi after TDCJ revealed the identity of the supplier of the execution drug in 2013; and my 36 years of law enforcement experience, including my current duties as Director of DPS.

20. The threat assessment methodology that I used (based on the RAND model) considers the product of vulnerability, probability, and consequences to determine the severity of a threat. As the head of DPS entrusted with protecting public safety, I use and recommend a proactive approach to mitigating risks.

21. In this case, vulnerability is particularly high because the current compounding pharmacy is open to the public and located in an urban area of a Texas city. My research of the Woodlands pharmacy revealed that I could locate the pharmacy's website and then from open source information I could easily identify and locate the pharmacy's employees and their family members. Anyone who wanted to target the employees for violence could easily locate the employees through the internet.

22. Pharmacies are by design easily accessible to the public. The Woodlands pharmacy can be easily surveyed online, which is how I viewed the layout of the pharmacy. Any pharmacy that is located in a city and open to the public is easily accessible and presents a "soft-target," meaning it is an easy target for violence, and generally unprotected by significant security measures. The threat extends beyond those inside the pharmacy itself, because violence that occurs near the pharmacy can injure bystanders as well.

23. Naturally, the consequences of an act of violence, such as use of an Improvised Explosive Device (IED) or a mass shooting, are significant and likely to result in the loss of human life. Any risk of injury or death is unacceptable when such can be readily avoided by withholding a single piece of information such as the identity of the supplier of the execution drugs.

24. While the probability of an act of violence is impossible to predict, I considered the email from Professor Humez to the Oklahoma pharmacy [Ex. 8] to constitute a serious threat. The email is indicative of the fervor surrounding the death penalty issue that, in my opinion, may likely lead to violence against the compounding pharmacy if the identity is released.

6

25. While the other emails that I reviewed did not contain direct threats, those documents demonstrate the tension and attention surrounding the provision of execution drugs to TDCJ, which is likely to lead to violence against the compounding pharmacy if the identity is released.

26. In my assessment, I also considered other acts of violence, including what I consider to be domestic terrorism, such as the Eric Robert Rudolph bombing; the thwarted Smadi incident in Dallas; the Nadal Hassan mass shooting; and the assassination of the Colorado prison director in 2012. I also considered the conduct of other radical fanatics, such as opponents to abortion and animal testing. Based on my assessment there is at least a 90% chance of a publicly-identified compounding pharmacy receiving a threat. Although there are no known attacks on a similarly-situated pharmacy that is, in my opinion, only because prior providers ceased supplying the execution drugs once the harassment and threats commenced. If the supplier is identified, there is a substantial (or significant) threat of physical harm to the pharmacist, employees, customers, or bystanders. Issues of passion, including the death penalty, inherently pose a significant risk of escalation to violence. Moreover, not all acts of violence are preceded by threats. For example, the murder of the district attorney in Kaufman County was not preceded by a known threat. It will be difficult, if not impossible, to stop violence against a supplier if the person seeking to cause harm does not put the supplier on notice prior to an attack.

27. It did not take a great deal of time or research for me to conduct a threat assessment in this case based on my law enforcement experience. It is my opinion, based on my law enforcement training and experience, as well as the documents, materials, and conversations in this case, that there is absolutely a substantial threat of physical harm that would result from the release of the name of the supplier of the execution drug. Therefore, the name of the supplier of the execution drug should remain confidential.

"Further affiant sayeth not."

Steven C. McCraw
Director
Texas Department of Public Safety

7

EXHIBIT 14

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on this the _____ 6th _____ day of _____ November _____, 2014.

SOPHIE YANEZ
Notary Public, State of Texas
Notary Without Bond
My Commission Expires
OCTOBER 14, 2017

_____
Notary Public in and for the State of Texas

Sophie Yanez
_____
Notary's Printed Name

10/14/17
_____
Date Commission Expires

8

### 14

1    A.  But, I mean, I get the same request from like
2  Judge Specia.  And he -- I get a number of requests
3  from other executive directors from time to time on
4  threat assessments.  And depending upon what the issue
5  is is depending on how I respond.
6    Q.  At that time did you ask him to provide you
7  specific information?
8    A.  No, not at all.  He said he would provide the
9  information that he had.  And I agreed, "Yes, I will
10  review it and I'll provide you my expert opinion on
11  this."  And I did so.
12    Q.  Okay.  Anything else that you remember about
13  that conversation?
14    A.  No.
15    Q.  Okay.  And you said -- can you estimate more
16  or less when that conversation happened in relation to
17  your March 7th letter?
18    A.  It was days before.
19    Q.  So it could have been a week before?
20    A.  No, it would have been sooner than that.
21    Q.  So fewer than seven days?
22    A.  Yeah, it would have been fewer than
23  seven days.
24    Q.  So then you said you received some -- the
25  e-mails by fax from his office, correct?

### 15

1    A.  Correct.
2    Q.  Okay.  Was that the same day?
3    A.  I believe so.
4    Q.  Okay.  What happened next?
5    A.  I didn't review it that day.  I think it was
6  later.  Like I didn't take on that task until the next
7  day.
8    Q.  Okay.  And what's the next thing that
9  happened?
10    A.  I reviewed it, and it was obvious to me that
11  it was an unnecessary risk to provide that information
12  publicly.  I'm surprised that they did -- quite
13  frankly, I was surprised that they did before and why
14  they didn't ask or at least make a better argument for
15  not providing that information publicly, because what
16  happened, obviously, is that the compounding --
17  Woodlands -- as you would expect on something that's so
18  emotionally charged was -- received a number of --
19  we'll call it -- at least one case was a threat, but
20  certainly a lot of attention.
21    Q.  Okay.  And what is the next thing that
22  happened after that?
23    A.  I wrote the letter and sent it to him.
24    Q.  Okay.
25    A.  Now, I can tell you this, is -- again, just to

### 16

1  ensure that we're -- you've got everything that I can
2  recall about this is that I did have two -- I had a
3  discussion with him about the wording and framing of
4  it.
5    Q.  Okay.
6    A.  I preferred to -- I use "significant" serious.
7  Okay?  I don't want to use the term "substantial."  And
8  to me they're synonymous.
9    Q.  When was that conversation?
10    A.  It would have been after the first day that I
11  looked at the information.
12    Q.  How much time did you spend reviewing
13  those e-mails?
14    A.  I think it only took a couple of hours at the
15  most.
16    Q.  Okay.  You said this discussion was shortly
17  after you reviewed the e-mails?
18    A.  You know, it was after I reviewed the e-mails.
19    Q.  And so in relation to the phone call?
20    A.  Yeah.  I mean, what -- I was telling you what
21  my findings were.  Okay?
22    Q.  Right.  But in relation -- go ahead.  I'm
23  sorry.
24    A.  That's all.  It was in relation to the
25  follow-up and during that discussion.  I mean, it

### 17

1  was -- you know, like I said, "substantial" is not a
2  term that -- I do recall that it was -- "significant"
3  is what my term for the threat was.
4    Q.  Okay.
5    A.  Which is -- it doesn't make any difference to
6  me.  It's the same thing.  It's synonymous.  But for
7  some reason it was important to him.
8    Q.  Okay.  And what I was trying to get at was at
9  the timing.  Your letter was written March 7th.  You
10  said the initial phone call was no longer than a week
11  before that.  The e-mails came later that day and you
12  reviewed them perhaps the next day.  When did this
13  conversation happen in that timeframe?
14    A.  Within the same period of time.
15    Q.  Okay.
16    A.  It was before I wrote the letter.  And before
17  he received -- before the -- the letter on the -- well,
18  the March 7th letter is when I had the discussions.
19  It's when I had the request, when I had the finding,
20  when I had the discussions, and when I wrote the
21  letter.
22    Q.  Okay.  And if you needed to double-check the
23  timing or if we needed to double-check the timing,
24  could we do via -- certainly via the fax, correct, when
25  you received those documents?

