| | |
|---|---|
| **RICHARD JORDAN and RICKY CHASE** | *Plaintiffs* |
| **THOMAS EDWIN LODEN, JR.,** | |
| **ROGER ERIC THORSON, and** | |
| **ROBERT SIMON, JR.** | *Intervenors* |
| *vs.* | **No. 3:15-cv-00295-HTW-LRA** |
| **PELICIA HALL, Commissioner,** | |
| **Mississippi Department of Corrections, in** | |
| **her Official Capacity; EARNEST LEE** | |
| **Superintendent, Mississippi State Penitentiary,** | |
| **in his Official Capacity; THE MISSISSIPPI** | |
| **STATE EXECUTIONER, in his Official** | |
| **Capacity; an UNKNOWN EXECUTIONERS,** | |
| **in their Official Capacities** | *Defendants* |

## DEFENDANTS' MEMORANDUM OF AUTHORITIES IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Defendants Pelicia Hall, in her official capacity as Commissioner of the Mississippi Department of Corrections ("MDOC"), Earnest Lee, the Superintendent of the Mississippi State Penitentiary ("MSP"), and the Mississippi State Executioner (collectively referred to as "MDOC"), submit this their Memorandum of Authorities in support of their Motion for Protective Order.

## INTRODUCTION

In May of this year, MDOC obtained new supplies of midazolam, vecuronium bromide, rocuronium bromide, and potassium chloride. MDOC only has one supplier ("Supplier 1") for two of the three drugs needed to carry out executions in accordance with MDOC's lethal injection protocol. Supplier 1 has provided midazolam, the first drug in the protocol which renders the condemned prisoner unconscious prior to the administration of the second and third drugs, to MDOC, as well as vecuronium and rocuronium bromide, the paralytic agent which is injected after midazolam. Without these drugs,

the State cannot carry out executions. Plaintiffs have served discovery requests on MDOC seeking the disclosure of the identities of MDOC's drug suppliers. MDOC has objected, because to identify these suppliers would violate state law prohibiting disclosure of any information which could reveal the identities of its current or former lethal injection drug suppliers. Miss. Code Ann. § 99-19-51(6)(c), (7). Further, Supplier 1 has informed MDOC that it will not provide any additional drugs if its identity is disclosed or revealed. [See Exh. A, Supplier 1 Decl. at ¶ 6]. If Supplier 1 is eliminated, MDOC and the State of Mississippi will be irreparably harmed, because the only source of required drugs will be eliminated. Accordingly, MDOC respectfully requests that the Court enter a protective order barring any and all disclosure or discovery of the identities of MDOC's drug suppliers. Similarly, the identities of all members of the execution team, which by law "include[s] those individuals involved in assisting in the execution in any capacity, as well as those personnel assigned to specific duties related to an execution" must remain confidential and undisclosed. Miss. Code. Ann. § 99-19-51(6)(a).

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      The Discovery Dispute Between Plaintiffs and MDOC**

On May 25, 2017, Plaintiffs served their Second Set of Interrogatories and Second Set of Requests for Production of Documents on MDOC. MDOC served its Responses and Objections to Plaintiffs' Second Sets of Interrogatories and Requests for Production of Documents on June 26, 2017. Interrogatory 18 of Plaintiffs' Second Set of Interrogatories and MDOC's response read as follows:

> **INTERROGATORY NO. 18**: Describe all efforts by MDOC to purchase any of the following, whether in manufactured (FDA-approved) form, compounded from API, or the API itself: pentobarbital, midazolam, any chemical paralytic agent, and/or potassium chloride. Also, identify all persons with discoverable knowledge of these efforts, identify all documents containing discoverable information regarding these efforts, and identify all communications related to those efforts.

> **RESPONSE TO INTERROGATORY NO. 18**: Defendants objects to this Interrogatory for the following reasons: (1) it seeks the disclosure of the identities of MDOC employees and/or agents who have obtained and/or transported and/or attempted to obtain or

transport lethal injection drugs on behalf of MDOC, which could subject those individuals to annoyance, embarrassment, oppression, harassment, retaliation, including potentially endangering their safety and/or well being; (2) it seeks information that could lead to the identification of individuals or entities that have supplied lethal injection drugs to MDOC and subject those individuals or entities to annoyance, embarrassment, oppression, harassment, retaliation, including potentially endangering their safety and/or well being ; (3) it seeks information that is confidential and protected from disclosure by Miss. Code. Ann. § 99-19-51; and (4) it seeks information that is protected by the attorney/client privilege, the work product doctrine, and/or which would otherwise disclose the mental impressions, conclusions, opinions, or legal theories of defense counsel and MDOC's attorneys.

Without waiving, and subject to those objections, Defendants respond as follows: Since June 2016, AG1, acting on behalf of MDOC and at the direction of the Commissioner of MDOC, contacted Supplier 1 and inquired if it could obtain and would supply any of the referenced drugs to the State for use in executions. Supplier 1 obtained and then supplied MDOC with 80 units of midazolam, 6 units of vecuronium bromide, and 20 units of rocuronium bromide. An employee of MDOC ("MDOC3") picked up the drugs from Supplier 1 and transported the drugs to MSP. Supplier 1 notified AG1 that Supplier 1 could not obtain potassium chloride at a concentration suitable for use in executions. Thereafter, AG1, acting on behalf of MDOC and at the direction of the Commissioner of MDOC, requested that a member of the Execution Team ("SE1") obtain potassium chloride from a supplier. SE1 subsequently obtained 17 units of potassium chloride from Supplier 2. MDOC3 picked up the drug from Supplier 2 and transported the drug to MSP. The only documents in the possession, control, or custody of Defendants reflecting these efforts to obtain lethal injection drugs since June 2016 are emails between AG1 and Supplier 1 and MDOC's drug inventory logs. Defendants are producing redacted copies of drug inventory logs covering the time period from January 7, 2016 through June 5, 2017. Defendants are withholding the emails because they would disclose the identity of Supplier 1 in violation of Miss. Code Ann. § 99-19-51, and could subject Supplier 1, the owner(s) of Supplier 1, and Supplier 1's employees to annoyance, embarrassment, oppression, harassment, retaliation, including potentially endangering their safety and/or well being. See Defendants' Second Supplemental Privilege Log, which is being produced.

[Exh. B, Defs.' Resp. and Obj. to Pls.' Second Set of Interr at 5-6].

Request for Production 17 of Plaintiffs' Second Set of Requests for Production and MDOC's

response read as follows:

**REQUEST NO. 17**: Produce all documents identified in your Answer to Interrogatories 18-22.

**RESPONSE TO REQUEST NO. 17**: Defendants object to this Request in that it seeks documents that are protected by the attorney-client privilege, the work product doctrine,

and/or which would otherwise disclose the mental impressions, conclusions, opinions, or legal theories of defense counsel and MDOC's attorneys. Defendants further object to this Request on the grounds that: (1) it seeks documents which identify or may be used to identify MDOC employees and/or agents who have obtained and/or transported and/or attempted to obtain or transport lethal injection drugs on behalf of MDOC, which could subject those individuals to annoyance, embarrassment, oppression, harassment, retaliation, including potentially endangering their safety and/or well being; (2) it seeks documents which identify or may be used to identify individuals or entities that have supplied lethal injection drugs to MDOC and subject those individuals or entities to annoyance, embarrassment, oppression, harassment, retaliation, including potentially endangering their safety and/or well being ; and (3) it seeks information that is confidential and protected from disclosure by Miss. Code. Ann. § 99-19-51.