5  (Pages 14 to 17)

### 18

1    A. I don't -- I'm sure that -- I'm sure that his
2  fax machine -- I'm sure they might have some
3  information on that.
4    Q. Okay. And what about call logs or anything
5  like that of times that -- the dates when you spoke to
6  him for the initial request and your subsequent phone
7  call, are those things that exist, if you know?
8    A. I don't believe those exist, but perhaps they
9  have -- they record their phone calls, outgoing phone
10  calls at TDCJ.
11    Q. Okay. And in terms of -- you've made
12  reference to having a discussion with
13  Director Livingston about some terminology in the
14  letter. In addition to that, who else had input into
15  the writing of the letter?
16    A. That's it.
17    Q. He had some input into --
18    A. He had some input into the "substantial"
19  versus "significant." I mean, I know that because I
20  recall that directly.
21    Q. Okay. And, obviously, you had some input into
22  the content of the letter?
23    A. Of course.
24    Q. Okay.
25    A. I wasn't going to buy off on anything that I

### 19

1  didn't absolutely firmly believe to be true.
2    Q. Did anyone else have input into the letter,
3  into the content of the letter?
4    A. No. No, just me.
5    Q. Anyone else from your -- from this department?
6    A. Absolutely not.
7    Q. Okay. Did he or anyone else send you any
8  proposed language?
9    A. No.
10    Q. Okay. Did you tell you why the terminology
11  "substantial" versus "significant" or "serious" was
12  important?
13    A. No. I just assumed it's his attorneys. There
14  was a lawyer somewhere that was -- I mean, that is a
15  pejorative. I just assumed. It sounded technical and
16  irrelevant to me.
17    Q. But you don't know the reason behind his --
18    A. No.
19    Q. -- preference?
20    A. No.
21    Q. Okay. Did you at some point send a draft
22  letter to him?
23    A. You know, I don't know -- I can't recall
24  whether I did or did not, to tell you the truth. I
25  just know that the one that I -- that the 7th is the

### 20

1  one I signed. And I've tried to reflect on that and
2  can't recall.
3    Q. If you were to send a draft, would that come
4  via e-mail or via fax? What would your typical --
5    A. I wouldn't use a fax. I would use an e-mail.
6    Q. Okay.
7    A. Yet I can't find, you know -- we couldn't find
8  anything responsive to the request after looking.
9    Q. And so just to double-check, you've looked for
10  a draft in your e-mail and you haven't found one?
11    A. Oh, yeah.
12    Q. Okay.
13    A. And then in my secretary's file she keeps
14  pretty much everything, so -- once there's been an open
15  records request.
16    Q. Okay.
17      (Exhibit 2 marked)
18    Q. (BY MR. QUINTO-POZOS) I would like to show
19  you what's been marked as Exhibit 2. And if I could
20  ask you to take a moment to reacquaint yourself with
21  that.
22    A. Okay.
23    Q. Okay. And so is this the March 7th letter
24  that we've been discussing?
25    A. That is correct.

### 21

1    Q. The final draft, correct?
2    A. Yes, sir.
3    Q. And it has your signature at the bottom?
4    A. Yes, sir, it does.
5    Q. Okay. If I could direct your attention to the
6  first paragraph, and if you could follow along as I
7  read. It says, "The purpose of this letter is to
8  provide you with the results of our assessment of
9  threats, including a terrorist threat, to pharmacies
10  who have been publicly identified as providing
11  controlled substances to corrections departments,
12  including the Texas Department of Criminal Justice, for
13  the purpose of fulfilling its statutory obligation to
14  execute prisoners."
15    A. Uh-huh.
16    Q. Did I read that accurately?
17    A. You did.
18    Q. Okay. And one thing I note is that it refers
19  to pharmacies in the plural there --
20    A. Uh-huh.
21    Q. -- in that initial paragraph. How many
22  pharmacies did you consider when you were making --
23    A. I looked at the Woodland compound, Woodland
24  Pharmacies.
25    Q. Okay.

6  (Pages 18 to 21)

## 22

1  A. But I considered in the same circumstances
2  that I would address from Woodlands, you know, publicly
3  identifying it, its employees, and locations would be
4  relevant to a similar circumstance of any pharmacies.
5  Q. And so the specific situation you considered
6  was only regarding the Woodlands Compounding Pharmacy?
7  A. Yeah. That's the one I had the information
8  on.
9  Q. Okay.
10  A. I used pharmacies just to, you know, I
11  guess -- you know -- well, I'll just let you go ahead.
12  Q. Okay. And the next paragraph says, "It is our
13  assessment that some of the threats made to the
14  Woodlands Compounding Pharmacy that we identified
15  should be taken seriously and we recommend that all
16  threats received by the Woodlands Compounding Pharmacy
17  be reported to law enforcement officials as soon as
18  they receive them and that the employees receive
19  training on the detection and reporting of suspicious
20  activity."
21       Did I read that accurately?
22  A. Correct.
23  Q. Okay. Why did you say some of the threats
24  should be taken seriously?
25  A. Well, maybe I should have said all threats

## 23

1  should be taken seriously, but --
2  Q. But you said "some," and so I'm curious to
3  know why --
4  A. Well, I should have used the term "all" -- in
5  today's threat environment all threats should be taken
6  seriously.
7  Q. Okay.
8  A. Even -- in fact, even implied threats should
9  be taken seriously.
10  Q. Okay.
11  A. It's one of the things we counsel, you know,
12  our state legislators and others that we are bound to
13  protect about. You know, and today you cannot -- you
14  cannot, you know, afford to underestimate the level of
15  extremists and violence that's out there.
16  Q. And then you made reference to threats that we
17  identified. And which ones were those?
18  A. The threats that we identified, one of them
19  was related to -- reference to the Oklahoma City
20  bombing, I think, was one that was an inference.
21  Q. Okay.
22  A. The fact that it's public location, the owners
23  were easily identified, including the family, how to
24  get to them.
25  Q. Okay. And so you said you considered there

## 24

1  was a reference to the Oklahoma City bombing?
2  A. Yeah, one of the e-mails.
3  Q. Okay. Were what were some of the other
4  threats that you identified?
5  A. That is a -- that's a threat, a threat in
6  terms of their -- the individual's access, the
7  accessibility of the compounding pharmacy, urban,
8  public, accessible to the public, days, web page,
9  employees all are listed. You can go back from it and
10  use open source information and track them down. You
11  can track family members down. So the threats were,
12  you know, obviously significant.
13  Q. Okay.
14  A. Anyone that wanted to -- to use extreme
15  violence, okay, on the owner and some of the employees,
16  could easily do so.
17  Q. Okay. And so I don't want to use terminology
18  that you haven't used, so correct me if I use a word
19  that you wouldn't use. But I think you've been
20  describing sort of the visibility, perhaps, of some of
21  these pharmacies.
22  A. We use -- when you look at threats, okay, you
23  have to use, you know, a number of -- you've got to
24  use, you know, probability, you have to use -- use a --
25  well, model, you use probability, you use

## 25

1  vulnerability, and you use consequences. If you use
2  it, you know, like -- they usually -- RAND model uses
3  risk is a factor as equal to threat, vulnerability, and
4  consequences.
5       We use in the department, and have and
6  the other law enforcement agencies, use threat as a
7  product of -- of probability, vulnerability, and
8  consequence. It's essentially the same thing when
9  you're doing hurricanes, okay, or you're looking at
10  individual threats of locations.
11  Q. Okay.
12  A. For example, the Woodlands Pharmacy is higher
13  vulnerability to attack. Okay? The consequences of
14  someone -- you know, whether it's an IED or simply just
15  a mass shooting is substantial. I think I referenced
16  the public as well.
17  Q. If you know, what has been done to take these
18  threats seriously?
19  A. I hope they take -- I hope immediately -- I
20  hope they've been taken seriously from the beginning.
21  Q. But in terms of your knowledge, do you know
22  what measures have been taken to take these threats
23  seriously?
24       MS. BUNKER-HENDERSON: Objection, form.
25  Q. (BY MR. QUINTO-POZOS) Go ahead.

7  (Pages 22 to 25)

26

1   MS. BUNKER-HENDERSON: Oh, yeah. I'm
2   sorry. Yeah, go ahead.
3   THE WITNESS: Form? You don't like the
4   way I -- my form or --
5   MS. BUNKER-HENDERSON: Objection to his
6   form.
7   THE WITNESS: Yeah, I was asked -- you
8   know, the department was asked -- okay. And this was,
9   you know, after the fact, asked to assess the threats.
10  And that's what we were looking at, is to -- I did not
11  get into what the local authorities do, was the FBI
12  contacted, did they follow up along those things. You
13  know, we were specifically asked, you know, what --
14  would we be willing to do a threat assessment, and
15  that's -- that's what we limited the scope to.
16  Q. (BY MR. QUINTO-POZOS) Okay. In your letter
17  you recommend that all threats received by the
18  Woodlands Pharmacy be reported to law enforcement.
19  A. Correct.
20  Q. Do you know if that has happened since your
21  letter?
22  A. You would like to think so. You would like to
23  think that my recommendations were taken seriously.
24  Q. But you don't know?
25  A. No, I don't.