Without waiving, and limited by those objections, please see documents Bates-numbered MDOC001094 through MDOC001245, which are being produced. See also Defendants' Second Supplemental Privilege Log, which is being produced.

[Exh. C, Defs.' Resp. and Obj. to Pls.' Sec. Set of Req. for Prod. at 5-6]. MDOC served its Second Supplemental Privilege Log on Plaintiffs on the same date.[1] [Exh. D, Defs.' Sec. Supp. Priv. Log].

After reviewing MDOC's responses, objections and Second Supplemental Privilege Log, Plaintiffs' counsel sent a good faith letter to MDOC's counsel on July 10, 2017, specifically indicating their dissatisfaction with MDOC's objections to Interrogatory 18:

In response to Interrogatory No. 18, regarding the Department's efforts to purchase pentobarbital, midazolam, paralytic agents, and potassium chloride, Defendants state that "AG 1" and "MDOC3" have been involved in the negotiation, purchase, and delivery of drugs for use in lethal injections. These two individuals are not identified specifically. Nor are they identified as members designated to be on the "execution team" by the Commissioner. We ask that Defendants provide the names of these individuals in response to this interrogatory.

Further, Defendants' response describes drug purchases from "Supplier 1" and "Supplier 2." Plaintiffs dispute the applicability of the secrecy provisions in Miss. Code Ann. § 99-19-51 to discovery in this federal civil rights action. That objection aside, to the extent Supplier 1 and Supplier 2 are not located within the State of Mississippi, there is no basis for Defendants' assertion that Miss. Code Ann.§ 99-19-51 prevents disclosure of the

---

[1] Plaintiffs sought similar information in their First Set of Interrogatories and Requests for Production, which MDOC answered on June 3, 2016. [Docs. 77, 78]. MDOC objected and declined to identify its drug suppliers or any execution team member, citing, *inter alia*, Miss. Code Ann. § 99-19-51. [*See* Exh. E, Defs.' Resp. and Obj. to Pls.' First Set of Interr.; Exh. F, Defs.' Resp. and Obj. to Pls.' First Set of Req. for Prod.]. Plaintiffs took no action to compel disclosure at that time.

identities of these suppliers.

[Exh. G, Pls.' July 10, 2017 Good Faith Letter at 1].

Plaintiffs' counsel further asserted that, in response to Request 17, MDOC should have produced

"any drug labels or package inserts for the newly acquired supplies of midazolam, rocuronium bromide,

vecuronium bromide, and potassium chloride." [*Id.* at 2]. Last, Plaintiffs' counsel objected to MDOC's

refusal to provide them with copies of emails between AG1 and Supplier 1:

> Communications with Supplier 1. Defendants state (in response to Interrogatory No. 18)
> that they are "withholding the emails because they would disclose the identity of Supplier
> 1 in violation of Miss. Code Ann. § 99-19-51." Plaintiffs dispute the applicability of the
> secrecy provisions in Miss. Code Ann. § 99-19-51 to discovery in this federal civil rights
> action. That objection aside, Defendants have no basis for withholding the emails - and
> their contents - in their entirety. Plaintiffs would ask that all correspondence with
> Supplier 1, as detailed in the Second Supplemental Privilege Log, be provided. To the
> extent Defendants seek to rely on the secrecy provisions of Miss. Code Ann. § 99-19-51,
> redactions should be made such that the content of the communications may be provided
> to Plaintiffs.

[*Id.* at 2-3].

In response to Plaintiffs' good faith letter, counsel for MDOC sent an email dated July 19, 2017,

summarizing its position:

> **Interrogatory No. 18**: "AG1" and "MDOC 3" are not being identified by name due to
> safety, security, and privacy concerns, and to comply with Miss. Code Ann. s
> 99-19-51(2), which provides that the execution team "shall also include those individuals
> involved in assisting in the execution in any capacity, as well as those personnel assigned
> to specific duties related to an execution." The identities of "Supplier 1" and "Supplier 2"
> are also confidential and protected by Section 99-19-51(2).

[Exh. H, July 19, 2017 email from MDOC counsel]. Counsel for MDOC also addressed Plaintiffs'

complaint about MDOC's decision to withhold the drug labels and package inserts from the drugs

MDOC obtained in May:

> Defendants disagree with plaintiffs' interpretation of Section 99-19-51, which is
> inconsistent with the plain language of the statute. The suppliers of the drugs to MDOC
> are located in Mississippi. Even if only redacted copies of the requested documents (drug
> labels, package inserts, etc.) were produced, the manufacturers of the drugs would be

identified because such documents vary in appearance from manufacturer to manufacturer. The identity of the manufacturer(s) could then be used to identify the Mississippi-based suppliers of lethal injection drugs through "reverse engineering." Therefore, Defendants will not produce any such documents based on safety, security, and privacy concerns, as well as Section 99-19-51, which provides that "**any** portion of any record of any kind that could identify a person as being . . . a current or former supplier of lethal injection chemicals . . . shall at all times be confidential, exempt, and protected from disclosure." (emphasis added).

[*Id.*].

Counsel for the plaintiffs then notified MDOC of their intent to file a motion to compel, and MDOC stated its intent to file a motion for protective order. The parties exchanged good faith certificates. [Exh. I, Good Faith Certificate].

MDOC's position throughout this litigation (and otherwise) has remained consistent. It has steadfastly refused to disclose the identity of its lethal injection drug suppliers and execution team members, or produce any document which *could* be used to identify those persons or entities. That information is confidential and exempt from disclosure by virtue of Miss. Code Ann. § 99-19-51, as amended in 2016. Further, preserving the confidentiality of this information is essential to MDOC's ability to acquire the lethal injection drugs needed to carry out executions, because pharmacies will only supply lethal injection drugs if their identities remain secret.

**B.**     **Plaintiffs' Other Attempts to Discover Identities of Drug Suppliers**

This is not the first or only attempt by Plaintiffs or their counsel to reveal the identity of MDOC's drug suppliers. In 2014, MDOC responded to a public records request made by the Roderick & Solange MacArthur Justice Center ("MJC"), the public interest law firm which represents Plaintiffs, seeking all documents related to MDOC's lethal injection drugs. MDOC inadvertently  failed to redact sufficient information. MJC sued MDOC under the Mississippi Public Records Act. After filing suit, MJC was able to identify the supplier by comparing unredacted information (specifically the date and the amounts of the transactions) with publicly available information from the State's transparency website. [*See* Exh.

J, Pls.' Reply in Opp. to Def.'s Counterclaim at 2-3]. Upon discovering the identity of the drug supplier, the MJC immediately disclosed the identity of the supplier in court documents and statements to the press. [*Id.*; Exh. K, Tracy Connor, *Mississippi Death Row Inmate Michelle Byrom Challenges Drugs*, NBC News (Mar. 28, 2014)].

MJC then filed a Section 1983 action in state court on behalf of two death row inmates challenging the constitutionality of Mississippi's lethal injection protocol, and served Rule 45 document subpoenas on the Mississippi supplier and the company which sold it the pentobarbital that was provided to MDOC. (Exh. L, Subpoenas to Brister Brothers and Professional Compounding Centers of America, and Returns]. After these entities were forced to hire lawyers and comply with the subpoenas, the Mississippi supplier was no longer willing to sell lethal injection drugs to MDOC. As a result, MDOC was unable to obtain a new supply of pentobarbital from this supplier or any other source. [Doc. 25-1, Decl. of Marshall Fisher at ¶¶ 8-9 ]. Thus, the public disclosure of this supplier's identity by Plaintiffs' counsel not only eliminated MDOC's sole supplier of lethal injection drugs, it forced MDOC to amend its lethal injection protocol to allow for the use of midazolam in place of pentobarbital, which the Plaintiffs now challenge. [*Id.* at ¶ 10]. After much effort, Supplier 1 agreed to provide certain execution drugs, but only on condition of complete anonymity.