27

1   Q. Okay. And, likewise, do you know if employees
2   have received training at the Woodlands Compounding
3   Pharmacy regarding reporting --
4   A. I don't. I hope that they have.
5   Q. Okay. And, again, you don't have any
6   knowledge of that?
7   A. I don't have any knowledge of it.
8   Q. Now, this talks about a specific pharmacy, the
9   Woodlands Compounding Pharmacy. What about the current
10  supplier of lethal injection drugs for the Department
11  of Criminal Justice? Do you know if threats have been
12  reported from that pharmacy?
13  A. I don't know and I don't -- I actually don't
14  know where it is or who it is.
15  Q. Okay. And do you know if they -- their
16  employees have undergone any training?
17  MS. BUNKER-HENDERSON: Objection, form.
18  THE WITNESS: I don't, but I hope so.
19  Q. (BY MR. QUINTO-POZOS) Okay.
20  A. I hope they've taken some of the measures that
21  I recommended.
22  Q. In the last paragraph, you describe -- you
23  say, "If you should like a detailed briefing of our
24  assessment, please contact me," and you list your phone
25  number.

28

1   A. Uh-huh.
2   Q. Did I read that accurately?
3   A. Correct.
4   Q. What is that detailed briefing?
5   A. Just simply walk them through the matrix that
6   we use -- or I use in terms of assessing threats.
7   Q. And did you do that?
8   A. No. I had no request to do it.
9   Q. Okay. So tell me a little bit more about what
10  would go into that. You mentioned a matrix.
11  A. Yeah. The thought -- how I do it, how I do
12  threats -- well, first of all, we do threats a number
13  of different ways in the Department of Public Safety,
14  and the scope of it depends upon what we're being asked
15  to do.
16  For example, we set up a state
17  intelligence assessment process and we're using -- and
18  we're assessing public safety threats. And it could be
19  from disasters to pandemic flu that we address;
20  terrorism, for example. And we get the inputs and
21  expertise and the analysis from all agencies fed into.
22  So now you're looking at a formalized process, okay,
23  not unlike the national intelligence assessment that
24  we've adopted.
25  And we do production model for gangs, we

29

1   do it for public safety threat assessment, and at our
2   annual gang assessment, also recently a human traffic
3   assessment. That's a very formal one, obviously, with
4   inputs from other stakeholders and law enforcement
5   agencies. There's other assessments as well.
6   I mean, in fact, general counsel and I
7   were visiting about how really we require, you know,
8   troopers, agencies --
9   MR. ADKINS: Don't talk about what the
10  general counsel and I were visiting about.
11  THE WITNESS: Okay.
12  MR. ADKINS: Sorry. I apologize.
13  MR. DURST: I was waiting for when that
14  was going to happen.
15  THE WITNESS: Yeah, that's right.
16  But the bottom line is that troopers
17  agents and Texas Rangers, okay, on a daily basis do
18  threat assessments and quickly are required to make
19  decisions. And some of those decisions call off the
20  pursuit or exercising the use of deadly force or the
21  entire force continue based on the variables they come
22  to. So they're looking to mitigate risk or what that
23  threat is to them or the public.
24  And, you know, similarly, we do it, you
25  know, when the representatives want to travel to other

8  (Pages 26 to 29)

**30**

1 countries. It's a little bit more formal -- a little
2 bit more background, we do a little more research along
3 these lines. And, of course, something like this
4 requires, you know, requires -- you know, it's helpful
5 to have some level of expertise.
6 And, obviously, in this situation I'm
7 ideally suited to make this call because I've been
8 involved in this, you know, for many, many years and
9 have done it for the Attorney General of the United
10 States, have done it for the director of the FBI in
11 terms of threat assessments and on a high level and on
12 a low level.
13 So, moreover, it keeps any of my
14 employees out of the public arena of being criticized
15 on such an issue that has generated so much publicity
16 and it minimizes any threats that civilians might have.
17 I don't want any of our employees or analysts exposed
18 to -- to threats from some of these types of people
19 that you can't -- you have no way to accurately predict
20 their actions.
21 Q. So in this specific instance the detailed
22 briefing as to this threat assessment would consist of
23 what?
24 A. My process. And I could take them from --
25 like I said, it's a little geek-ish, but I can take

**31**

1 them from the quadrants and the different variables and
2 explain it. But no one really wanted to hear. They
3 just wanted my conclusions.
4 Q. Okay. And does that exist in written form
5 somewhere --
6 A. No.
7 Q. -- the debriefing in this case?
8 A. No.
9 Q. Okay.
10 A. There's examples -- I better be careful here
11 because we do have -- we have examples of the process,
12 okay, or a threat process, a deliberative threat
13 process that -- that certainly I use for any type of
14 threat assessments published in a public -- law
15 enforcement sensitive public safety threat assessment.
16 And I think we even have it -- it may be in an unclass
17 version as well.
18 Q. And my next question to you is going to be, do
19 you have -- are there any notes that exist of your
20 process in this case?
21 A. Yes.
22 Q. Okay. And have those been turned over to the
23 department's attorneys?
24 A. Yes.
25 Q. Okay.

**32**

1 THE WITNESS: They have, have they not?
2 MR. ADKINS: Yes.
3 THE WITNESS: I mean, that's --
4 Q. (BY MR. QUINTO-POZOS) Okay. And you made
5 reference a number of times to -- both in your letter
6 by stating that pharmacies are by design -- by design
7 are easily accessible, and you've mentioned among the
8 factors that you've considered the vulnerability. Did
9 you physically visit the Woodland Compounding Pharmacy?
10 A. No. And today, unfortunately, you can conduct
11 surveillance online. I mean, it's that open and it's
12 something we're mindful of. It's put -- it's an
13 additional factor we're aware of when we're doing our
14 security assessments.
15 Q. Okay. And did you visit the department's
16 current supplier of lethal injection drugs?
17 A. First -- you mean TDCJ?
18 Q. TDCJ's.
19 A. Like I said before, I don't know where that
20 would be. I don't know who it would be.
21 Q. And, therefore, didn't visit?
22 A. Correct.
23 Q. Yeah. And have you visited prior suppliers of
24 TDCJ's lethal injection drugs?
25 A. Not at all.

**33**

1 Q. Okay. Did you go to any of their websites?
2 A. No.
3 Q. Okay. Did you do -- how about any potential
4 suppliers --
5 A. No.
6 Q. -- that the TDCJ considered?
7 A. No.
8 MS. BUNKER-HENDERSON: Just let him
9 finish asking his question, because she's going to have
10 a hard time writing you both down.
11 THE WITNESS: Okay.
12 Q. (BY MR. QUINTO-POZOS) Did you go to the
13 Woodland Compounding Pharmacy's website?
14 A. Yes.
15 Q. Okay. And how did you use that in your --
16 A. See if you can -- I wanted to see, you know,
17 what information was available to the public on the web
18 page.
19 Q. Okay. And what did you find?
20 A. The location, the owner, members.
21 Q. By "members," what do you mean?
22 A. People that work there.
23 Q. Okay.
24 A. Because it is a -- is a follow-up. The
25 concern we have is just not just -- I mean, the

9 (Pages 30 to 33)

EXHIBIT 15
Appellate Case: 16-3072     Page: 92     Date Filed: 09/23/2016     Entry ID: 4451561
689

## 38

1  A. I didn't see anything that -- this doesn't
2  bother me. It's just one of many people that are
3  complaining. I mean, "The pharmacist sold medical
4  ethics and shamed his profession for $2,800." I don't
5  see anything in here other than the person's --
6  Q. Did you research who authored this?
7  A. No.
8  Q. The person's name, where they live?
9  A. No.
10  Q. What they do for a living?
11  A. No.
12  Q. Okay. Was there some sort of case or file
13  open on this website?
14  A. Not by us.
15  Q. Okay. Did you see where this website was
16  hosted, you know --
17  A. No.
18  Q. -- in Texas, outside of Texas?
19  A. I just looked at the documents that were
20  provided to me.
21  Q. Okay.
22  (Exhibit 5 marked)
23  Q. (BY MR. QUINTO-POZOS) I'm handing you what's
24  been marked for identification purposes as Exhibit 5,
25  and I would just ask that you to take a minute to