Even after MJC "outed" MDOC's drug supplier, it continued peppering MDOC with repeated and largely duplicative public records requests. [*See* Docs. 31-1, -2, -3, -4, -5, MJC Public Records Requests]. This resulted in a second public records lawsuit between MJC and MDOC. *See Mississippi Dep't of Corr. v. Roderick & Solange MacArthur Justice Ctr.*, 220 So. 3d 929, 2017 WL 1370983 (Miss. Apr. 13, 2017). The Chancery Court of Hinds County ordered MDOC to produce the unredacted documents requested by MJC. MDOC appealed, but while the appeal was pending, the Mississippi Legislature passed Senate Bill 2237 (2016), which amended Miss. Code Ann. § 99-19-51 to

unequivocally provide that the "identit[y] of . . . a supplier of lethal injection chemicals . . . shall at all times remain confidential, and the information is exempt from disclosure under the provisions of the Mississippi Public Records Act[.]" Miss. Code Ann. § 99-19-51(6)(c). After considering the amendment, the Mississippi Supreme Court vacated and rendered, holding that the documents sought by MJC were within the scope of the statute, and that MDOC was not required to produce any public record which could be used to identify its drug suppliers, because this information was exempt from disclosure under Public Records Act. *See Roderick & Solange MacArthur Justice Ctr.*, 2017 WL 1370983 at *8.

MDOC's position (and Supplier 1's demand for anonymity) is not unique. During the summer of 2016 and early 2017, in *this* case, Plaintiffs had Rule 45 subpoenas issued to the correctional departments of the States of Texas, Missouri, Georgia, Virginia, and Idaho in an effort to discover the identities of their drug suppliers. [*See* Docs. 72, 73, 75, 97, 98]. These subpoenas directed each correctional department to produce a 30(b)(6) representative to testify at a deposition about the sources of its lethal injection drugs, including the name, address, and telephone number of each supplier. [*See, e.g.*, Doc. 98, Notice of Depo. at 2]. These subpoenas further required the departments to produce all documents from 2010 to the present regarding any purchase or attempt to purchase pentobarbital and/or midazolam. [*See, e.g.*, Doc. 98-2, Exh. A to Subpoena Duces Tecum at 2]. None of these States agreed to identify their drug suppliers or produce documents which would do so. Missouri, Georgia, and Virginia all filed motions to quash the subpoenas to prevent such disclosure. [Exh M, Suggestions in Supp. of MTQ (Missouri); Exh. N, GDOC MTQ and Mem. of Law; Exh. O, Mem. in Supp. of MTQ (Virginia)]. To date, the courts have not permitted Plaintiffs to discover the identities of other State's drug suppliers. *See, e.g.*, *In re Missouri Dep't of Corr.*, 839 F.3d 732, 734 (8th Cir. 2016) (granting Missouri's petition for writ of mandamus), *cert. denied sub nom. Jordan v. Missouri Dep't of Corr.*, 137 S. Ct. 2180, 198 L. Ed. 2d 236 (2017).

As Plaintiffs continue to demand disclosure of confidential information regarding MDOC's drug supplier(s) and execution team members, Defendants have been left with no choice but to file this motion for protective order.

## ARGUMENT

### *Controlling Legal Standard For Issuance of a Protective Order*

District courts have broad discretion in deciding whether to issue a protective order, *see Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985), because they are "in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). Under Fed. R. Civ. P. 26(c)(1), a court may, "for good cause," enter a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" The term "good cause" "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Cazorla v. Koch Foods of Mississippi, LLC*, 2014 WL 12639863, at *2 (S.D. Miss. Sept. 22, 2014) (quoting *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998)). In analyzing good cause, a district court must "balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Cazorla*, 2014 WL 12639863, at *2 (quoting *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001); citing *United States v. Garrett*, 571 F.2d 1323, 1326 & n.3 (5th Cir. 1978)). Further, under Fed. R. Civ. P. 37(a)(5)(B), if a court denies a motion to compel, it "may issue any protective order authorized under Rule 26(c)[.]"[2]

Rule 26(c)(1) permits a court to enter an order that protects a party or person from discovery in numerous ways, including:

---

[2] Plaintiffs' counsel confirmed to the Court their intention to file a motion to compel at the status conference held on July 27, 2017.

forbidding the disclosure or discovery;

* * *

forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;

designating the persons who may be present while the discovery is conducted;

* * *

requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . .

Fed. R. Civ. P. 26(c)(1)(A), (D), (E), (G).

**I.** **Good Cause Exists to Enter a Protective Order Forbidding Disclosure and Discovery of Any Information, Document, or Record That Would Reveal or Could Lead to the Disclosure of the Identities of MDOC's Current and Former Lethal Injection Drug Suppliers, or Members of the Execution Team.**

MDOC has met its burden of showing good cause for the entry of a protective order for the following reasons. First, under Miss. Code Ann. § 99-19-51(7), such information "shall at all times be confidential, exempt, and protected from disclosure," unless a court enters a protective order sufficient to preserve the secrecy of such supplier's identity. Section 99-19-51 also prohibits the disclosure of any information which could identify any current or former member of the State's execution team, which includes "those individuals involved in assisting in the execution in any capacity, as well as those personnel assigned to specific duties related to an execution." Miss. Code Ann. 99-19-51(6)(a), (7). Indeed, if the Court does not enter a protective order, it would effectively be requiring MDOC to violate state law. *See In re: Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2015 WL 6446093, at *7 (S.D. Ohio Oct. 26, 2015), (granting protective order forbidding discovery of the source(s) of Ohio's lethal injection drugs and finding that "[a]bsent a protective order, this Court would be compelling Defendants to violate" Ohio's execution secrecy law), *aff'd sub nom. In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016).

The Court should enforce the confidentiality protections in Section 99-19-51 through entry of a protective order because Section 99-19-51 reflects the State's compelling interest in preserving the confidentiality of the information sought by Plaintiffs. Further, Plaintiffs have no need for this information.

Second, MDOC will be irreparably harmed if it is compelled to violate Section 99-19-51 and disclose this confidential information. If the identities of MDOC's drug suppliers are disclosed, Supplier 1 will cease providing lethal injection chemicals to MDOC, and it is highly unlikely that MDOC will be able to find a new supplier, fulfilling Plaintiffs' aim: MDOC and the State Executioner will be unable to carry out executions when ordered to do so by the Mississippi Supreme Court. *See* Miss. Code. Ann. § 99-19-55(2).

Third, the Court should enter an order under Rule 26(c)(1) to protect MDOC's drug suppliers and execution team members from the substantial risk that disclosure of their identities could expose them to harm, oppression, annoyance, or harassment. The threats, harassment, and financial harm to which suppliers of lethal injection drugs have been subjected as a result of the public disclosure of their identities is well-documented. *See infra* at 17-20.

Only a protective order that completely bars any disclosure or discovery whatsoever of MDOC's drug suppliers and execution team members will suffice under these circumstances. Because of the irreparable harm that will result, the risk of even inadvertent disclosure is too great to permit entry of a protective order which allows even extremely limited disclosure of this highly sensitive and confidential information --- because if that information is disclosed, there is no remedy or sanction available that could cure such harm.