## 39

1  review it, please.
2  A. Okay.
3  Q. This is about a ten-page document. And my
4  first question is, are these the -- what you refer to
5  as the e-mails that you reviewed that you had received
6  from Mr. Livingston?
7  A. They appear to be.
8  Q. Okay. And your analysis of these
9  communications partially is what went into your letter?
10  A. I looked at these, yeah.
11  Q. Okay. And let's take them one by one. Let's
12  start with Page 1. And if you could just tell me what
13  it is in here, if anything, that you see of concern to
14  you with regard to the threat assessment.
15  A. Nothing in all of it. These are just -- all
16  this does is -- individuals weren't happy with -- I
17  didn't see any specific threats in there.
18  Q. Did you do any research into these
19  individuals --
20  A. No.
21  Q. -- who they were --
22  A. Absolutely not.
23  Q. Okay.
24  A. They have a right to express their opinions.
25  (Exhibit 6 marked)

## 40

1  Q. (BY MR. QUINTO-POZOS) I'm handing you what's
2  been marked as Exhibit 6. And I'll just ask you to
3  take a moment to review it, please.
4  A. Okay.
5  Q. Is this one of the materials that you received
6  from Mr. Livingston?
7  A. Yes.
8  Q. Okay. And is this something you reviewed?
9  A. Yes.
10  Q. Okay. Is there anything in here that was of
11  concern to you in respect to your threat assessment?
12  A. Yeah, inference to the Oklahoma City bombing.
13  Q. Okay. And can you tell me where that is in
14  this message?
15  A. Do you want me to give you which -- exactly
16  what paragraph it is, or how do you want me to describe
17  it to you? Do you want me to read it?
18  Q. Yeah, if you could just read the language.
19  A. "As the folks in the federal building can tell
20  you, it only takes one fanatic with a truckload of
21  fertilizer to make a real dent in business as usual.
22  In your place, I would either swear to the nation that
23  my company didn't make execution drugs of any sort and
24  then make dang sure that that's true or else openly
25  accept the burden of putting my employees and myself in

## 41

1  an unacceptable (and possibly uninsurable) risk. Just
2  saying."
3  Q. And this appears to be a message that was sent
4  by someone named Professor Humez to -- judging from the
5  subject line, to Apothecary Tulsa; is that correct?
6  A. Uh-huh.
7  Q. Okay.
8  A. I'll assume you have it correct. Okay?
9  Q. All right. Is there anything else in this
10  e-mail that appears to be threatening to you?
11  A. That's threatening enough.
12  Q. And apart from that, is there any other
13  specific language in here that's threatening?
14  A. I think that pretty much does it.
15  Q. Did you do anything to investigate who this
16  Professor Humez was?
17  A. No.
18  Q. Okay. Did you call this number that appears
19  here or e-mail this --
20  A. I'll go back to what I started with. I was
21  asked to do a threat assessment based on my expertise.
22  I did so based on the information. I did not do any
23  investigations. We didn't look at any people. We
24  didn't do anything. Simply conduct a threat
25  assessment.

11 (Pages 38 to 41)

42

1 Q. So you didn't research who this person was?
2 A. Absolutely not.
3 Q. Okay. Do you know if DPS opened a case file
4 on this person?
5 A. Of course not.
6 Q. Okay.
7 MS. BUNKER-HENDERSON: Just let him ask
8 his question.
9 Q. (BY MR. QUINTO-POZOS) The answer was, no,
10 there was no case file opened by --
11 A. There was no case.
12 Q. Okay. By DPS?
13 A. That's correct.
14 Q. Okay. Now, we can go back to it, if you would
15 like. But in your letter there's a -- there's
16 reference to threats, including a terrorist threat.
17 And in this e-mail we've made reference to -- this
18 writer made reference to the Oklahoma City federal
19 building bombing, correct?
20 A. Uh-huh.
21 Q. Did you ever refer any of these terroristic
22 threats to another law enforcement entity?
23 A. Are you talking about -- what -- what threats
24 are you talking about?
25 Q. Well, there's a reference to a threat in this

43

1 e-mail, and in your letter there are references -- or
2 there's a reference to a terroristic threat. As part
3 of your work, were any of those threats referred to --
4 MS. BUNKER-HENDERSON: Objection, form.
5 Go ahead.
6 Q. (BY MR. QUINTO-POZOS) As part of your -- as
7 part of your work, did you refer any terroristic
8 threats?
9 A. I probably need to go back and start from the
10 beginning. Okay?
11 MS. BUNKER-HENDERSON: Objection, form.
12 THE WITNESS: What I did was a threat
13 assessment. Okay? A threat assessment, okay, is a
14 product of probability, vulnerability, and
15 consequences. Okay? To say that -- from a terrorist
16 attack, you know, having been involved with
17 Eric Robert Rudolph and the San Antonio Park bombing is
18 an example. We were involved. And not just in terms
19 of anti-government, but also anti-abortion and
20 anti-gay, for example. We can say that's -- but it's a
21 use of violence and we can argue that, "Yeah, that's a
22 terrorist type of threat scenario."
23 But when we say threats, absolutely. You
24 know, I talked about it, is that there has to be
25 concern. It could be a domestic terrorism threat as

44

1 defined or it can be an extremist violent threat is
2 what I laid out.
3 But as far as specific threats, I did a
4 threat assessment. And what I'm saying is -- and what
5 I've concluded is that the Woodlands Compounding
6 Pharmacy was vulnerable to, you know, an attack, and it
7 could be -- also relate to a terrorist attack defined
8 as domestic terrorism under statute.
9 Q. Okay. This -- this e-mail that you have in
10 front of you marked as Exhibit 6, is this the terrorist
11 threat that's referred to in your letter?
12 A. No.
13 Q. What is the terrorist threat that's referred
14 to in your letter?
15 A. The terrorist threat would be a domestic --
16 someone that would do it for ideology. Their
17 vulnerability is a -- as I viewed it from the compound
18 pharmacy would be someone that could attack them. If
19 they do it specifically on ideology and used violence
20 for a political purpose or ideology or religion, for
21 that matter, it would be defined as a domestic
22 terrorism attack. And they were vulnerable to that.
23 Q. And was there anything in the materials that
24 you reviewed that -- that you judge to fit under that
25 description of a terrorism threat?

45

1 A. My expertise and knowledge of assessing
2 threats throughout my career, in particular over the
3 last 20 years.
4 Q. But nothing tied to the e-mails that we've
5 reviewed?
6 A. No.
7 MS. BUNKER-HENDERSON: Objection, form.
8 Is it okay if we take a quick break?
9 MR. QUINTO-POZOS: Sure.
10 (Recess from 9:58 a.m. to 10:11 a.m.)
11 Q. (BY MR. QUINTO-POZOS) Did you have a chance
12 to take a break?
13 A. What was the question?
14 Q. Did you have a chance to take a break?
15 A. Oh, yes.
16 Q. Okay. Good. Do we need to revisit any
17 answers that you previously gave?
18 A. No, sir.
19 Q. Okay.
20 (Exhibit 7 marked)
21 Q. (BY MR. QUINTO-POZOS) I'm handing you what's
22 been marked as Exhibit 7. And I would just ask you to
23 take a minute to look at it and familiarize yourself
24 with it, please.
25 A. Okay.