A.      **Miss. Code Ann. § 99-19-51 Requires MDOC to Keep the Identities of Current and Former Lethal Injection Suppliers Confidential.**

In 2016, the Mississippi Legislature enacted Senate Bill 2237, which amended Miss. Code Ann.

§ 99-19-51 to provide that the "identities of all members of the execution team . . . [and] a supplier of lethal injection chemicals . . . shall at all times remain confidential, and the information is exempt from disclosure under the provisions of the Mississippi Public Records Act of 1983." Miss. Code Ann. § 99-19-51(6)(c). Section 99-19-51, as amended, further states in relevant part:

> Notwithstanding any provision of law to the contrary, any portion of any record of any kind that could identify a person as being a current or former member of an execution team or a current or former supplier of lethal injection chemicals . . . shall at all times confidential, exempt, and protected from disclosure, but the remainder of the record shall not be protected unless otherwise provided by law. A court shall preserve the secrecy of all confidential and exempt information described in this section by reasonable means, which may include granting protective orders, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose such information without prior court approval.

*Id.* at (7).

The term "'supplier of lethal injection chemicals' means a supplier or suppliers of lethal injection chemicals located within MDOC of Mississippi." *Id.* at (6)(b). Additionally, the execution team, as defined by Section 99-19-51, consists of the following persons:

> the State Executioner and his deputies who are responsible for the administration of lethal chemicals, . . . such as medical personnel, who provide direct support for the administration of lethal chemicals . . . [and] those individuals involved in assisting in the execution in any capacity, as well as those personnel assigned to specific duties related to an execution.

*Id.* at (6)(a).

Although the federal courts adjudicating federal claims are not absolutely bound by state statutes declaring certain information privileged or confidential, "[f]ederal courts will, however, consider state policies supporting a privilege in weighing the government's interest in confidentiality." *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991). The Fifth Circuit has noted that there is "a strong policy of comity between state and federal sovereignties [which] impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural

policy." *Am. Civil Liberties Union of Mississippi, Inc. v. Finch*, 638 F.2d 1336, 1343 (5th Cir. 1981) (internal quotations and citation omitted). To determine whether to enforce a "privilege not existent in the common law but enacted by the state legislature based on unique considerations of government policy," federal courts should "balanc[e] the policies behind the privilege against the policies favoring disclosure." *Id.* (internal quotations and alterations omitted). The Fifth Circuit has instructed that in performing this balancing test, courts should answer the following questions: "(1) whether the fact that the courts of Mississippi would recognize the privilege itself creates good reason for respecting the privilege in federal court, regardless of our independent judgment of its intrinsic desirability; and (2) whether the privilege is intrinsically meritorious in our independent judgment." *Id.*; *see, e.g.*, *Kendall v. Mississippi Baptist Health Sys., Inc.*, 2009 WL 5030669, at *2 (S.D. Miss. Dec. 15, 2009) (applying *Finch* balancing test to state statute prohibiting the Mississippi Board of Nursing from disclosing information in its investigative files).

The provisions in Section 99-19-51 making the identities of current and former suppliers of lethal injection chemicals confidential and exempting from disclosure any record which could identify a current or former supplier of lethal injection chemicals satisfy both prongs of the *Finch* balancing test. First, the Mississippi Supreme Court has recognized and enforced this statutory exemption. In *Mississippi Department of Corrections v. Roderick & Solange MacArthur Justice Ctr.*, 220 So.3d 929, 2017 WL 1370983 (Miss. 2017), the Supreme Court held that Section 99-19-51, as amended, exempted documents which would have identified the State Executioner and a supplier of lethal injection chemicals from disclosure under the Mississippi Public Records Act. *Id.* at * 8.

Second, the exemptions set forth in Section 99-19-51 are intrinsically meritorious. As discussed more fully below, there is ample evidence that pharmacies will not supply lethal injection drugs to state correctional departments unless their identities remain secret and confidential, and courts across the

country have repeatedly recognized that preserving the confidentiality and anonymity of drug suppliers is essential to a State's ability to carry out executions. *See infra* at 20-23. It is beyond dispute that, if this Court does not enter a protective order prohibiting the disclosure and discovery of MDOC's drug suppliers, Supplier 1 will no longer provide execution drugs to MDOC. In that event, it will be virtually impossible for MDOC to locate a new supplier of those drugs, because MDOC will be unable to provide any assurance of confidentiality despite state law specifically mandating such protection.

Given that Section 99-19-51 implicates a state interest of the highest order, and that Plaintiffs have no need for the information, this Court should enter a protective order forbidding the disclosure or discovery of the sources of MDOC's lethal injection drugs in any way.

**1.  Pharmacies Will Only Supply Lethal Injection Drugs If Their Identities Are Kept Confidential.**

It is well established that pharmacies which provide drugs to States for use in executions do so under the condition that their identities remain secret. Moreover, when the identities of drug suppliers have been disclosed, those suppliers have immediately declared that they would no longer provide lethal injection drugs to States due to threats, harassment, and/or incurring significant legal fees.

This is the case with Supplier 1, which recently supplied MDOC with midazolam and the paralytic agents, vecuronium bromide and rocuronium bromide. Supplier 1 is a licensed pharmacy located in Mississippi, and its "decision to supply the Mississippi Department of Corrections with lethal injection chemicals was and is contingent on [its] identity remaining secret." [Exh. A, Supplier 1 Decl. at ¶¶ 2, 6]. Supplier 1 unequivocally states that if its "identity is disclosed or revealed, [it] will no longer supply the Mississippi Department of Corrections with lethal injection chemicals." [*Id.* at ¶ 6]. Supplier 1 "reasonably fears that if its identity is disclosed or revealed, anti-death penalty advocates will harass and retaliate against [it], resulting in physical and/or financial harm to Supplier 1, its owner(s), and its employees." [*Id.* at ¶ 7]. Further, Supplier 1 "reasonably fears that if its identity is disclosed or revealed,

its business relationships with the sources from which Supplier 1 receives lethal injection chemicals will be endangered, and Supplier 1 will be subjected to retribution for providing lethal injection chemicals to the Mississippi Department of Corrections." [*Id.*].

Thus, it cannot be disputed that if Supplier 1's identity is disclosed, MDOC will lose its only supplier of midazolam and/or vecuronium/rocuronium bromide. It is highly unlikely that any other pharmacy would be willing to supply those drugs to MDOC if this Court effectively eliminates the confidentiality requirement of Section 99-19-51, such that MDOC could not provide any assurance to a potential supplier that its identity would remain confidential as required by state law.

The purpose of Section 99-19-51 is clear and supported by sound public policy: to preserve the State's ability to obtain the lethal chemicals necessary to carry out executions by protecting the State's drug suppliers, and to prevent harassment of others who play a role in carrying out executions, such as those making arrangements to obtain such drugs from drug suppliers (*e.g.*, "AG1" and "MDOC 3").

Of course, the Court need not rely solely on the testimony of Supplier 1. The public identification of MDOC's former supplier by MJC in 2014, *see supra* at 6-7, rendered that source unavailable to the State for future purchases, resulting in MDOC's inability to obtain pentobarbital in any form and carry out executions in accordance with its then-current lethal injection protocol. To date, Supplier 1 is the only pharmacy MDOC has been able to identify that is willing to provide the first two drugs to the State, and that was contingent on anonymity. Because potential suppliers will not sell execution drugs unless their identities are kept confidential, States have consistently refused to identify their suppliers and have passed statutes similar to Section 99-19-51[3] in order to protect their ability to acquire execution drugs. It is no coincidence that each of the States upon which Plaintiffs have served subpoenas in this action have

---

[3] *See* Georgia Lethal Injection Secrecy Act, O.C.G.A. § 42-5-36; Mo. Rev. Stat. § 546.720.2; Ohio Rev. Code §§ 2949.221, 2949.222; Va. Code § 53.1-234.

refused to identify their drug suppliers.