12 (Pages 42 to 45)

EXHIBIT 15
Appellate Case: 16-3072    Page: 94    Date Filed: 09/23/2016    Entry ID: 4451561                    691

**50**

1  20 percent chance?
2      A.  I don't think that's a possible --
3          MS. BUNKER-HENDERSON:  Objection, form.
4      Go ahead.
5          THE WITNESS:  That's impossible to do.
6  Again, it goes back to the totality of circumstances.
7  I mean, this could be from a friend.  This could be,
8  you know, to siblings thinking it's funny.  I'm just
9  telling you it should be taken -- something like that
10  that's that specific as you read it should be taken
11  seriously.
12      Q.  (BY MR. QUINTO-POZOS)  Okay.  And can you tell
13  the statement like that should be taken -- can you tell
14  if a statement that should be taken seriously will
15  likely amount to an actual physical action?
16      A.  Not necessarily.
17          MS. BUNKER-HENDERSON:  Objection, form.
18      Q.  (BY MR. QUINTO-POZOS)  Okay.  So let's take a
19  different statement.  Okay.  So let's set the
20  hypotheticals aside and let's focus on the threat
21  assessment that you did for this situation, the
22  provider of lethal injection drugs.  I believe you said
23  this, but let me ask you again.
24      A.  Okay.
25      Q.  Do you believe that the threats to pharmacies

**51**

1  that provide lethal injection drugs are threats that
2  should be taken seriously?
3      A.  Yes.
4      Q.  Okay.  Do you believe that the e-mails and
5  documents on which you relied for making that
6  assessment are statements or a threat that could
7  possibly lead to violence?
8      A.  I think it leads to one -- it needs to be
9  taken seriously.  But all of them need to be -- you
10  know, in terms of making the assessment, it's the
11  totality of not just -- I want to go back to the
12  e-mails.  It's not just the e-mails that's considered
13  in the threat assessment.  We've discussed that before.
14      Q.  And Exhibit 5 contains the e-mails that you
15  received from Mr. Livingston.
16          MR. ADKINS:  6.  Sorry.
17          THE WITNESS:  Exhibit 6.
18      Q.  (BY MR. QUINTO-POZOS)  Pardon me,  Exhibit 6,
19  the e-mail regarding the federal building.
20      A.  Yes, sir.
21      Q.  Could that be somebody just trying to be funny
22  or trying to blow off steam instead of a threat?
23      A.  Not funny, but it could be blowing off steam.
24  You don't know until you look into it.  It certainly is
25  disconcerting.

**52**

1      Q.  Okay.  You made reference to other types of
2  protests, types of protests that could happen in Texas.
3  Do you know if there has been any violence in the State
4  of Texas regarding abortion clinics or --
5      A.  I didn't say anything about protests.
6          MS. BUNKER-HENDERSON:  Objection, form.
7  Sorry.  Let him go ahead and ask it.
8          THE WITNESS:  I didn't say anything about
9  protests.
10      Q.  (BY MR. QUINTO-POZOS)  So let me ask you
11  outright.  Do you know if there's been any violence in
12  Texas regarding, for example, abortion clinics?
13      A.  Not that I'm aware of.
14      Q.  Regarding LGBT rights?  I think that's another
15  category that you made reference to.
16      A.  What rights?
17      Q.  Gay rights.
18      A.  No.
19      Q.  Okay.  To your knowledge --
20      A.  Not that I'm aware of.
21      Q.  Okay.  To your knowledge, have there been --
22  has there been violence involving protests regarding
23  religious rights or different religious?
24      A.  Nidal Hasan killed 13 people in the -- at Fort
25  Hood.

**53**

1      Q.  And is that something that DPS investigated?
2      A.  Yes.
3      Q.  Okay.
4      A.  There's -- the Smadi incident was prevented,
5  the terroristic attack in Dallas.
6      Q.  The what incident?  I'm sorry.
7      A.  Smadi.
8      Q.  How do you spell that?
9      A.  S-m-a-d-i.  Based on religion.
10      Q.  And is that something that DPS investigated?
11      A.  Yes, part of the joint terrorism task force.
12      Q.  What about situations in other states?  You
13  are aware that there are other states that make the
14  source of execution drugs public.  Are you not aware of
15  that?
16      A.  No, I'm not.
17      Q.  Okay.  Did you look into whether that's, in
18  fact, the case in other states?
19      A.  No.
20      Q.  Okay.  Were there any other documents that you
21  reviewed for your threat assessment other than what
22  you've seen today in the exhibits?
23      A.  No, sir.
24      Q.  Okay.  We talked a little bit earlier about,
25  in general, what is used in determining whether

14   (Pages 50 to 53)

EXHIBIT 15
Appellate Case: 16-3072    Page: 95    Date Filed: 09/23/2016  Entry ID: 4451561                692

---

**54**

1     something is a terroristic threat. And I would like to
2   go back and ask you if you could explain to me in
3   general what goes into making that determination for
4   you.
5     A. Well, a terroristic threat was probably
6   defined by statute. That sounds like a criminal
7   violation. So that -- you're talking about a -- a
8   potential for a terrorist attack. Again, I go back.
9   There's a number of different factors that play into
10   that scenario.
11     Q. And I want to make sure that we're on the same
12   page and I want to use the phrase that you used in your
13   letter, "a terrorist threat."
14     A. Okay.
15     Q. Okay. And so let's go over some of those
16   factors that you would take into account. What would
17   those be?
18     A. It would be -- well, certainly as -- as anyone
19   expressed an act of violence or a potential violence.
20   That would be one factor that would be considered.
21     Q. Okay. What else?
22     A. Vulnerability to attack, the -- certainly
23   would be another factor that's considered.
24     Q. Okay.
25     A. Has there been attacks -- has there been

---

**55**

1   attacks before on like issues?
2     Q. Okay.
3     A. Such as -- for example, we mentioned gay
4   rights, we mentioned abortion. Those are factors.
5     Q. Any other factors?
6     A. All I mentioned before in terms of -- and each
7   one -- we'll go back to -- I'll start from the
8   beginning.
9     It could be threats, a combination of
10   threats, a combination of vulnerability, and the
11   consequences of those threats.
12     Q. Is there anything else that formed the basis
13   of your threat assessment that we have not talked about
14   today?
15     A. Yeah, just all my experience that we've
16   already discussed in dealing with other threats and
17   threat scenarios.
18     Q. Okay. You made reference to having received
19   requests to make threat assessments in the past,
20   correct?
21     A. Correct.
22     Q. Okay. And you've done a number of them?
23     A. Yes, in varying different forms.
24     Q. Can you approximate how many you've done over
25   the years in your capacity as director of DPS?

---

**56**

1     A. I'll say it -- where I have personally handled
2   it, three.
3     Q. Okay. Can you tell us what those were?
4     A. Travel to Mexico was one for a particular
5   person going to a particular location.
6     Q. Okay.
7     A. And the agency handling it has handed
8   several -- many more of those particular requests. And
9   assessment threats against Child Protective Service
10   caseworkers. Judge Specia asked us to do an
11   assessment, vulnerability assessment, and work with him
12   on it, and an appropriate response also to protect
13   them.
14     And then this is an assessment that I've
15   done.
16     Q. The current one?
17     A. Current one.
18     Q. In those three assessments that you've been
19   personally involved in, have you concluded in any of
20   them that there -- there is no serious or significant
21   or substantial threat assessment?
22     MS. BUNKER-HENDERSON: Objection, form.
23     THE WITNESS: On these three, no. There
24   have been others that we have followed up on on threats
25   that we've been able to because they were specific that

---

**57**

1   we followed up on. And at -- at the end of the day
2   there appeared that there was no threat of violence to
3   one of our officials.
4     Q. (BY MR. QUINTO-POZOS) But those were ones
5   that you were not involved in personally?
6     A. Well, I was -- well, I was personally involved
7   in, you know, knowing the results of it.
8     Q. And I think you said that those were follow-up
9   assessments?
10     A. Individual threats, individual threats to
11   individual members of Legislature.
12     Q. And what you mean is that -- or is this what
13   you mean, that it didn't come to fruition as an actual
14   incident?
15     A. Correct.
16     Q. Okay. In that particular situation someone
17   had made a threat initially and then nothing happened,
18   nothing came of it?
19     MS. BUNKER-HENDERSON: Objection, form.
20     THE WITNESS: Whenever we receive a
21   threat we follow up on it. And in each of the
22   ones none of them -- nothing happened. As was
23   mentioned, we followed up on on those threats.
24     MR. QUINTO-POZOS: Okay.
25     Can we just take a couple minutes to see

EXHIBIT 15
Appellate Case: 16-3072    Page: 96    Date Filed: 09/23/2016   Entry ID: 4451561
693