*Missouri*: The Plaintiffs served a Rule 45 subpoena on the Missouri Department of Corrections seeking "information regarding [Missouri]'s use of pentobarbital in lethal injections, including the identity of [Missouri]'s supplier of pentobarbital. *In re Missouri Dep't of Corr.*, 839 F.3d 732, 734 (8th Cir. 2016). Missouri filed a motion to quash and submitted an affidavit from its Director, George Lombardi, who "explained that because [Missouri]'s pentobarbital suppliers 'require the assurance of confidentiality,' producing the information sought by the inmates would result in the state no longer being able to obtain the drug for use in executions." *Id.* The district court denied the motion to quash and ordered Missouri to "produce the majority of information . . . sought as well as a detailed privilege log." *Id.* Missouri immediately appealed to the Eight Circuit. *Id.*

Missouri's drug supplier was allowed to intervene in the appeal and proceed anonymously under the pseudonym "M7." *Id.* at 735. M7 submitted a declaration stating that its "decision to provide lethal chemicals anonymously arises out of [its] fear of harassment and retaliation, both physical and financial, if [its] identity is released." [Exh. P, M7 Decl. at ¶ 4]. M7 testified that it "[s]pecifically . . . fears that if its identity is disclosed to the public, death penalty opponents will seek physical and/or financial harm on [it]." [*Id.* at ¶ 5]. Further, M7 confirmed that "[i]f disclosure of M7's identity is required, M7 will not supply lethal chemicals to the state of Mississippi. In fact, M7 will no longer supply lethal chemicals at all." *In re Missouri Dep't of Corr.*, 839 F.3d at 735. The Eighth Circuit granted Missouri's mandamus petition, holding, in part, that the disclosure of M7's identity would "certainly harm" Missouri's interest in enforcing its criminal laws "by preventing [it] from acquiring pentobarbital for executions from M7." *Id.* at 736 (citing *In re Blodgett*, 502 U.S. 236, 239 (1992) (recognizing state interest in "exercising its sovereign power to enforce the criminal law")). The Supreme Court denied Plaintiffs' petition for certiorari. 137 S. Ct. 2180 (2017). This is consistent with previous Eighth Circuit rulings holding that

Missouri was not required to disclose its drug supplier.[4]

*Virginia:* The compounding pharmacy which supplies execution drugs to the Virginia Department of Corrections ("VDOC") agreed to do so only on condition of confidentiality, and required VDOC to enter into a memorandum of understanding to protect its identity. "Total confidentiality about the pharmacy's identity was an essential term of that agreement." *Gray v. McAuliffe*, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017).

When Plaintiffs in this case issued a Rule 45 subpoena to VDOC seeking the source of its drugs, VDOC produced a limited number of redacted documents, but refused to produce anything which could identify its drug supplier. [*See* Exh. O, VDOC Mem. in Supp. of MTQ, at 1-2]. VDOC moved to quash, arguing, among other things, that this information is shielded from disclosure pursuant to Virginia law, *see* Va. Code § 53.1-234, and that if its supplier's identity was disclosed, the supplier "would not supply execution drugs to anyone—Virginia or Mississippi," since confidentiality is an essential term of its agreement with VDOC.[5] [*See id.* at 8-9, 11].

*Georgia*: Similarly, the Georgia Department of Corrections ("GDC") filed a motion to quash Plaintiffs' Rule 45 subpoena seeking the identity of its drug supplier(s). [Exh. N, GDC MTQ and Mem in Supp.]. GDC contended that it should not be required to disclose the identity of its drug supplier

---

[4] In an earlier lawsuit, the Eighth Circuit held that the identity of Missouri's drug supplier[s] was not relevant to an Eighth Amendment method of execution claim, overruling lower court decisions ordering disclosure. *In re Lombardi*, 741 F.3d 888, 894-95 (8th Cir. 2014). Although never officially identified, the compounding pharmacy in Tulsa, Oklahoma *suspected* by anti-death-penalty advocates to be the supplier ("The Apothecary Shoppe") was sued in federal court by a Missouri inmate, and the pharmacy apparently capitulated and agreed not to supply drugs to Missouri in order in exchange for dismissal of the suit. *See Taylor v. The Apothecary Shoppe, LLC*, 2014 WL 631664 (N.D. Okla. Feb. 18, 2014) (ordering certain documents placed under seal in light of newspaper report that the pharmacy had agreed not to provide lethal injection drugs to resolve the lawsuit); *see also* Tim Tally, *Tulsa Pharmacy Won't Sell Drug for Missouri Execution under Deal*, Tulsa World (Feb. 18, 2014) http://www.tulsaworld. com/news/local/tulsa-pharmacywon-t-sell-drug-for-missouri-execution-under/article_a8148d29-4503-5e2 0-aa43-983d0c330a71.html.

[5] The district court in Virginia has not ruled on VDOC's motion to quash as of this date.

because this information is privileged under Georgia's Lethal Injection Secrecy Act, O.C.G.A. § 42-5-36, and the "Eleventh Circuit has considered the Secrecy Act several times, and each time it held that a capital offender did not have a right to the confidential information and that the information did not have to be disclosed."[6] [*Id.*, at 5-7]. Additionally, GDC asserted that the "State of Georgia ha[s] a very strong interest in preventing its confidential execution information from being publicly disclosed" considering the "guerrilla war currently occurring against the death penalty in the United States" in which "[a]nti-death penalty groups have been on a crusade against those legally involved with executions, harassing and threatening them until they feel pressured to withdraw their participation." [*Id.* at 10].

A magistrate judge granted GDC's motion to quash, in part, because "the Eleventh Circuit has uniformly given Georgia's Lethal Injection Secrecy Act an expansive reading, essentially viewing it as creating a total ban on the production of information concerning Georgia's choices in connection with its lethal injection protocol." [Exh. S, Oct. 20, 2016 Order at 6]. In view of the Eleventh Circuit's treatment of Georgia's secrecy legislation, the magistrate concluded that because "Georgia's own death row prisoners have been flatly denied access to information covered by Georgia's Lethal Injection Secrecy Act, it similarly bars Jordan and Chase's efforts to secure the same types of information via subpoena for use in their Mississippi case." [*Id.* at 7]. The district court judged subsequently affirmed the magistrate's ruling, [Exh. T, Jan. 17, 2017 Order], and the Eleventh Circuit denied Plaintiffs' petition for writ of mandamus. [Exh. U, Mar. 27, 2017 Order].