**62**

1     A.  My -- my discussions -- well, I don't know
2  that they -- that it wasn't -- we didn't have
3  discussions during the course of it. But I didn't
4  discuss any of the formulas with him or anything like
5  that.
6     Q.  And so these notes --
7     A.  But I see at least one location where I've got
8  Brad Livingston, which is "burn it to the ground.
9  Owner in fear of life." But I don't know that
10  Brad Livingston said that or not.
11     Q.  Okay.
12     A.  I can't tell.
13     Q.  And so what are these notes of if they're not
14  notes of your discussions with him?
15     A.  Before I did the -- before I wrote the letter,
16  I just went through a deliberative process that I've
17  talked about and looked at the totality and
18  circumstances. And I'm looking here. I won't be
19  surprised to find that this -- we were concerned
20  about -- I know, for example, the executive director --
21  I got a call when the executive director in Colorado,
22  their prison system, was killed by my counterpart over
23  there, former FBI, as they say, that I work with.
24     And we had some dealings here in Texas
25  because our fusion center identified -- was able to

**63**

1  link it up to someone that was down here. We had
2  talked about protection -- his -- the necessary
3  requirement to protect all of his staff, cabinet level
4  staff, 24 and seven.
5     And the Kaufman County murders, for
6  example, because it wasn't just on the front end we
7  lost an assistant district attorney and then, of
8  course, the murder of the district attorney and his
9  wife at their location, but we were concerned about who
10  else we had to protect at that regard and go through
11  the same process. And you had to -- you know, you have
12  to presume -- even though there was no specific threats
13  to any of the county commissioners or the county judge,
14  you know, or anyone else connected, we had an
15  obligation, you know, to take it seriously and to
16  provide the type of coverage, you know, to provide the
17  type of protection that we did.
18     Similarly, you know -- I can give you
19  other instances, as well, where we've had to react that
20  way based upon the -- based upon the information that
21  we received.
22     Q.  Okay. And do you see reference in your notes
23  to the Colorado situation you were referencing?
24     A.  Well, that's what I said. I'm surprised it's
25  not -- it may the dates -- these dates may be reflected

**64**

1  in here, because it's something I know I considered as
2  a factor. In fact, I went back and looked at -- it's
3  probably -- I looked at in terms of all recent, you
4  know -- because, like I say, routine we have to testify
5  and certainly talk to our elected officials as to,
6  "Let's go back and talk about all the violent attacks
7  against political officials or the public," and then
8  going back to the timeline. So I take all of those
9  into consideration.
10     But, again, it's my experience to take it
11  into consideration. I look at all of those as part of
12  the process of determining is there threat or not, is
13  to take all of that into consideration. So the Kaufman
14  County murders, the Nidal Hasan situation, Eric Robert
15  Rudolph, going back to even Ted Kaczynski from an
16  anarchist's position. You know, you take into
17  consideration the full -- the full spectrum of
18  information out there to make these assessments.
19     Q.  And I'm going to have to ask you to educate me
20  here, at least with regard to the Colorado situation
21  and the Kaufman County situation. Did either one of
22  those involve the death penalty in any form --
23     A.  No.
24     Q.  -- to your knowledge?
25     A.  No.

**65**

1     Q.  Okay. I want to ask you to go over some of
2  these dates that are here.
3     A.  Uh-huh.
4     Q.  There's -- there's a date of December 8th,
5  2013.
6     A.  Uh-huh.
7     Q.  Do you remember what that is in reference to?
8     A.  No.
9     Q.  Okay. What about the date March 1st, 2014?
10     A.  No.
11     Q.  And there's a date range here of April 5th, it
12  looks like, to April 8th of 2013.
13     A.  I think that's 10. I think that's 10-5. But
14  I don't know what is, yeah.
15     Q.  I'm sorry. I meant to say October.
16  October 5th to October 8th, yes.
17     A.  No.
18     Q.  Do you know what that's in reference to?
19     A.  No.
20     Q.  And then it --
21     A.  Well, I could -- but I've got the same date
22  down here underneath where I'm talking about pictures,
23  information, location, owner information, map,
24  Woodlands. So I know that looking about that range --
25     Q.  Can you tell me again about this quote "burn

17  (Pages 62 to 65)

EXHIBIT 15

66

1    it down to the ground"?
2    A. No, I really can't.
3    Q. You don't know who said that?
4    A. No, I don't.
5    Q. And you don't know how that quote came to you?
6    A. No.
7    Q. And what about this duration at the bottom
8    right, 10-13 to 3-14. What is that?
9    A. It looks like -- almost like 3-1 to 14. I'm
10   not sure.
11    Q. You don't know what that duration refers to?
12    A. No.
13    Q. Okay. So if we could go to Page 2.
14    A. Okay.
15    Q. Does that say conspiring?
16    A. Conspiracy. It looks like -- yeah,
17   conspiracy. I can't make out the other part.
18    Q. And then we see "V equals." Does that also
19   refer to vulnerability, as you mentioned?
20    A. Yeah, location, names, map, accurate, public
21   access, countermeasures, soft target, employees,
22   public.
23    Q. And then the bottom has, again,
24   Mr. Livingston's name and that same quote, "burn it to
25   the ground."

67

1    A. Yeah.
2    Q. And then it says, "Owner in fear of life."
3    A. Yep.
4    Q. Who does that refer to?
5    A. The owner of the compounding pharmacy is what
6   I would presume.
7    Q. Do you remember where that information came
8   from?
9    A. No, I don't.
10    Q. Okay.
11    A. "Family customers will no longer work with
12   state because of threats." This would be a discussion
13   I would have -- "needs letter from DPS on findings
14   ASAP."
15    Q. What -- what kind of threats are you referring
16   to here?
17    A. I don't -- again, that's not my -- all I do is
18   put the quotations there, "threats." "Will no longer
19   work with state because of threats."
20    So at least -- you know, it could be an
21   Oklahoma City reference or just threats -- it could be
22   even threats from his standpoint, I guess, the owner's
23   standpoint. It could even be threats to lose business.
24    Q. Is this your -- is this section of your notes,
25   notes of your conversation with --

68

1    A. I don't know that it is. I don't know that it
2   is, to tell you the truth.
3    Q. Okay. This says, "Need" -- I think you said
4   this reads, "Needs letter from DPS on findings ASAP."
5    A. Yeah.
6    Q. What does it say after that?
7    A. "Court actions review."
8    Q. Okay.
9    A. So that would be his justification why ASAP.
10    Q. And then there's that sort of bolded arrow?
11    A. Uh-huh.
12    Q. What does it say after that?
13    A. That's a good question. I don't -- I can't --
14   underneath it, "Public threat assessment, determined,
15   approximate."
16    Okay. This is some of the stuff that
17   I've done before, things that I've done before.
18   Attorney General, the U.S. that I reflected on, the
19   director of the FBI, some of the things that I had done
20   before that I had called back upon when I was looking
21   at some of the things I had to do.
22    Q. And referring to those prior investigations,
23   did those investigations lead you to the conclusion
24   that there was no threat?
25    A. No, just the opposite.

69

1    MS. BUNKER-HENDERSON: Objection, form.
2    THE WITNESS: Oh, I'm sorry.
3    MS. BUNKER-HENDERSON: Go ahead.
4    THE WITNESS: Just the opposite. There
5   was substantial threat both to the Attorney General and
6   to the director of the FBI.
7    Q. (BY MR. QUINTO-POZOS) Okay. And so if we
8   could just go to the last page. What is that symbol
9   there at the top?
10    A. "C," consequences.
11    Q. Uh-huh.
12    A. "Violent extremism" -- well, I then referenced
13   Eric Robert Rudolph, gay and race. People don't miss
14   that part, that he was also a racist.
15   Tim McVeigh; Ted Kaczynski, which is the Oklahoma City
16   reference in that regard. Congresswoman, which --
17   Congresswoman was Gifford that was shot in Tucson.
18    Q. And then what does it say below there, "100"
19   is --
20    A. "100 percent probability that threats will be
21   made." Okay.
22    Q. And what does it say to the left of the equals
23   sign?
24    A. "100 percent," okay, probability, "P of
25   threats." So there's going to be threats. And the

18 (Pages 66 to 69)