*Texas:* In 2013, after the State of Texas disclosed the identity of the pharmacy which had

---

[6] GDC cited the following Eleventh Circuit decisions: *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260 (11th Cir. 2014); *Gissendaner v. Ga. Dep't of Corr.*, 779 F.3d 1275 (11th Cir. 2015) ("*Gissendaner I*"); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 803 F.3d 565 (11th Cir. 2015) ("*Gissendaner II*"); *Terrell v. Bryson*, 807 F.3d 1276 (11th Cir. 2015); *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, (11th Cir. 2016). [Exh. N, GDC MTQ and Mem. in Supp. at 6].

supplied the State with compounded pentobarbital, the pharmacy received harassing emails, and anti-death-penalty activists publicly demonstrated outside of the pharmacy. [*See* Exh. 2 to Supplier 1 Decl., Emails to Texas pharmacy; Exh. 3 to Supplier 1 Decl., Aff. of Exec. Dir. of Tex. Dept. of Crim. Just. Brad Livingston at ¶ 1].  As a result, the owner of the pharmacy, the Woodlands Compounding Pharmacy, not only refused to supply any additional lethal injection drugs, but sent a letter to the State of Texas demanding the return of the pentobarbital. [Exh. 4 to Supplier 1 Decl.]. Thereafter, Texas has refused to disclose the identity of its drug supplier(s). *See Wood v. Collier*, 836 F.3d 534, 537 n.3 (5th Cir. 2016) ("In an effort to protect its suppliers, Texas does not disclose its sources of pentobarbital."). The Executive Director of the Texas Department of Criminal Justice has testified that protecting the confidentiality of its drug supplier(s) is essential to Texas' ability to acquire lethal injection drugs. [*See* Exh. 13 to Supplier 1 Decl., Brad Livingston Aff. at 2 ("TDCJ has been able to purchase pentobarbital only by ensuring that every effort would be taken to protect the identity and, thus, safety of the pharmacists involved.")].

Thus, it is readily apparent that MDOC will not be able acquire all the drugs necessary to carry out future executions unless the identities of its drug suppliers are not kept confidential.  Because confidentiality is essential to the State's interest in the enforcement of  criminal law and MDOC's ability to carry out executions under state law, the confidentiality requirements of Section 99-19-51 should be fully enforced by the Court.  *Cf. Kendall*, 2009 WL 5030669, at *2 (recognizing and enforcing Nursing Board's confidentiality provisions because "[i]f the public, or other healthcare workers or facilities, are not assured that their reporting is confidential, discovery of infractions may be missed or delayed").

### 2.      Courts Have Consistently Recognized the Need to Preserve the Confidentiality of a State's Lethal Injection Drug Suppliers.

In *Glossip v. Gross*, --- U.S. ---, 135 S. Ct. 2726 (2015), the United States Supreme Court expressly acknowledged the supply-side attack on the death penalty which has targeted manufacturers of

lethal injection drugs. At the *Glossip* oral argument, Justice Alito described the tactics of capital punishment opponents as "guerilla war against the death penalty which consists of efforts to make it impossible for the States to obtain drugs that could be used to carry out capital punishment with little, if any, pain." *Glossip*, Oral Argument, 2015 WL 1929998 at *14-15 (U.S. Apr. 29, 2015). The majority opinion in *Glossip* discussed the efforts by anti-death penalty advocates, both in the U.S. and abroad, and the role they played in rendering sodium thiopental and pentobarbital unavailable:

> *Baze* cleared any legal obstacle to use of the most common three-drug protocol that had enabled States to carry out the death penalty in a quick and painless fashion. But a practical obstacle soon emerged, as anti-death-penalty advocates pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences. The sole American manufacturer of sodium thiopental, the first drug used in the standard three-drug protocol, was persuaded to cease production of the drug. After suspending domestic production in 2009, the company planned to resume production in Italy. Activists then pressured both the company and the Italian Government to stop the sale of sodium thiopental for use in lethal injections in this country. That effort proved successful, and in January 2011, the company announced that it would exit the sodium thiopental market entirely.
>
> After other efforts to procure sodium thiopental proved unsuccessful, States sought an alternative, and they eventually replaced sodium thiopental with pentobarbital, another barbiturate. In December 2010, Oklahoma became the first State to execute an inmate using pentobarbital. That execution occurred without incident, and States gradually shifted to pentobarbital as their supplies of sodium thiopental ran out. It is reported that pentobarbital was used in all of the executions carried out in 2012. Petitioners concede that pentobarbital, like sodium thiopental, can "reliably induce and maintain a comalike state that renders a person insensate to pain" caused by administration of the second and third drugs in the protocol. And courts across the country have held that the use of pentobarbital in executions does not violate the Eighth Amendment.
>
> Before long, however, pentobarbital also became unavailable. Anti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions. That manufacturer opposed the death penalty and took steps to block the shipment of pentobarbital for use in executions in the United States. Oklahoma eventually became unable to acquire the drug through any means. The District Court below found that both sodium thiopental and pentobarbital are now unavailable to Oklahoma.

*Glossip*, 135 S. Ct. 2733-34 (internal citations omitted).

In addition to the pressure applied to drug manufacturers, anti-death-penalty advocates have also targeted the local pharmacies which directly supply lethal injection drugs to the various states, as exemplified by MJC's "outing" of the Grenada pharmacy which previously supplied lethal injection drugs to MDOC. As this two-pronged supply side attack continued, the courts began to acknowledge that States could not obtain drugs for executions unless the identities of their suppliers was kept secret. *See, e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1106, 1113 (8th Cir.), *cert. denied*, 135 S. Ct. 2941, 192 L. Ed. 2d 976 (2015) (holding that condemned inmates would not be allowed to learn the identity of Missouri's drug supplier because of "[t]he real potential that unwarranted discovery would serve as a back-door means to frustrate the State's ability to carry out executions" and "the practical effect of public disclosure would likely be frustration of the State's ability to carry out lawful sentences").

Other appellate courts have likewise rejected attempts by condemned prisoners to discover the identity of drug suppliers because of the harmful effects disclosure would have on States' ability to carry out executions. *See, e.g.*, *Gissendaner v. Commissioner, Georgia Dep't of Corr.*, 803 F.3d 565, 569 (11th Cir. 2015) ("To require, as Gissendaner is seeking, that Georgia open up about its source of pentobarbital would result in the drug becoming completely unavailable for use in executions."); *Kelley v. Johnson*, 496 S.W.3d 346, 362 (Ark. 2016) (holding that prisoners did not have a constitutional right to know the source of State's lethal injection drugs because "the current supplier of the drugs agreed to provide them only on the condition of anonymity," and because it is "well documented" that "disclosing" the identity of drug suppliers is "actually detrimental to the process"); *Owens v. Hill*, 758 S.E.2d 794, 805 (Ga. 2014) (reversing injunction prohibiting execution of inmate with drugs from confidential source and observing that "without the confidentiality offered to execution participants by the statute, as the record and our case law show, there is a significant risk that persons and entities necessary to the execution would become unwilling to participate").

Importantly, the Fifth Circuit has held that condemned prisoners do not have a due process right to information about the State's supplier of lethal injection drugs. In *Trottie v. Livingston*, 766 F.3d 450 (5th Cir. 2014) (per curiam), the inmate claimed he had a constitutional right to discover the source of the compounded pentobarbital that Texas intended to use in his execution. *Id.* at 452. Texas refused to reveal the identity of its drug supplier, but did disclose that it had obtained the pentobarbital from a licensed pharmacy in the United States and that the pentobarbital "ha[d] been tested by an independent laboratory and found to be 108% potent and free from contaminants." *Id.* The Fifth Circuit concluded that the elimination of all possible "uncertainty as to the method of execution is not a cognizable liberty interest." *Id.* (citing *Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013)).

In sum, numerous courts have consistently recognized that States have a compelling interest in keeping the identities of their execution drug suppliers secret, because disclosure of a supplier's identity would severely impede a State's ability to obtain drugs and enforce the death penalty.