EXHIBIT 15

**70**

1   question mark is the follow-through. There's no way of
2   knowing whether -- whether there's going to be a
3   follow-through on a threat or not.
4        Q. And what is the first word before 100 percent?
5   It starts with an R. It looks like --
6        A. Yeah. Yeah. I can't tell you.
7        Q. And then below that it says, "Bottom line" --
8        A. Yes.
9        Q. -- "may" --
10       A. "Many against. Interest to do so." And then
11   there's, "Wood and violence, percent, extremist, mental
12   issues, fixation, celebrity issue, roadmap,
13   coordinated, south targets, unacceptable risk, owners,
14   employees, public, security, and foolish to divulge
15   company owner and location."
16       Q. Overall, could you estimate how much time you
17   spent on making your threat assessment?
18       A. I don't think it's more than -- it couldn't be
19   more than a morning of four hours. This is like --
20   this is -- this is -- it may not -- it may be more
21   difficult for others, but this is -- this is a slam
22   dunk case.
23       Q. And where did this percentage, 90 percent,
24   come from?
25       A. Me. This is my mental map of going through

**71**

1   and tracking it.
2        Q. And so that figure of 90 percent probability
3   is a figure you came up with?
4        A. Yeah.
5        Q. Okay.
6        A. But there -- you know, it looks like
7   100 percent that there's going to be hate mail and
8   90 percent that there would be a terrorist threat as
9   part of that hate mail.
10       Q. Okay. Aside from the documents that we have
11   looked at today and the e-mails, et cetera, is there
12   anything else that went into your assessment that we
13   haven't seen or talked about today?
14       A. Yeah, I'm afraid there is. I just can't -- to
15   list it all, it really -- it's just -- going back to
16   you know, I can skip forward to at least, you know, my
17   first -- we'll call it national convention where I was
18   involved in -- in threat assessments. But even going
19   back as a trooper. I mean, it's -- you use the
20   totality of -- of experiences that I've had in this
21   business. And, you know, for the most part,
22   unfortunately, I've been right. Unfortunately, I've
23   been wrong on a couple of occasions.
24       But in today's threat environment we have
25   to presume -- we have to -- you know, it's my

**72**

1   obligation, okay, to -- and here at the Department of
2   Public Safety is to protect people. And we try to do
3   it in a protective way. And the most proactive way you
4   can is to mitigate risk. And if we can find a way to
5   mitigate it, in my view when I concluded it, it was
6   foolish to provide this -- if we can mitigate, we
7   can -- if we can eliminate the threat altogether just
8   by not providing this information, why would we not do
9   so, is my point.
10       Q. And you're speaking in terms of your
11   experience and you drew from that experience to make
12   this threat assessment?
13       A. Yes, sir.
14       Q. My question was more directed at anything else
15   that -- in terms of e-mails or documents about the
16   specific situation that we haven't discussed today.
17       A. No.
18       Q. Okay. You mentioned that there have been some
19   situations in which, unfortunately, you have been
20   wrong. Can you give us examples of when that happened?
21       A. Well, I can -- I've been wrong. It didn't
22   necessarily result in death of people, but I've been
23   wrong in -- I would like to tell you I'm right
24   100 percent of the time, but I'm not.
25       I developed an undercover operation based

**73**

1   on a faulty assessment at how well corruption works on
2   the border to the tune of a -- and as a result, it took
3   several redirection -- a substantial redirection before
4   the operation was successful, just based on a faulty
5   conclusion that I had that it works -- corruption on
6   the border works the same way as big city corruption.
7   That wasn't the case.
8        And -- but that's -- I can -- you know, I
9   can go -- I can find other mistakes I've made as well,
10   going back through my career.
11       Q. And so -- I'm sorry, I didn't mean to
12   interrupt.
13       A. No, that's -- that's just one example.
14       Q. Okay.
15       A. But one thing, I can assure you this, is what
16   we try to do. And there's a reason why the director
17   asked me to come back and stand up at the FBI's office
18   of intelligence after 9-11 is because I had dealt with
19   the intelligence process and risk and enterprise-wide
20   approach to address the Sicilian mafia, Cosa Nostra.
21       Again, there are some things that are
22   relevant, you know, in the organized crime world to the
23   terrorism world which gets us what we call today or
24   what the federal government calls violent extremism and
25   is a term of art being used.

19  (Pages 70 to 73)

EXHIBIT 15
Appellate Case: 16-3072   Page: 99   Date Filed: 09/23/2016 Entry ID: 4451561

696

**74**

1  And in today's society you cannot afford
2  to take -- every threat must be considered serious.
3  You have to follow up on each particular threat. And
4  to the extent we can mitigate it and educate, you know,
5  people in terms of how to mitigate those things, that's
6  helpful, but we -- we have to remain proactive in these
7  regards.
8  As a professional, I can tell you that I
9  would rather not have to investigate a crime if we can
10  prevent it. And to the extent that whether it's -- you
11  know, another unpopular decision or assessment of
12  mine -- and, unfortunately, I have been correct -- is
13  don't send your kids to Mexico during spring break.
14  There's some things that -- you know, right now the
15  threat environment as such is not a good place. I
16  don't care where it is right now. And that's something
17  we've been consistent and, unfortunately, been correct
18  at.
19  MR. QUINTO-POZOS: We'll go ahead and
20  pass the witness at this point.
21  MS. BUNKER-HENDERSON: We'll reserve our
22  questions for trial.
23  MR. QUINTO-POZOS: Thank you very much.
24  (Proceedings concluded at 10:55 a.m.)
25

**76**

1  
2  
3  
4  I, COLONEL STEVEN MCCRAW, have read the
foregoing deposition and hereby affix my signature that
same is true and correct, except as noted above.
5  
6  
7  
8  COLONEL STEVEN MCCRAW
9  
10  THE STATE OF _____)
COUNTY OF _____).
11  
12  Before me, _____, on this day
13  personally appeared COLONEL STEVEN MCCRAW, known to me
14  (or proved to me under oath or through
15  _____) (description of identity
16  card or other document) to be the person whose name is
17  subscribed to the foregoing instrument and acknowledged
18  to me that they executed the same for the purposes and
19  consideration therein expressed.
20  Given under my hand and seal of office this
21  _____ day of _____
22  
23  
24  NOTARY PUBLIC IN AND FOR
THE STATE OF_____
25  COMMISSION EXPIRES:_____

**75**

1  CHANGES AND SIGNATURE
WITNESS NAME: COLONEL STEVEN MCCRAW
2  DATE OF DEPOSITION: JULY 21, 2014
3  PAGE LINE    CHANGE    REASON
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  

**77**

1  NO. D-1-GN-14-000908
2  MAURIE LEVIN, NAOMI TERR, ) IN THE DISTRICT COURT
and HILARY SHEARD,    )
3  Plaintiffs,    )
   )
4  VS.    ) TRAVIS COUNTY, TEXAS
   )
5  TEXAS DEPARTMENT OF    )
CRIMINAL JUSTICE,    )
6  Defendant.    ) 201ST JUDICIAL DISTRICT
7  
8  REPORTER'S CERTIFICATION
DEPOSITION OF COLONEL STEVEN MCCRAW
JULY 21, 2014
9  
10  I, DONNA WRIGHT, Certified Shorthand Reporter in
11  and for the State of Texas, hereby certify to the
following:
12  
13  That the witness, COLONEL STEVEN MCCRAW, was duly
14  sworn by the officer and that the transcript of the
15  oral deposition is a true record of the testimony given
16  by the witness;
17  That the deposition transcript was submitted on
18  _____, 2014, to the witness or to the
19  attorney for the witness for examination, signature and
20  return to me by _____, 2014;
21  That the amount of time used by each party at the
22  deposition is as follows:
23  Mr. Manuel Quinto-Pozos - 1 hr. 34 min.
Ms. Nichole Bunker-Henderson -
24  
25  That pursuant to information given to the

20  (Pages 74 to 77)

EXHIBIT 15

1    timing-wise, or do you know when that phone call

2    was?

3         A    Yes, sir, that would be right.

4         Q    Okay.  And so he also testified that you

5    or TDCJ sent him some information.  Do you recall if

6    that was before or after the phone call?

7         A    It would have been after the phone call.

8         Q    Okay.  So he didn't have anything in front

9    of him that he got from you when the -- when the

10   call comes?

11        A    Correct.  Right.

12        Q    And was the call sort of scheduled, or can

13   you pick up the phone and reach Colonel McCraw like

14   when I got arrested I call him directly?

15        A    I can't speak to when you're arrested, but

16   I can pick up the phone and call him.  And he's very

17   good about either answering immediately or calling

18   back.

19        Q    Oh.  And do you recall in this instance

20   did you get him the first time or did he call you

21   back?

22        A    I believe he answered or his assistant

23   answered and transferred him to me.