### 3. Plaintiffs Do Not Need to Know the Identities of MDOC's Drug Suppliers.

As demonstrated above, MDOC has a significant and compelling interest in preserving the anonymity of its lethal injection drug suppliers. In contrast, Plaintiffs have no legitimate need for this information. The identities of MDOC's drug suppliers, are simply not relevant to Plaintiffs' claims. *See In re Lombardi*, 741 F.3d 888, 897 (8th Cir. 2014) (holding that "the identities of the prescribing physician, pharmacist, and laboratory are plainly not relevant" to an Eighth Amendment challenge to a state's lethal injection protocol because the "merits of these claims do not depend on the identities of the physician, pharmacist, or laboratory").

In order to prevail in this action, Plaintiffs must prove that MDOC's lethal injection protocol "creates a demonstrated risk of severe pain" and that "the risk is substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737 (internal quotations and citation omitted).

The names and quantities of the drugs MDOC will use during their executions are all Plaintiffs need to try to make this showing. Plaintiffs already have this information. MDOC's lethal injection protocol identifies the names and quantities of the three drugs that will be administered at Plaintiffs' executions. Further, MDOC has already disclosed that it recently acquired sufficient quantities of midazolam, vecuronium bromide, rocuronium bromide, and potassium chloride to carry out several executions. Having been provided this information, Plaintiffs and their experts have no need to know the identity of MDOC's suppliers.

Plaintiffs must also "identify an alternative [method of execution] that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Glossip*, 135 S. Ct. at 2737. The identities of MDOC's lethal injection drug suppliers are plainly irrelevant to this issue. *See Jones v. Comm'r, Georgia Dep't of Corr.*, 811 F.3d 1288, 1296 (11th Cir. 2016) (holding that even though Georgia's confidentiality statute "protects information about the specific drug sources Georgia actually is using and identifying information about any person or entity who participates in the execution of a death sentence[, i]t does not deprive [prisoner] of the ability to locate an alternative source").

Thus, as Plaintiffs have no legitimate need to know the identity of MDOC's drug suppliers, the only possible use of such information would be to publicly disclose MDOC's current suppliers, just as Plaintiffs' attorneys "outed" MDOC's previous supplier in 2014 --- and thus to achieve the goal of eliminating MDOC's only source of two of the three drugs required for executions under Mississippi law. Because the identities of MDOC's drug suppliers are irrelevant to Plaintiffs' claims, the State's need to preserve the secrecy of its drugs suppliers far outweighs any purported need Plaintiffs could possibly have in learning that information. *Cf. In re: Ohio Execution Protocol Litig.*, 2015 WL 6446093, at *8 (concluding that condemned prisoners had "failed to present a persuasive case for the proposition that source knowledge is necessary to mount a meaningful, much less comprehensive, challenge to

Ohio's execution protocol" and that "the burden on and prejudice to [the State] . . . outweighs Plaintiffs' interests"). Put another way, the Court should bar disclosure because state policy requiring that suppliers' identities remain secret can be "accomplished at no substantial cost to federal substantive and procedural policy." *Finch*, 638 F.2d at 1343.

Plaintiffs also seek the production of the drug labels, package inserts, and all other materials related to the lethal injection drugs that MDOC acquired in May of this year. However, these documents are obviously confidential and exempt from disclosure under Section 99-19-51. Subsection (7) of the amended statute provides that "*any* portion of *any* record of *any* kind that *could* identify a person as being . . . a current or former supplier of lethal injection chemicals . . . shall *at all times* be confidential, exempt, and protected from disclosure[.]" (emphasis added). The appearance (logos, size and type of font, number of pages, and the like) of drug labels and package inserts vary from manufacturer to manufacturer. No matter how much information MDOC redacted, the identities of the drug manufacturers could still be disclosed from the appearance of the labels or package inserts. If the identities of the drug *manufacturers* are determined, either Plaintiffs or the manufacturers could identify MDOC's in-state suppliers through "reverse engineering."

MDOC's concern is well-founded in this regard, as recent efforts to halt executions in the State of Arkansas demonstrate. The Arkansas Department of Corrections produced redacted copies of drug labels and package inserts to condemned inmates. *See Kelley*, 496 S.W.3d at 352. However, even in redacted form, the labels and inserts disclosed sufficient information for the manufacturers of the drugs to identify their products and attempt to stop the state from using its products in executions. Two of the drug manufacturers, Fresenius Kabi USA, LLC, and West-Ward Pharmaceuticals Corp., moved for leave to file an *amicus* brief in a federal court case in which inmates were challenging the constitutionality of the State's lethal injection protocol. [*See* Exh. Q, *McGehee v. Hutchinson*, E. Dist. of Ark., No. 4:17-cv-

179-KGB, Br. in Supp. of Motion for Leave, Doc. 43 (Apr. 13, 2017)].  The manufacturers asserted that they should be allowed to intervene because they had manufactured two of the drugs, and that the drugs had been obtained by the State "in violation of the company's contractual supply-chain controls." [*Id.* at 4].   Similarly, another manufacturer, McKesson Medical-Surgical, Inc., filed suit against the Arkansas Department of Corrections in state court and obtained a temporary restraining order prohibiting the Department from using the vecuronium bromide it had purchased from McKesson, but that order was later vacated.  McKesson has refiled a lawsuit to prevent Arkansas from using its product which remains pending at this time.  However, in the interim, the State of Arkansas carried out four executions during eight days using the drugs, and neither the Arkansas Supreme Court, the Eighth Circuit, nor the U.S. Supreme Court halted those executions.

Thus, the production of even heavily redacted copies of drug labels or package inserts could reveal the identities of MDOC's drug suppliers, and thereby severely harm MDOC's ability to carry out future executions. Even entering a protective order restricting access to this highly sensitive and confidential information to "Attorneys Eyes Only" would not be sufficient to protect the State's interests, since Supplier 1 has made it absolutely clear that it will no longer provide lethal injection drugs to MDOC if its identity is revealed to anyone. In any event, even an "Attorneys Eyes Only" designation would greatly enhance the risk of inadvertent disclosure by increasing the number of people with access to this information --- even though access to that information is currently highly compartmentalized and limited to a handful of individuals on an absolute need-to-know basis. Simply put, the fewer people have such information, the less the chance of a leak.  Because the State would suffer irreparable harm even from an inadvertent or accidental disclosure, no after-the-fact order or sanctions could cure the effects of such a disclosure. MDOC would have no remedy for the resulting harm.

**B.     MDOC and the State of Mississippi Will Be Irreparably Harmed and/or Unduly Burdened If the Identities of Its Drug Suppliers Are Disclosed.**

The Supreme Court has emphasized that "because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." *Glossip*, 135 S. Ct. at 2732-33 (internal quotations, alterations and citation omitted). In that regard, in addition to the confidentiality requirements of Section 99-19-51, good cause exists independently to enter a protective order under Rule 26(c) barring disclosure of the information sought by Plaintiffs. MDOC and the State of Mississippi have a compelling interest in the timely enforcement of the State's criminal laws and Plaintiffs' death sentences. *See Hill v. McDonough*, 547 U.S. 573, 584 (2006) ("Both the State and the victims of crime have an important interest in the timely enforcement of a sentence.") (citation omitted); *In re Blodgett*, 502 U.S. at 239 (acknowledging state interest in "exercising its sovereign power to enforce the criminal law"). Thus, a protective order is warranted whether considered alone or in combination with Section 99-19-51. *See In re: Ohio Execution Protocol Litig.*, 2015 WL 6446093, at *7 (holding that "the Rule 26(c) considerations warrant a protective order, whether taken alone *or* in conjunction with Ohio's secrecy statute" and that a "protective order is necessary in this case to protect Defendants from being unduly burdened and unfairly prejudiced by Plaintiffs obtaining via discovery the identities of those individuals and entities necessary to Ohio's securing the drugs or materials necessary to fulfill the lawful implementation of the death sentences imposed on Plaintiffs and other non-party inmates") (emphasis in original).