24        Q    All right.  Was anybody with you when you

25   called and spoke to him?

                                                    12

1     A    No.

2     Q    Okay.  Do you know if he had anybody else

3 on his end of the phone?

4     A    I'm not advised.

5     Q    Okay.  Why were you calling him then?

6 What was the issue in late February or early March?

7     A    Okay.  The context of -- of the call and

8 the timing of it I think is important, because if --

9 if you go back to October of 2013, our at that time

10 supplier of compounded pentobarbital was -- the name

11 of the pharmacy and pharmacist was made public.

12        We were, in the spring of 2014, nearing

13 the end of -- of the pentobarbital that we had, and

14 we needed to ensure that we could find another

15 supplier.  I was very concerned about the nature of

16 the harassment and the threats that occurred in late

17 October with -- or in early October with respect to

18 the Woodlands Pharmacy and that particular

19 pharmacist.  And I wanted to ensure that as we moved

20 forward we could ensure, to the extent possible,

21 that any pharmacist that we would do business with

22 moving forward would not be subject to potential

23 violence and -- and the threats that are associated

24 with that.

25     Q    And the supplier in 2013 when it became

                              13

1    he -- "I must demand that TDCJ immediately return

2    the vials of compounded pentobarbital in exchange

3    for a refund."

4          Did the State refund the drugs -- or

5    return the drugs?

6       A    No.

7       Q    Okay.  So I'm guessing that means there

8    was no refund.  Correct?

9       A    That's a fair assumption.

10      Q    All right.  I know you have your point of

11   view.  I respect that.  I know you have your own

12   personal ideas of what the firestorm was or is, and

13   I respect that.

14        But you do agree that nowhere in this

15   letter does he mention violence or any physical

16   acts.  Correct?

17      A    Let me re-read the letter.  I -- I --

18      Q    Sure.

19      A    The words he used are not in dispute.

20   They're right here on -- on the paper.

21        The word violence does not appear in his

22   letter.

23      Q    Or anything about fearing for his or his

24   employees' physical safety.  Correct?

25      A    Correct.

                                          30

1     Q    Before your conversation with McCraw in

2  February or March, did you have any other contact

3  with DPS about this lethal injection drug issue?

4     A    No.

5     Q    Okay.  Had any vendor up until the time of

6  your conversation with Colonel McCraw asked for an

7  assurance or a promise or anything about

8  confidentiality going forward?

9           MS. MATLOCK:  Objection; form.

10    A    Prior to my conversation with Mr. McCraw?

11    Q    (By Mr. Durst) Yes.  Yes, sir.

12    A    I don't know.

13    Q    Okay.  And so the purpose of the call and

14  wanting the letter at that time was why?

15    A    I'm sorry.  What was the last word of your

16  question?

17    Q    Okay.  Why was the last word.

18           Let me ask it better.

19           What was the purpose of your call?  What

20  did you want from Colonel McCraw when you called

21  him?

22    A    I wanted him to utilize his expertise as a

23  law enforcement officer and the head of the largest,

24  most sophisticated Police Department in the State of

25  Texas to review anything he deemed to be pertinent

31

1  as it relates to pharmacies and drug suppliers who

2  supply drugs to departments of corrections.

3          We provided some information to him.  And

4  the information we provided to him, again, within

5  the context of all -- all of the information and the

6  timing of it all caused me great concern that if

7  someone -- if -- if the name of the pharmacist

8  and/or pharmacy that we do business with or -- or

9  would do business with in any time in the future,

10  that they would be subject to -- you know, very

11  likely subject to violent threats and -- and actual

12  violence.  That concerns me.

13     Q    Okay.  And so what was the purpose of

14  wanting the letter or a written statement from --

15  from Colonel McCraw?

16     A    The purpose was multiple.

17          First of all, I wanted to get his sense of

18  whether he viewed the threat environment, so to

19  speak, surrounding these issues and surrounding this

20  area of government to be as serious as we thought

21  they were.  And knowing that there is an immediate,

22  in my view, nexus between when a compounding

23  pharmacy is made public and the immediacy or nearly

24  immediacy of the harassing E-mails and threats -- it

25  happened both in this case and in January of 2014

                                               32

```
 1     with respect to The Apothecary Shop in Oklahoma.
 2     The day after it was reported that they were the
 3     likely supplier of compounded drugs to the
 4     Department of Corrections in Missouri, a very
 5     significant and real threat -- threatening E-mail
 6     was sent.
 7             Those -- those factors specific to -- to
 8     my knowledge, the two times compound pharmacies had
 9     been utilized by departments of corrections, the
10     nexus between when they're being made public and the
11     threats were -- the -- the -- the nexus is -- is
12     there and nearly immediate, within a day or two,
13     both in -- in the case of the January '14 Oklahoma
14     E-mail and the Woodlands Pharmacy, October -- early
15     October, 2013 timeframe.
16             Also, again, the context that -- that I
17     was living in, in the world I live in, during that
18     spring of 2014 was a very unsettled and dangerous
19     world.  The context included security risks that are
20     inherent in -- in the criminal justice world that
21     had escalated in general and specifically over the
22     last number of months and years to include -- at
23     that point we're just roughly a year removed from
24     the director of the Colorado Department of
25     Corrections being assassinated on March the 19th,
```

                                                    33

1  2013.

2          At that same time there were specific

3  death threats to me, both just prior to the

4  Executive Director in Colorado's assassination and

5  just shortly after it.

6          Those -- those examples and the context of

7  what I would consider the elevated intensity of the

8  criticism, harassing E-mails and -- and so forth,

9  all contributed to my interest in having Steve

10 McCraw look into this.

11         In addition to that -- first of all, I'm

12 not likely to remember the entire list of all of the

13 factors that I -- that I considered at that time.

14 But I'm listing those that I recall now.

15         And because of this ever more volatile

16 world, I live with a security detail.  That is

17 subject to change given the overall threat

18 consideration of the environment that we -- that we

19 operate in.

20         There were -- I think a -- there's a -- to

21 me, a significant substantive difference, too, when

22 we transitioned from utilizing drugs provided

23 primarily by big pharma and/or distributors.  At

24 that point the criticism and the -- the -- for lack

25 of a better phrase, a corporate logo or corporate

                                            34

EXHIBIT 16

1  face is what would, in essence, be printed in the

2  newspapers.

3          A transition to compounding pharmacies,

4  it's a different magnitude and a different reality.

5          For example, those harassing E-mails,

6  which on their face may not specifically reference

7  violence, they are very personalized.  They

8  reference individuals by name.  They reference the

9  location or proximity of that pharmacy to their

10  homes.  So what that said to me was while these

11  harassing E-mails weren't in and of themselves a

12  threat of physical violence, it puts a vulnerable,

13  real face on the individual and the pharmacy, a --

14  and a storefront, a location, an office, a -- an

15  individual.  Okay?

16          And given that and given the velocity, I

17  think, of the ramping up of the criticism and the

18  blog posting, that coupled with the immediacy of --

19  of -- of that criticism and -- and those threats

20  caused me to -- to want Steve McCraw and -- and his

21  resources to evaluate that and -- and see if -- if

22  they shared -- shared that view.

23          And that -- again, that's -- that's what I

24  recall at this point.  I'm sure there were other

25  factors I considered.  But that's -- again, that's

                                                35

1   what I can recall now.

2       Q    Okay.  Thank you.

3           Did you want a letter or a piece of

4   written communication for a lawsuit or an AG opinion

5   or any opinion specific or not specific in that kind

6   of realm?

7               MS. MATLOCK:   Objection; form.

8       A    It was, I think, important to have a --

9   and -- and Steve and I talked about the -- the

10  things that we would provide to him for his

11  assessment.  He indicated at that time that he would

12  do an assessment and -- and send me a letter.

13          It -- certainly, in my mind, the ability

14  to keep confidential the name of the supplier, both

15  the individual and the -- the name of the pharmacy

16  are inextricably linked with being able to also

17  ensure that their safety is -- is protected.

18          And -- and so from that perspective, I was

19  anxious to see Steve's assessment overall as to

20  whether he shared our view about the threat --

21  threat level and that it might also be helpful in

22  our ability to legally protect that name and not

23  disclose it.

24      Q    (By Mr. Durst) Did he volunteer the idea

25  of let me send you a letter?

                                                    36