**C.     There is An Appreciable Risk that Disclosure of the Identities of MDOC's Drug Suppliers Will Expose Those Persons and Entities to Harm, Retaliation, and Harassment.**

Entry of a protective order is also warranted to protect MDOC's drug suppliers and others from potential harm, retaliation, and harassment. The fears of drug suppliers that they or their employees will be subjected to threats, harassment, and economic reprisals are well-founded in light of the efforts by

anti-death-penalty activists to pressure all links in the drug supply chain, and the experiences of the Woodlands Compounding Pharmacy and The Apothecary Shoppe. *See supra* at 17, 19. That some risk of physical harm to, and/or harassment of, MDOC's drug suppliers, their owners, and their employees would result from disclosure cannot be denied. For example, J. Lawrence Cunningham, a security consultant who spent 20 years in the United States Secret Service, conducted "threat assessment[s]" for the states of both Missouri and Texas concerning the risks faced by suppliers of lethal injection drugs, and concluded that "there is a significant and substantial threat of physical harm" to pharmacies if their identities are disclosed and that "there are reasonable grounds to conclude that withholding from public disclosure the identities of persons engaged in manufacture, supply and distribution of . . . drugs used to carry out executions is necessary to insure their safety and security against physical harm or harassment." [Exh. R, Cunningham Decl., at ¶¶ 29-30].

Further, drug suppliers can reasonably expect to be subjected to litigation resulting from disclosure and incurring significant legal fees, as happened to The Apothecary Shoppe, as well as MDOC's previous supplier that was publicly identified by Plaintiffs' attorneys. Last, there is a significant risk that, if the identities of MDOC's drug suppliers are revealed, their business relationships with the drug manufacturers from which they have obtained lethal injection chemicals will be harmed. [Exh. A, Supplier 1 Decl. at ¶ 7].

**II.    Good Cause Exists to Enter a Protective Order Prohibiting Any Disclosure or Discovery of the Identities of MDOC Employees and/or Agents Responsible for the Procurement, Purchase, Custody, Transportation, and Storage of Lethal Injection Drugs.**

Plaintiffs have demanded that MDOC disclose the identities of, and produce documents which would reveal the identities of, the individuals who arranged for the purchase of lethal injection chemicals from Supplier 1 and transported the drugs from Supplier 1 to the Mississippi State Penitentiary. However, the identities of those individuals, whom MDOC has referred to in its discovery responses as

"AG1" and "MDOC3" in order to preserve their anonymity and protect their safety, are confidential and exempt from disclosure under Section 99-19-51.  The statute provides that the "identities of all members of the execution team . . . shall at all times remain confidential[.]"  Miss. Code Ann. § 99-19-51(6)(c).  The statute further states that the execution team "shall also include those individuals involved in assisting in the execution in any capacity, as well as those personnel assigned to specific duties related to an execution." *Id.* at (6)(a).  Plainly, AG1 and MDOC3 are involved in assisting with executions in some capacity and have been assigned specific duties related to the execution process.  Arranging for the purchase of and transporting lethal injection drugs are essential to carrying out executions.  The public policy justifications for non-disclosure of the identities of persons involved in any capacity with the execution of condemned inmates "are obvious, including avoiding the risk of harassment or some other form of retaliation from persons related to the prisoners or from others in the community who might disapprove of the execution as well as simply offering those willing to participate whatever comfort or peace of mind that anonymity might offer." *Owens v. Hill*, 758 S.E.2d 794, 805 (Ga. 2014).  As the Georgia Supreme Court explained, "[a]lthough the identity of the executioner who actually inflicts death upon the prisoner is the most obvious party in need of . . . [confidentiality], . . . the same logic applies to the persons and entities involved in making the preparations for the actual execution, including those involved in procuring the execution drugs." *Id.*  Second, Plaintiffs have no need for that information to pursue their Eighth Amendment claim.  Thus, the same rationale which justifies entry of a protective order barring disclosure of the identities of drug suppliers applies with full force to the identities of members of the execution team, as defined in Section 99-19-51.  Accordingly, the need for confidentiality clearly outweighs the Plaintiffs' purported interest in knowing the identities of AG1 and MDOC3.  This is true whether considered in conjunction with Section 99-19-51 or based on independent security and safety concerns.

MDOC has met its burden under Rule 26(c) of showing that good cause exists for the entry of a protective order forbidding any and all discovery of the identities of individuals to whom MDOC has assigned the duty of procuring and transporting lethal injection chemicals, *see Owens*, 758 S.E.2d at 805 ("[W]ithout the confidentiality offered to execution participants by the statute, . . . there is a significant risk that persons and entities necessary to the execution would become unwilling to participate."), as well as barring disclsoure of MDOC's drug suppliers. In light of the irreparable harm that will occur to MDOC, compared with the fact that Plaintiffs have no legitimate need for the information in question, the balancing required by Rule 26(c) demonstrates the compelling need for entry of the protective order requested by MDOC.

## CONCLUSION

For the foregoing reasons, MDOC respectfully requests that the Court enter a protective order forbidding any and all disclosure or discovery of (1) the identities of MDOC's lethal injection drug suppliers, or any information, document, or tangible thing that could be used to identify such suppliers; and (2) the identities of any persons who have played, or in the future may play, any role in the procurement, purchase, custody,  transportation, and/or storage of lethal injection drugs, or any information, document, or tangible thing that could be used to identify such persons.

Respectfully submitted, this the 14th day of August, 2017.

**JIM HOOD**
ATTORNEY GENERAL
STATE OF MISSISSIPPI


By:     *s/Wilson Minor*                        
Jason L. Davis, MSB No. 102157
Paul E. Barnes, MSB No. 99107
Wilson Minor, MSB No. 102663
SPECIAL ASSISTANT ATTORNEYS GENERAL
ATTORNEYS FOR DEFENDANTS

STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-6279
Telefax: (601) 359-2003
wmino@ago.state.ms.us

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I, Wilson Minor, Special Assistant Attorney General for the State of Mississippi, have electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

James W. Craig
Emily M. Washington
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
4400 South Carrollton Ave.
New Orleans, LA 70119
jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org
ATTORNEYS FOR PLAINTIFFS
RICHARD JORDAN AND RICKY CHASE

Stacy Ferraro
STACY FERRARO, ATTORNEY AT LAW
239 N. Lamar Street, Ste. 604
Jackson, MS 39201
lifestoryms@gmail.com
ATTORNEY FOR INTERVENOR-
PLAINTIFF THOMAS EDWIN LODEN, Jr.

James Davis
Law Office of Jim Davis
1904 24th Avenue
Gulfport, MS 39502
JamesLDavisIII@aol.com

Richard F. Klawiter
Matt Klepper
DLA Piper LLP (US)
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293

Nicholas F. Aldrich, Jr.
Schwabe, Williamson & Wyatt, P.C.
1211 SW Fifth Ave., Suite 1900
Portland, Oregon 97204
ATTORNEYS FOR INTERVENOR
ROGER ERIC THORSON

Sibyl Byrd
McDuff & Byrd

767 N. Congress St.
Jackson, MS 39202

Vanessa Carroll
1055 St. Charles Ave., Suite 505
New Orleans, LA 70130
ATTORNEYS FOR INTERVENOR
ROBERT SIMON, JR.

This the 14th day of August, 2017.

<div style="text-align: center; margin-left: 40%;">

*s/Wilson Minor*
Wilson Minor

</div>