### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

IN RE: VIRGINIA DEPARTMENT
OF CORRECTIONS

     Petitioner,

v.                                                Civil Action No. 3:17mc02

RICHARD JORDAN and
RICKY CHASE, *et al.*

     Respondents.

### MEMORANDUM OPINION

This matter comes before the Court on the Motion to Quash the third-party Notice of Deposition and Subpoena issued in *Jordan v. Fisher*, (S.D. Miss.).[1]  Neither party requested a hearing on the matter.  For the reasons that follow, the Motion to Quash will be GRANTED to the extent it seeks information beyond that already disclosed.

### I.  Pertinent Procedural Background

Mississippi sentenced Richard Jordan and Ricky Chase to death.  Mississippi proposes to execute Jordan and Chase by the serial intravenous injection of three drugs:  midazolam, vecuronium bromide, and potassium chloride.  Jordan and Chase ("Plaintiffs") filed a civil rights action under 42 U.S.C. § 1983[2] asserting that execution under the above protocol violates the

---

[1] *Jordan v. Fisher*, 3:15–CV–295–HTW–LRA (S.D. Miss.).

[2] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.



EXHIBIT
DD

Eighth Amendment.[3] "To prove this protocol violates the Eighth Amendment, Jordan and Chase must show (1) that the Mississippi protocol raises a substantial risk of serious harm and (2) that there is a known, available alternative to the Mississippi protocol which reduces this risk. *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015)." (Resp. Opp'n 1, ECF No. 12.)

The underlying challenge to Mississippi's method of execution continues the impassioned debate regarding where the contours of the Eighth Amendment's prohibition of cruel and unusual punishment lie when a state ultimately implements a death sentence. This opinion must address, in detail, the method by which a death sentence may be imposed.[4] Here, Jordan and Chase dispute the three-drug lethal injection protocol Mississippi uses. The inmates seek discovery from the Virginia Department of Corrections ("VDOC") which they contend relates to their constitutional challenge to Mississippi's method-of-execution protocol.

### A.   Two Courts Have Quashed Subpoenas from Plaintiffs When Plaintiffs Sought Materials from Single-Drug Protocol States

Prior to this motion, Plaintiffs sought information from two other states in addition to Mississippi itself.[5] Both of those third-party subpoenas have been quashed entirely. First,

---

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[4] Many challenges to the death penalty involve distasteful analyses: either an objective discussion of the vile crimes that often undergird an imposition of a death sentence, or analysis in explicit detail—past or potential—of the execution method imposed. "Certainly some jurists have questioned the constitutionality of the death penalty . . . [y]et the law remains valid," *In re Ohio Execution Protocol Litigati*on, 845 F.3d 231, 240 (6th Cir. 2016), *cert denied, sub nom. Fears v. Kasich*, No. 17-5010, 2017 WL 2854622 (U.S. Oct. 2, 2017), and courts must recognize "society's compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine*, 475 U.S. 412, 426 (1986); *see Brooks v. Warden*, 810 F.3d 812, 825 (11th Cir.) (noting that the state, a victim, and the victim's family "have an important interest in the timely enforcement" of a lawful sentence), *cert denied*, 136 S. Ct. 979 (2016).

[5] The Plaintiffs fail to identify what, if any, information they have obtained in discovery from the state of Mississippi in the underlying civil rights action.

Jordan and Chase served upon the Missouri Department of Corrections ("MDOC") "a third-party subpoena for documents and a Federal Rule of Civil Procedure . . . 30(b)(6) deposition notice seeking information regarding MDOC's use of pentobarbital in lethal injections, including the identity of MDOC's supplier of pentobarbital." *In re Mo. Dep't of Corr.*, 839 F.3d 732, 734 (8th Cir. 2016), *cert. denied, sub nom. Jordan v. Mo. Dep't of Corr.*, 137 S. Ct. 2180 (2017). The United States Court of Appeals for the Eighth Circuit ultimately granted MDOC's writ of mandamus prohibiting the discovery "on the grounds of relevancy and undue burden." *Id.* at 737.

In Missouri, the district court had found that information as to the use of pentobarbital as a single drug might be relevant to the Plaintiffs' quest to establish a feasible and readily implemented alternative. But the Eighth Circuit ultimately ruled the request to be irrelevant and unduly burdensome. Based on a record expanded beyond that of the district court, the Eighth Circuit concluded that the release of the drug supplier's identity would result in the supplier "refusing to make pentobarbital available to anyone," *id.* at 736, meaning that discovery of the supplier's name would result in its identity becoming irrelevant to *all* method of execution claims because the company would no longer supply to Missouri, Mississippi, or any state. And, the court concluded, Missouri would consequently suffer an undue burden on its interest in "exercising its sovereign power to enforce criminal law." *Id.* (quoting *In re Blodgett*, 502 U.S. 236, 239 (1992)).

Second, Plaintiffs served upon the Georgia Department of Corrections ("GDOC") a third-party subpoena seeking a deposition and documents related to executions in Georgia. *Ga. Dep't Corr. v. Jordan*, 1:16–cv–02582–RWS–JCF, at 1 (N.D. Ga. Oct. 20, 2016) (ECF No. 12–9).[6] The GDOC uses a single drug, pentobarbital, to carry out its executions. *Id.* at 2. Plaintiffs

---

[6] The Court employs this abbreviation in the quotations that refer to the GDOC.

3

sought "to secure discovery from GDOC concerning (a) whether pentobarbital is available, (b) the factors which went into GDOC's decision to switch from a three-drug protocol to a single-drug protocol, and (c) whether a single-drug protocol is a feasible alternative method of execution." *Id.* The GDOC asserted, *inter alia*, that the information sought was protected by Georgia's Lethal Injection Secrecy Statute and moved to quash the third-party subpoena.[7] *Id.* at 4.

The district court granted the GDOC's motion to quash the subpoena. *Id.* at 8. While finding that this single-drug protocol might be relevant to the Plaintiffs' need to establish the existence of a feasible and available alternative to Mississippi's three-drug protocol, *id.* at 3, the district court observed that "the Eleventh Circuit has uniformly given Georgia's Lethal Injection Secrecy Act an expansive reading, essentially viewing it as creating a total ban on the production of information concerning Georgia's choices in connection with its lethal injection protocol," *id.* at 6. The Court then concluded, "where Georgia's own death row prisoners have been flatly denied access to information covered by Georgia's Lethal Injection Secrecy Act, it similarly bars Jordan and Chase's efforts to secure the same type of information via subpoena for use in their Mississippi case." *Id.* at 7.

---

[7] That statute provides, in pertinent part:

> The identifying information of any person or entity who participates in or administers the execution of a death sentence and the identifying information of any person or entity that manufactures, supplies, compounds, or prescribes the drugs, medical supplies, or medical equipment utilized in the execution of a death sentence shall be confidential and shall not be subject to disclosure under Article 4 of Chapter 18 of Title 50 or under judicial process. Such information shall be classified as a confidential state secret.

O.C.G.A. § 42–5–36(d)(2).

**B.**   **Virginia Provided Information within a Week of Receiving Plaintiffs'
Subpoena, Despite the Fact that Information about Virginia's Three-Drug
Protocol Likely Lacks Relevance to Plaintiffs' Attempt to Establish a
Feasible and Available Alternative to Mississippi's Three-Drug Protocol**

After seeking information from Missouri and Georgia, Plaintiffs served the VDOC with a

third-party subpoena for documents and a deposition notice seeking information regarding, *inter*

*alia*, VDOC's current lethal injection drug supplies, testing results, and efforts to obtain lethal

injection drugs. (ECF No. 2–2.) Virginia, like Mississippi, utilizes a three-drug protocol

beginning with midazolam. The VDOC quickly and voluntarily supplied Plaintiffs with a host of

information responsive to the subpoena. (ECF No. 2–3.) The VDOC, however, refused to

supply Plaintiffs with, *inter alia*, information that might lead to the disclosure of the supplier of

the chemicals the VDOC utilizes in carrying out an execution or to the disclosure of the identities

of the members of the VDOC execution team. VDOC argues that these aspects of the subpoena

should be quashed because they require compliance

> with discovery requests that are overbroad, not narrowly tailored to the subject of
> that dispute, require the production of irrelevant information, and would disclose
> identities that are privileged as a matter of state and federal constitutional law.
> Compliance with the discovery requests would pose an undue burden on VDOC,
> Virginia's lethal injection drug suppliers, and members of the execution team.

(Mem. Supp. Mot. Quash 18, ECF No. 2.)

Plaintiffs assert that the VDOC's arguments lack merit. Plaintiffs, however, fail to direct

the Court to any decision from any federal court of appeals[8] where the court found that

---

[8] Plaintiffs assert that "[t]wo other district courts have held that similar discovery requests
were relevant to the pleadings" in Plaintiffs' underlying case, and point to decisions in the
Western District of Missouri and the Northern District of Georgia. (Resp. Opp'n Mot. Quash
13.) First, the findings of relevance in those cases do not constitute even persuasive authority
here because they rest on the premise that the single-drug protocol in Missouri and Georgia
would be relevant to Plaintiffs establishing a readily, available feasible alternative to
Mississippi's current three-drug protocol. Virginia's three-drug protocol does not hold the same
relevance.

disclosure of the identities of the execution team or the supplier of the lethal injection materials pursuant to a discovery request to be appropriate.  Conversely, the circuit courts that have addressed the issue have concluded that disclosure of that information pursuant to a discovery request would impose an undue burden upon a state seeking to carry out lawfully imposed executions in the future. *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 239 (citation omitted) ("[B]ut for the protective order, Defendants will suffer an undue burden and prejudice in effectuating Ohio's execution protocol and practices."); *In re Mo. Dep't of Corr.*, 839 F.3d at 736–38 (granting petition for rehearing, and granting petition for writ of mandamus because disclosure of the supplier's identity placed an undue burden on the state by preventing it from acquiring the drug for executions, and the inmates offered no assurances that active investigation of the supplier would not lead to further disclosure of identities); *Jones v. Comm'r, Ga. Dep't of Corr.*, 811 F.3d 1288, 1292–93 (11th Cir.) (citation omitted) (internal quotation marks omitted) (concluding death row inmate has no constitutional right to "know where, how, and by whom lethal injection drugs will be manufactured," and no "due process right-of-access claim" to this information exists), *cert. denied*, 136 S. Ct. 998 (2016).[9]  For the reasons stated more fully below, the Court finds that requiring the VDOC to file a further response to the subpoena would

---

Perhaps more importantly, Plaintiffs point to these decisions while acknowledging -- only by footnote -- that, eventually, both subpoenas were quashed.  As they must, Plaintiffs admit that "[t]he Eighth Circuit reversed the [Missouri] district court['s]" denial of the motion to quash, and the Northern District of Georgia granted the motion to quash. (*Id.* nn.24, 25.)

[9] In the context of denying a stay of execution, a court in this district recently rejected a Virginia inmate's assertion that he had a "procedural due process right to discover information about Virginia's lethal injection drugs." *Gray v. McAuliffe*, No. 3:16CV982–HEH, 2017 WL 102970, at *20 (E.D. Va. Jan. 10, 2017) (citing *Jones*, 811 F.3d at 1292–93; *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir.), *cert. denied*, 135 S. Ct. 2941 (2015); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014)).

pose an undue burden. Accordingly, the Motion to Quash will be granted to the extent it seeks information not already disclosed.[10]

## II.  Relevant Legal Principles Regarding the Motion to Quash

### A.  Federal Rules of Civil Procedure 26 and 45

The Federal Rules of Civil Procedure govern the scope of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1).[11] Pursuant to Federal Rule of Civil Procedure 45, parties may use subpoenas to command parties or non-parties to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(l)(A)(iii).

Rule 45(d)(1) emphasizes that "[a] party or attorney responsible for issuing . . . a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). A court "*must* quash or modify a subpoena that fails to allow a reasonable time to comply; . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to *undue burden*." Fed. R. Civ. P. 45(d)(3)(A) (emphases added). "[T]he burden for showing that a subpoena must be quashed under Rule 45([d])(3) is at all times on the movant." *Ohio Valley Envtl. Coal., Inc. v.*

---

[10] Because the Court grants the Motion to Quash on the grounds of undue burden, no need exists to address the VDOC's other arguments for quashing the subpoena.

[11] Federal Rule of Civil Procedure 26(c) provides, in pertinent part:

A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .

Fed. R. Civ. P. 26(c)(1).

*U.S. Army Corps of Eng'rs,* No. 1:11MC35, 2012 WL 112325, at *2 (N.D.W. Va. Jan. 12, 2012); *see Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 125 (4th Cir. 1994).

"A party may seek to quash or modify a subpoena on grounds of irrelevance or overbreadth, even though irrelevance and overbreadth are not explicitly listed as grounds to quash in Rule 26(c)(1) or Rule 45([d])(1), because either irrelevance or overbreadth necessarily establishes undue burden." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.,* No. 3:16–MC–1, 2016 WL 1071016, at *5 (E.D. Va. 17, 2016). This principle flows from the interaction of Rule 26(c)(1) and Rule 45(d)(1) with Rule 26(b)(1). *Id.* "[T]he scope of discovery allowed under a subpoena is the same as the scope of discovery allowed under Rule 26." *Singletary v. Sterling,* 289 F.R.D. 237, 240–41 (E.D. Va. 2012) (citing *Cook v. Howard,* 484 F. App'x 805, 812 (4th Cir. 2012); *Barrington v. Mortage IT, Inc.,* No. 07–61304–CIV 2007 WL 4370647, at *3 (S.D. Fla. Dec. 10, 2007)). "Despite the additional proportionality consideration required under the amendment to Rule 26, . . . 'the [2015 amendment] does not place on the party seeking discovery the burden of addressing all proportionality considerations.'" *Brown v. Mountainview Cutters, LLC,* No. 7:15cv204, 2016 WL 3045349, at *3 (W.D. Va. May 27, 2016) (alteration in original) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment).

Rule 26(b) limits the scope of discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), and Rule 45(d)(1) requires that a party seeking discovery through the use of a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subjected to the subpoena." Fed. R. Civ. P. 45(d)(1). Thus,

> any subpoena that seeks evidence that is neither relevant . . . or that is so overbroad that compliance with its demands will necessarily require production of irrelevant evidence, seeks evidence outside the scope of Rule 26(b)(1). Such a

8

> subpoena creates an undue burden because it necessarily imposes greater hardship
> than is necessary to obtain proper discovery.

*In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *5.

In order to avoid imposing an undue burden, third-party subpoenas, like the one before the Court,

"must be narrowly crafted to relevant subject matter in the underlying litigation." *Id.* at *6 n.6

(citing *Theofel v. Farey-Jones*, 359 F.3d 1066, 1071–72 (9th Cir. 2004); *In re Subpoena Duces*

*Teucm to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008)).

> Therefore, in assessing whether a subpoena imposes an undue burden
>
> [c]ourts should balance the need for discovery against the burden imposed on the
> person ordered to produce documents.  Non-party status is one of the factors the
> court uses in weighing the burden of imposing discovery.  An undue burden is
> identified by looking at factors such as relevance, the need for the documents, the
> breadth of the document request, the time period covered by such request, the
> particularity with which the documents are described, and the burden imposed.

*Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 452–53 (D.D.C. 2002) (citations omitted).

Critically, as discussed more fully below, disclosures pursuant to a subpoena that impede

a state's ability to carry out executions constitute an undue burden. *See Ohio Execution Protocol*

*Litigation*, 845 F.3d 231, 238–39 (6th Cir. 2016); *In re Mo. Dep't Corr.*, 839 F.3d 732, 737 (8th

Cir. 2016).

**B.    Eighth Amendment Principles in Method of Execution Claims**

In the most recent method-of-execution challenge the Supreme Court of the United States

has evaluated, a majority of the Court upheld the denial of a preliminary injunction as to whether

Oklahoma's three-drug protocol using midazolam violated the Eighth Amendment. *Glossip v.*

*Gross*, 135 S. Ct. 2726, 2736–46 (2015). In *Glossip*, the Supreme Court reiterated an earlier

finding that "because it is settled that capital punishment is constitutional, '[i]t necessarily

follows that there must be a [constitutional] means of carrying it out.'" *Id.* at 2732–33 (quoting

*Baze v. Rees*, 553 U.S. 35, 47 (2008)). While the dissent in *Glossip* challenged this "flawed

syllogism,"[12] *id.* at 2795, the Court majority plainly confirmed its earlier observations in *Baze* that because "[s]ome risk of pain is inherent in any method of execution," the Eighth Amendment "does not require the avoidance of all risk of pain" in carrying out executions, *Baze*, 553 U.S. at 47. More specifically, the Court in *Baze* defined the contours of the Eighth Amendment by stating that "[s]imply because an execution method may result in pain, either by accident or as an inescapable consequence of death, [it] does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.* at 50. "[P]risoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers.'" *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 50). "[T]he condemned prisoner [must] establish[] that the State's lethal injection protocol creates a demonstrated risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 61).

Despite the *Glossip* dissent's contention that no second requirement need be established, this Court must apply what the majority in *Glossip* unmistakably articulated as a second necessary showing an inmate must make: the inmate must also show that "the risk is substantial

---

[12] In *Glossip*, the dissent commented that, if only a barbarous method of execution remained, it "would not become less [barbarous] because it is the only method available to the state." 135 S. Ct. 2726, 2795 (Sotomayor, J., dissenting). Thus, the dissent suggests this syllogism could ring false if a state has available only barbarous methods of execution. A majority of the Supreme Court has been unwilling to adopt the dissent's reasoning.

But the observation speaks to the *sub rosa* dispute underlying many method-of-execution claims. Success in identifying the source of lethal injection has, in addition to allowing testing for unnecessary infliction of pain, resulted in pressure on pharmacies or laboratories to cease supplying the drug used in lethal injection. *Glossip*, 135 S. Ct. at 2733 (discussing sodium thiopental and pentobarbital); *see Zink v. Lombardi*, 783 F.3d 1089, 1106 (8th Cir.) (citing allegation in complaint saying that confidentiality improperly prevented plaintiffs from "censuring or boycotting" suppliers of drugs or their agents), *cert denied*, 135 S. Ct. 2941 (2015). When those censuring efforts have succeeded, states have established a new drug protocol based on substituted, and still available, drugs. The question then becomes whether the new drug or drug protocol passes constitutional muster, and how deeply a challenge against it may delve.

when compared to the known and available alternatives." *Id.* (quoting *Baze*, 553 U.S. at 61).[13]
This second prong requires the condemned inmate to suggest an alternative method of execution
that is "known and available" as well as "feasible, readily implemented, and in fact significantly
[likely to] reduce a substantial risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 61, 52). The
burden rests with the plaintiff to "plead and prove" both prongs of the test. *Id.* at 2739; *see*
*Brooks v. Warden, Comm'r Ala. Dep't of Corr.*, 810 F.3d 812, 819 (11th Cir. 2016) (citation
omitted), *cert. denied*, 136 S. Ct. 979 (2016).

　　　　To undertake a proper analysis under *Glossip*, this Court must evaluate whether
Plaintiffs, who challenge Mississippi's three-drug protocol, are entitled to discover information
beyond that already provided by the VDOC as to its own three-drug protocol. In order to
conclude that Plaintiffs should receive further information, the Court must find that any
additional information would be relevant to the Mississippi Amended Complaint, and that
production would not unduly burden the VDOC, a third-party entity. Thus, the Court must
provide some background regarding the use of lethal injection in Virginia, Plaintiffs' claims in
Mississippi, and how the two interrelate. Only with that backdrop can the Court assess whether
the motion to quash should be granted.

### III.  Factual and Procedural Principles Regarding the Motion to Quash

### A.　Lethal Injection in Virginia

　　　　"As an alternative to execution by electric chair, Virginia adopted lethal injection on
January 1, 1995." *Gray v. McAuliffe*, No. 3:16CV982–HEH, 2017 WL 102970, at *6 (E.D. Va.
Jan. 10, 2017). Since then, Virginia has efficaciously "executed [over] 80 inmates by lethal

---

[13] The dissent in *Glossip* argued, "[n]owhere did the plurality [in *Baze*] suggest that all
challenges to a State's method of execution would require this sort of comparative-risk analysis."
135 S. Ct. at 2794. The dissent's attempt to constrain the finding in *Baze* to its factual and legal
posture did not prevail.

injection." *Id.* Like Mississippi, "Virginia employs a three-drug protocol to perform an execution by lethal injection." *Id.* The first drug in Virginia's protocol "renders the condemned inmate unconscious." *Id.*

Earlier this year, Ricky Javon Gray challenged, via preliminary injunction, the VDOC's proposal to carry out his execution by the proposed use of compounded midazolam to render him insensate. *Id.* at *1. "Gray argue[d] that the VDOC's planned use of compounded drugs, including compounded midazolam, carrie[d] a demonstrated risk of inflicting severe pain upon him." *Id.* at *4 (citation omitted). The *Gray* Court conducted an evidentiary hearing at which "A. David Robinson, the Chief of Corrections Operations for the VDOC, recounted the difficulty encountered by the VDOC in acquiring lethal injection drugs. He also explained the methodology the VDOC has employed for monitoring and controlling the potency of the compounded drugs at issue." *Id.* at *6 (citation omitted).[14]

Ultimately, the *Gray* Court concluded that Gray "fail[ed] to make any showing, much less a clear showing, that midazolam poses 'an objectively intolerable risk of harm.'" *Id.* at *12 (quoting *Glossip*, 135 S. Ct. at 2737). The Court further concluded that the evidence "establishe[d] that the administration of 500 mg of midazolam can render a prisoner unconscious and insensate to pain during the remainder of the three-drug protocol. The evidence [also] demonstrate[d] that even 500 mg of midazolam used alone will result in a 'certainty of death.' (Prelim. Inj. Hr'g Tr. 54.)" *Id.* at *13.

The Court further found that Gray had put forth no persuasive "evidence that compounded drugs subject [Gray] to 'a substantial risk of serious harm.'" *Id.* at *15 (quoting *Glossip*, 135 S. Ct. at 2737). In this regard, the Court noted,

---

[14] This Court has reviewed the entirety of the transcript of the evidentiary hearing, which the VDOC also has supplied to Plaintiffs.

> [T]he evidence before the Court reflects that the VDOC selected a licensed
> pharmacy and a licensed pharmacist to make the compounded drugs. Moreover,
> the compounded midazolam and potassium chloride have been tested by [a
> chemist at the Virginia Department of Consolidated Laboratory Services, General
> Services Division ("VDCL")]. The testing confirms that each bottle contains the
> substance and concentration that each label reflects and that the substance meets
> the concentration level of comparable manufactured drugs. The presence of
> contaminants in the compounded drugs would have been revealed in the VDCL's
> test results. Compounded drugs are utilized routinely, even in clinical settings,
> and are just as efficacious as their manufactured counterparts. Gray fails to point
> to any instance where a state has unsuccessfully used compounded midazolam or
> compounded potassium chloride in the execution context.

*Id.* at *14. The *Gray* Court concluded that Gray fell "far short of demonstrating entitlement to a

preliminary injunction," denied the motion for a preliminary injunction, and allowed Gray's

execution to proceed. *Id.* at *5, *22.

In their Response in Opposition to the Motion to Quash, Plaintiffs suggest that, in the

end, Gray's execution was not "without incident." (Resp. Opp'n 2, ECF No. 12.) Plaintiffs

quote a newspaper account of Gray's execution that stated, in pertinent part:

> [Gray] was placed on the gurney, and a half-dozen members of the
> execution team strapped down his limbs and torso. At 8:54, a curtain was drawn
> blocking the view of the witnesses so IV lines could be placed and other
> procedures conducted.
> By 9:14, the curtain was still closed and the Virginia public safety
> secretary, Brian J. Moran, apparently prompted by questions from one of Gray's
> lawyers, consulted with a corrections official in the witness room. The curtain
> was not opened again until 9:27. Gray's lawyer, Elizabeth Peiffer, with the
> Virginia Capital Representation Resource Center, said following the execution
> that "I do have great concern . . . it was a very unusual amount of time."

(*Id.*)[15] However, this same newspaper report revealed that, during the 33-minute interval

between 8:54 and 9:27, no lethal injection drugs were administered. The delay flowed from

---

[15] Plaintiffs' Response in Opposition to the Motion to Quash cites F. Green and A.
Rockett, *Executed: Ricky Gray put to death for murders of Harvey Girls*, Richmond Times-
Dispatch (Jan. 18, 2017)
http://www.richmond.com/news/local/crime/executed-ricky-gray-put-to-death-for-murders-of-
harvey/article_5de1f312-1142-5cad-88a3-cde1a0e068c7.html (last viewed July 8, 2017)).

difficulty citing intravenous lines or conducting other preliminary procedures, but the remainder

of the newspaper article, which Plaintiffs' themselves cite, did not report any untoward

"incident" that occurred during the actual injection of the lethal chemicals:[16]

> When the curtain was reopened, Gray declined to make a statement and at
> 9:28, the first of the three chemicals was introduced. Gray lifted his head up,
> looked around, moved his toes and legs. At 9:29, his eyes were closed. He
> appeared to take a number of deep breaths and he appeared to make snoring or
> groaning sounds.[17]
> At 9:32, an officer checked to make sure Gray was unconscious. At 9:33,
> all his body movements appeared to have stopped. At 9:41, the physician came
> out from behind the curtain and used a stethoscope to listen to his chest. He was
> pronounced dead at 9:42.

Plaintiffs' own source recounts that within five minutes of injecting the first chemical, all of

Gray's bodily movements had stopped. And within fourteen minutes Gray was pronounced

dead. Plaintiffs fail to plausibly suggest that Virginia's execution utilizing midazolam as the first

drug in a three-drug protocol was fraught with the sort of problems admittedly experienced by

other states. *Cf. The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1105–06

(10th Cir. 2016), *cert. denied sub nom. Lockett v. Fallin*, 137 S. Ct. 2298 (2017) (citation

---

[16] F. Green and A. Rockett, *Executed: Ricky Gray put to death for murders of Harvey Girls*, Richmond Times-Dispatch (Jan. 18, 2017) http://www.richmond.com/news/local/crime/executed-ricky-gray-put-to-death-for-murders-of-harvey/article_5de1f312-1142-5cad-88a3-cde1a0e068c7.html (last viewed June 1, 2017)).

[17] During the evidentiary hearing in *Gray*, Dr. Daniel E. Buffington testified that in addition to rendering an individual insensate, midazolam causes respiratory depression. *Gray v. McAuliffe*, 3:16CV982–HEH, ECF No. 30 (E.D. Va. 2016) ("Gray Transcript"), at 62–63. Gray's deep breaths appear to be consistent with respiratory depression. Dr. Buffington testified:

> [I]f you're going to say that [midazolam] is having one effect, you would expect it
> to have all the effects. So if you've got a serious profound respiratory depression,
> you've also got serious sedation and significant anesthetic effects all simultaneous.
> So, I would not expect the respiratory depression effect to be something the person
> would be cognizant of.

*Id.* at 63 (spelling corrected).

omitted) (describing an execution that lasted 43 minutes and where the inmate said, "something's wrong," "buck[ed] and writhe[d]," and "clench[ed] his teeth and grimac[ed] in pain").

**B.** **Plaintiffs' Amended Complaint as It Pertains to the VDOC**

    **1.** **Mississippi's Three-Drug Protocol Is Similar to that Used by Virginia**

The Mississippi Department of Corrections ("Mississippi DOC") intends to execute Plaintiffs using a three-drug protocol similar to that which Virginia employs.  In their September 28, 2015 Amended Complaint filed in the Southern District of Mississippi, Plaintiffs contend that:

> there is a substantial risk that the first drug injected in a three-drug series will not be administered correctly, will not be sufficiently potent, pure, and rapid in onset, and is not chemically capable of rendering the prisoner unconscious and insensate so he does not feel the painful effects of the second and third drugs, [therefore] the execution will cause severe, torturous pain for the prisoner, in violation of the Eighth and Fourteenth Amendments.

(Am. Compl. ¶ 55, ECF 2–1.)  Plaintiffs assert that no need exists to use the second and third drugs and that "[e]xecutions may be carried out through the use of a single-drug anesthetic-only injection, a protocol now used in most executions nationwide and which has proven effective in executing over one hundred (100) prisoners to date." (*Id.* ¶ 66.)

Plaintiffs do not challenge the "entirety of the lethal injection protocol promulgated by [the Mississippi DOC]." (*Id.* ¶ 6.)  Instead, Plaintiffs insist they challenge only:

> the use of compounded drugs (including but not limited to compounded pentobarbital) and midazolam in lethal injection executions conducted by [the Mississippi DOC].  Further this civil action specifically challenges the use of a three-drug lethal injection procedure.  Lastly, this civil action challenges [the Mississippi DOC's] intent to have the raw ingredients for pentobarbital compounded into an injectable solution on the grounds of the ... [p]enitentiary ... where there is no pharmacy suitable for compounding sterile drugs.

(*Id.*)  Plaintiffs contend:

there is a high risk that either: (a) the Defendants intend to use a degraded form of compounded pentobarbital for the execution[s] of the Plaintiffs; (b) the Defendants have obtained only the raw ingredients for pentobarbital and intend to compound the pentobarbital at the Mississippi State Penitentiary [where no licensed pharmacy exists]; or (c) the Defendants have devised some other unknown and heretofore untested method of making pentobarbital.

(*Id.* ¶ 155.)

Furthermore, in July of 2015, the Mississippi DOC's execution protocol changed to permit the "use of midazolam in executions by [the Mississippi DOC] where a sufficient quantity of pentobarbital is unavailable. Defendants have stated that [the Mississippi DOC] is unable to obtain pentobarbital in any form. However, other state departments of corrections continue to obtain and utilize compounded pentobarbital in lethal injection executions." (*Id.* ¶¶ 185–87 (paragraph numbers omitted).) Unable to obtain pentobarbital, the Mississippi DOC has "purchased midazolam to be used as the first drug in the three-drug series." (*Id.* ¶ 203.) Plaintiffs insist midazolam "cannot be relied upon to render a person anesthetized and insensate to pain." (*Id.* ¶ 201.)[18]

Plaintiffs also argue that the "Mississippi protocol does not provide for any procedural safeguards which have been added to the revised lethal injection protocols of other jurisdictions in an effort to reduce the . . . harm that can result from failures in the administration of lethal injection drugs." (*Id.* ¶ 210.)

---

[18] The Court notes that Torrey Twane McNabb, who was "scheduled to be executed by the State of Alabama on October 19, 2017, by a three-drug lethal injection protocol, with midazolam as the first drug administered," sought a stay challenging this method of execution. *Grayson v. Dunn*, No. 2:12-CV-0316-WKW, 2017 WL 4638594, at *1 (M.D. Ala. Oct. 16, 2017), *vacated sub nom. Dunn v. McNabb*, No. 17A440, 2017 WL 4698311 (U.S. Oct. 19, 2017). On October 16, 2017, the United States District Court for the Middle District of Alabama granted McNabb's motion to stay his execution. *Id.* at *5. On October 19, 2017, the Supreme Court vacated the stay. *McNabb*, 2017 WL 4698311, at *1.

Plaintiffs contend there exists "a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by the continuous intravenous administration of compounded pentobarbital in combination with a chemical paralytic agent and potassium chloride." (*Id.* ¶ 223.) That alternative requires "[t]he use of an FDA-approved, ultra short-acting barbiturate in a single-drug protocol . . . ." (*Id.* ¶ 224.) Alternatively, if a non-compounded, FDA approved barbiturate such as pentobarbital is "not legally available, and only in that event," the use of a compounded barbiturate "used in a single-drug anesthetic-only protocol (without a paralytic agent or potassium chloride), is a feasible and available alternative which would significantly reduce the substantial risk of severe pain presented by Mississippi's current procedure." (*Id.* ¶ 226.)

2.   **VDOC Properly Challenges Whether the Subpoena Seeks Information that Could Support or be Relevant to any Claim About an Alternative Method of Execution that Likely Could Significantly Reduce a Substantial Risk of Severe Pain**

At base, much of the information Plaintiffs seek from the VDOC appears to be irrelevant to the claims they raise in Mississippi. Such a finding would render any further production unduly burdensome. *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, No. 3:16–MC–1, 2016 WL 1071016, at *5 (E.D. Va. Mar. 17, 2016). First, because Virginia's current lethal injection protocol is similar to Mississippi's contemplated protocol criticized by Plaintiffs, it becomes hard to fathom how additional information from the VDOC would *support* Plaintiffs' claim that Mississippi is ignoring a "known and available alternative[]" method of execution that is "significantly [likely to] reduce a substantial risk of severe pain," *Glossip*, 135 S. Ct. at 2737 (quoting *Baze*, 553 U.S. at 61),[19] or how any additional response could be

---

[19] Plaintiffs contend that the "Mississippi protocol does not provide for any procedural safeguards which have been added to the revised lethal injection protocols of other jurisdictions in an effort to reduce the . . . harm that can result from failures in the administration of lethal

17

"relevant to [that] claim," Fed. R. Civ. P. 26(b)(1).  Both states contemplate using midazolam as the first drug.[20]  Indeed, the VDOCs production to date likely includes much of the relevant responsive information Plaintiffs are due under the rules.

Second, to the extent Plaintiffs seek information about an alternative method, the VDOC readily provided Plaintiffs with transcripts from evidentiary hearings in which Arnold David Robinson, the Chief of Corrections Operations for the VDOC, testified that the VDOC has been unable to obtain pentobarbital in recent years.  *Prieto v. Clarke*, 3:15CV587–HEH, ECF No. 27 (E.D. Va. 2015) and *Gray v. McAuliffe*, 3:16CV982–HEH, ECF No. 30 (E.D. Va. 2016).  Those transcripts include extensive testimony from Robinson regarding the VDOC's efforts to obtain pentobarbital, midazolam and other lethal injection drugs.  (Prieto Tr. 64–78; Gray Tr. 91–96, 98–99, 104–05.)

Third, because VDOC has efficaciously utilized a three-drug protocol employing compounded midazolam as the initial drug, the VDOC would not appear to be a source of relevant information to support Plaintiffs' claim that Mississippi's similar proposed method of execution "presents a risk that is *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers."  *Glossip*, 135 S. Ct. at 2737 (internal quotation marks omitted) (quoting *Baze*, 553 U.S. at 50).

---

injection drugs."  (Am. Compl. ¶ 210.)  The Court describes in detail, *see infra* Parts IV.A–IV.D, that the VDOC already has provided Plaintiffs with a significant amount of information relevant to this allegation, including the VDOC Execution Manual and extensive testimony regarding how the lethal injection drugs are stored and tested.

[20] Plaintiffs' attempt to ascertain the GDOC's *pentobarbital* supplier was relevant to Plaintiffs' claim that pentobarbital is a better alternative than midazolam, and is readily available to the Mississippi DOC for use in their executions.  *Ga. Dep't Corr. v. Jordan*, 1:16–cv–02582–RWS–JCF, at 3 (N.D. Ga. Oct. 20, 2016) (ECF No. 12–9).  The same cannot be said of Plaintiffs' attempt to ascertain the VDOC's *midazolam* supplier for executions.

These three observations, the significant information the VDOC already has provided to Plaintiffs, and the Plaintiffs' own failure to reveal what information they have obtained in discovery from the Mississippi DOC in the underlying litigation, all cut against Plaintiffs' need for the additional discovery sought from the VDOC. *See Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 452 (D.D.C. 2002) (citations omitted) (explaining that in assessing undue burden, courts consider non-party status and "the need for discovery against the burden imposed on the person ordered to produce documents"). Plaintiffs have been particularly opaque as to why the VDOC, a non-party to the underlying action, is a better source of information than the Mississippi DOC. These circumstances taken together tend to undercut any claim by Plaintiffs that they need the additional discovery sought. Instead, the record indicates that requiring the VDOC to provide additional material would pose an undue burden. The Court will not draw such a conclusion definitively, however, without considering the subpoena and any response to it in detail. That evaluation follows.

## IV.  Plaintiffs' Notice of Deposition, Subpoena Duces Tecum, and the VDOC's Response

Plaintiffs' Notice of Deposition of a Nonparty Organization (Notice Dep. 2–8, ECF 2–2) requires the VDOC to designate one or more persons to testify as to a variety of topics, the specifics of which are described below. *See infra* Parts IV.A–IV.D.  Plaintiffs also request that the following documents, from 2010 to the present,[21] be produced:

1)  All documents related to attempts to secure or purchase pentobarbital for use in executions in Virginia;

---

[21] For document requests 1–5, 6, and 8–13 and many of their deposition topics, Plaintiffs demanded information dating back to 2010. As explained below, the VDOC readily supplied pertinent information when it was available and would not pose an undue burden. *See infra* Parts IV.A–IV.B. However, as explained more fully below, *see infra* Part IV.C, requiring the VDOC to supply materials beyond the time period covered by the current response would pose an undue burden.

19

2) All documents related to attempts of any kind to secure or purchase midazolam for use in executions in Virginia;

3) All drug labels and package inserts for any drug purchased or obtained by the VDOC for use in lethal injection executions;

4) The VDOC'S Lethal Injection Protocols and Lethal Injection Procedures in force;

5) All documents related to the process by which the VDOC decided to use a three-drug series including the use of midazolam as the method of lethal injection executions in Virginia;

6) All documents related to the VDOC's potential use of any drug compounded from API for use in lethal injection executions;

7) All documents related to the process by which the VDOC determined that midazolam would be used in lethal injection executions in Virginia;

8) All documents related to and/or evincing any training attended by the VDOC's officers, employees, agents, or attorneys related to the conduct of executions by lethal injection;

9) All documents related to the supply or inventory of drugs purchased, procured, held or stored, by the VDOC for use in lethal injection executions, including all logs or inventory lists maintained by the VDOC with respect to such drugs;

10) All chronological logs or other documents which disclose the timing of the administration of lethal injection drugs in all executions in Virginia;

11) All documents which describe or evince the actual process of each of the lethal injection executions in Virginia;

12) All studies which constitute, describe or evince any evaluations or other examinations into any problems encountered in any lethal injection executions in Virginia; and,

13) All communications between the VDOC or any employee of, or attorney for, the VDOC, with any employee of, or attorney for, the corrections department or attorney general's office of any other jurisdiction, including but not limited to Mississippi or Texas, related to the selection, purchase, or exchange of drugs for purposes of lethal injection executions.

(*Id.* Ex. A, at 2–4.)

Within six days of being served with the subpoena duces tecum, the VDOC sent thirteen documents to Plaintiffs that were responsive to all but two of Plaintiffs' thirteen document

production topics, and all but seven of Plaintiffs' sixteen deposition notice topics. As described in Parts IV.A through IV.D, the VDOC provided information responsive to the Plaintiffs' requests when doing so would not jeopardize its ability to carry out executions.[22] Nevertheless, the majority of the topics for the deposition and the documents requested by Plaintiffs seek information that could reveal the supplier of Virginia's lethal injection chemicals or the individuals involved in carrying out Virginia's executions. (*See, e.g.*, Notice of Dep., Topics 1–8, 9(c), 12; *Id.* Ex. A, Documents to be Produced 1–2, 5–8.) For the reasons articulated below, the Court concludes that it would pose an undue burden on the VDOC to provide these additional materials.

### A. Materials Responsive to Notice of Deposition Topics 1 through 5 and Document Requests 1 through 2

In the first five topics in the Notice of Deposition and the first two classes of documents requested to be produced, Plaintiffs request information pertaining to the VDOC's efforts to obtain lethal injection drugs, including pentobarbital and midazolam from 2010 until the present. (Notice Dep. Topics 1–5.) In response, the VDOC provided Plaintiffs with, *inter alia*, the transcripts of the evidentiary hearings from *Prieto v. Clarke*, 3:15CV587–HEH, ECF No. 27 (E.D. Va. 2015) and *Gray v. McAuliffe*, 3:16CV982–HEH, ECF No. 30 (E.D. Va. 2016). In those transcripts, Arnold David Robinson, the Chief of Corrections Operations for the VDOC,

---

[22] Specifically, the VDOC provided Plaintiffs with: the "Laboratory Report, Pentobarbital (*Prieto v. Clarke*, ECF No. 12–1)"; "Affidavit of D. Ricks (*Arthur v. Dunn*)"; roughly 300 pages of testimony from the Prieto Transcript and the Gray Transcript; "Certificate of Analysis, January 2017"; "Label, Potassium Chloride (*Gray v. McAuliffe*, ECF  21–08)"; "Label, Midazolam (*Gray v. McAuliffe*, ECF No. 21–07)"; "Certificate of Analysis, items submitted December 2016 (*Gray v. McAuliffe*, ECF 21–06)"; "Certificate of Analysis, items submitted October 2016 (*Gray v. McAuliffe*, ECF 21–05)"; "Label, Potassium Chloride (*Gray v. McAuliffe*, ECF 21–04)"; "Label, Midazolam (*Gray v. McAuliffe*, ECF 21–03)"; "Memorandum of Understanding with Compounding Pharmacy (redacted) (*Gray v. McAuliffe*, ECF 21–02)"; and "VDOC Operating Procedure 406, Execution Manual (redacted) *Gray v. McAuliffe*, ECF 21–01)." (Mem. Supp. Mot. Quash Ex. 3, at 2, ECF No. 2–3.)

provided extensive testimony regarding the VDOC's efforts to obtain sodium thiopental, pentobarbital, midazolam and other lethal injection drugs. (Prieto Tr. 64–78; Gray Tr. 91–96, 98–99, 104–05.) Robinson testified that the VDOC initially used sodium thiopental and switched to pentobarbital when it could no longer obtain sodium thiopental. (Gray Tr. 91.) The VDOC then switched to midazolam when it could not obtain pentobarbital. (Gray Tr. 91). Robinson's testimony covered the VDOC's efforts to obtain lethal injection drugs from 2010 until the present. (*See* Am. Compl. ¶ 278; Prieto Tr. 65.) Furthermore, with respect to Plaintiffs' attempt to gain information to support their assertion that the Mississippi DOC should use pentobarbital in their executions, the evidence reflects that the VDOC is not a viable source for that information. Specifically the VDOC has provided a transcript of sworn testimony making plain that it "does not have pentobarbital," and, as evidenced through the documents disclosed, has not "for several years." (Reply 1; Prieto Tr. 64–78; Gray Tr. 91–96.)

**B.**     **Materials Responsive to Notice of Deposition Topics 6 and 7**

In Notice of Deposition Topics 6 and 7, Plaintiffs seek, *inter alia*:

**Topic No. 6:** The process, if any, by which sodium pentobarbital [Active Pharmaceutical Ingredient ("API")] has been compounded into injectable pentobarbital for use in lethal injection executions by the Department between 2010 and the present. This topic includes, but is not limited to:

    (a) The individual, corporation, or other entity with which the Department is, or has in the past, compounded sodium pentobarbital API into injectable pentobarbital for use in lethal injection executions.[23]

    (b) Any contracts or other agreements between the Department and any officer, agent, employee or representative of the compounding pharmacy.

    . . . .

**Topic No. 7:** The process, if any, by which API has been compounded into any drug other than pentobarbital (including, but not limited to, midazolam) for use in

---

[23] This "individual, corporation or other entity" shall be referred to below as "the compounding pharmacy."

lethal injection executions by the Department between 2010 and the present. This topic includes, but is not limited to:

(a) The individual, corporation, or other entity with which the Department is, or has in the past, compounded API into any drug other than pentobarbital (including, but not limited to, midazolam) for use in lethal injection executions.[24]

(b) Any contracts or other agreements between the Department and any officer, agent, employee or representative of the compounding pharmacy.

(c) Any communications, whether oral or written, whether on paper or electronically or digitally transmitted, between the Department and any officer, agent, employee or representative of the compounding pharmacy.

(Notice Dep. 5, 6.) The VDOC declined to provide Plaintiffs with information directly responsive to the above requests because doing so could reveal the identity of the pharmacy that was providing it with lethal injection drugs. However, under each of these topics, Plaintiffs also pursued information about procedures for testing compounded pentobarbital or compounded midazolam, (*id.* at 5–6, Topics 6(d), 7(d)).

The VDOC only used compounded midazolam in Mr. Gray's execution in 2017. The VDOC only used compounded pentobarbital, provided by Texas, in Mr. Prieto's execution in 2015. Thus, no evidence about the testing of compounded substances exists prior to 2015. With respect to the compounded pentobarbital, Robinson's testimony reflected that the VDOC did not independently test the compounded pentobarbital, but that Texas tested the drug and the VDOC obtained from Texas "a certificate that verified the validity of the drug." (Prieto Tr. 69, 73.)

With respect to the testing of compounded midazolam, the VDOC provided the testimony of Dr. Frank Fuller, III, the pharmacist for the VDOC, and Shane Wyatt, the lead scientist for Virginia's Division of Consolidated Laboratory Services. (Gray Tr. 129–47; 156–69.) Mr. Wyatt testified extensively about the exacting testing performed on the drugs for the Gray

---

[24] This "individual, corporation or other entity" shall be referred to below as "the compounding pharmacy."

23

execution to assure their purity and potency. (Gray Tr. 159–69.) Dr. Fuller confirmed that the results of the testing reflected that the concentrations of the drugs were "consistent with what you would see in their commercially available counterparts." (Gray Tr. 136.)

### C.   Materials Responsive to Notice of Deposition Topics 8 thorough 10 and Document Requests 3, 4, 5, 6, 7, 10 and 11

In Notice of Deposition Topics 8, 9, and 10, Plaintiffs seek information about:

**Topic No. 8**: The storage of lethal injection drugs by the Department from 2010 to the present. This includes, but is not limited to:

(a) All policies, written procedures, or other protocols governing the storage of the drugs which are intended for use in lethal injection executions.

(b) The actual practice of the Department with respect to the storage of the drugs which are intended by the Department to be used in lethal injection executions.

(c) The name, address, electronic mail address, and business telephone number of all persons, whether individual or corporate or other entity, responsible for the storage of the drugs which are intended by the Department to be used in lethal injection executions.

**Topic No. 9**: The procedures used by the Department from 2010 to the present to execute a convicted offender by means of lethal injection. This topic includes, but is not limited to:

(a) The documents which set forth the identity, dosage, and order of the drugs used in the lethal injection execution.

(b) The documents which set forth the logistical steps taken by the department and its officers, agents, employees and/or attorneys in the days leading up to an execution.

(c) The documents which record the events during the process of a lethal injection execution, including but not limited to execution logs, autopsies, and other materials.

(d) The actual practice of the Department in the execution of convicted offenders by means of lethal injection.

**Topic No. 10**: The process, if any, by which the Department determined that midazolam (either purchased in injectable form or API purchased for compounding into injectable form) would be used in lethal injection executions in Virginia.

24

(Notice of Dep. 6–7.)  The VDOC provided a significant amount of information pertinent to the above topics.  In response to Topics 8(a) and 8(b), the VDOC provided Plaintiffs with, *inter alia*, Robinson's testimony as to how Virginia obtained and stored the drugs utilized in Prieto's execution.  (Prieto Tr. 67–74.)  Additionally, the VDOC provided Dr. Fuller's extensive testimony regarding how the VDOC stored the lethal injection chemicals for Gray's execution. (Gray Tr. 129–43.)  This testimony covers the last two years and provides a clear picture of the VDOC's current practices, but it did not address the period between 2010 and 2014 as identified in the deposition notice.  Nevertheless, given the amount of information produced and the VDOC's third-party status, information for the 2010 to 2014 period appears irrelevant and unduly burdensome.  *See In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, No. 3:16–MC–1, 2016 WL 1071016, at *6 n.6 (E.D. Va. Mar. 17, 2016) (citations omitted) (emphasizing that in order to avoid imposing an undue burden, third-party subpoenas "must be narrowly crafted to relevant subject matter in the underlying litigation").  Moreover, Plaintiffs fail to suggest how information about the VDOC's storage of sodium thiopental and noncompounded pentobarbital during the 2010 to 2014 period would advance their claim.

In response to Topic 8(c), however, the VDOC did not identify the corporate entity or individual responsible for storage of lethal injection drugs.  As discussed below, this Court finds that disclosure of this information poses an undue burden.  With respect to Topic 9 and Document Requests 3, 4, 10, and 11, the VDOC provided Plaintiffs with the VDOC Execution Manual, the laboratory report for the pentobarbital used in Prieto's execution, (ECF No. 2–3, at 2), the labels of drugs and certificates of analysis of the drugs utilized in the Gray execution (*id.*), and testimony regarding the events that occur before and during an execution.  (Prieto Tr. 73–74;

Gray Tr. 88–90.)[25] The Execution Manual is eighteen (18) single-spaced pages long and bears

an effective date of June 30, 2016. (ECF No. 21–1, at 1.) Attached to the Execution Manual are

an additional twenty-six (26) pages of forms and checklists, with revision dates from October 1,

2010 (*see Gray v. McAuliffe*, 3:16cv982-HEH, ECF No. 21–1, at 30) to February 14, 2014 (*see*

ECF No. 19, at 1). These documents provide further details regarding the VDOC's execution

procedures from 2010 until 2016. Requiring the VDOC to provide additional information about

past procedures for executions would pose an undue burden given the amount of information

already provided and the marginal possible relevance to Plaintiffs' claims. This conclusion

applies with equal force to requiring the VDOC to respond further to Notice of Deposition

Topics 12 through 16 and Document Requests 8 and 9 discussed below.

Additionally, in response to Document Requests 5 and 7 and Topic 10, the VDOC

provided Plaintiffs with Robinson's testimony recounting why the VDOC incorporated

midazolam into its lethal injection protocol. (Gray Tr. 91–99, 104–05.)

---

[25] Plaintiffs request "[a]ll drug labels and package inserts for any drug purchased or obtained by the Department, from 2010 to the present, for use in lethal injection executions." (Notice of Dep. Ex. A, at 15 (as paginated by CM/ECF).) The VDOC provided labels of the drugs used in the most recent execution of Ricky Gray, which involved compounded midazolam. Labels and inserts for drugs the VDOC used before then, which by all accounts the VDOC cannot obtain, *see Gray*, 2017 WL 102970, at *7, are not relevant to Plaintiffs' claim. Plaintiffs' demand for such material poses "an undue burden because it necessarily imposes greater hardship than is necessary to obtain proper discovery." *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016 WL 1071016, at *5.

The Court also notes that the VDOC did not list (*see* ECF No. 2–3, at 2) any document responsive to Document Request 6: "All documents related to the Department's potential use of any drug (including, but not limited to, pentobarbital or midazolam) compounded from API for use in lethal injection executions from 2010 to the present . . . ." (Notice Dep. Ex. A 2.) Although not entirely clear, the record suggests that the lack of documents flows from the fact that the VDOC has no documents responsive to this request. Plaintiffs contend that the Mississippi DOC intends "to have the raw ingredients [i.e., API] for pentobarbital compounded into an injectable solution" on the prison grounds. (Am. Compl. ¶ 6.) But the VDOC does not follow such a practice. Rather, the record reflects that the lethal injection drugs are delivered to the VDOC already compounded into an injectable solution. (Gray Tr. 131–34.)

**D.**     **Notice of Deposition Topics 11 through 16 and Document Requests 8 and 9**

In Notice of Deposition Topics 11 through 16, Plaintiffs seek:

**Topic No. 11:** The process, if any, by which the Department rejected the use of a single-drug protocol for lethal injection executions in Virginia.

**Topic No. 12:** The training mandated by the Department from 2010 to the present for officers, employees, agents or attorneys with respect to the conduct of executions by lethal injection. This topic includes, but is not limited to:

    (a) The professional and/or educational certifications required for employees within the Department to participate in any specific role in lethal injection executions.

    (b) The documents provided to the Department's officers, employees, agents or attorneys during or as a result of any such training.

    (c) The syllabi, training description, or schedule of any such training.

**Topic No. 13:** From 2010 to the present, the supply or inventory of drugs purchased, procured, held or stored, by the Department for use in lethal injection executions, including the documents, logs or inventory lists maintained by the Department with respect to such drugs.

**Topic No. 14:** The actual process of lethal injection executions in Virginia, including the chronology of the administration of lethal injection drugs and the use of any method for monitoring the consciousness of the condemned prisoner, in all executions from January 1, 2010 to the present.

**Topic No. 15:** Any studies, evaluations or other examinations into any problems encountered in any lethal injection executions in Virginia from January 1, 2010 to the present.

**Topic No. 16:** Any communication between the Department and any officer, agent, employee, or attorney: for the Mississippi Department of Corrections or the Mississippi Attorney General's Office regarding lethal injection executions. This topic includes, but is not limited to:

    (a) The contents of any telephone or in-person conversation between any officer agent or employee of the Department with any officer, agent or attorney of or for the Mississippi Department of Corrections or the Mississippi Attorney General's Office.

    (b) The contents of any written communication, whether invoice, letter, electronic mail, text message or other form of written communication between any officer agent or employee of the Department with any officer, agent or attorney of or for the Mississippi Department of Corrections or the Mississippi Attorney General's Office.

> (c) The current location of any documents evincing any communication between any officer agent or employee of the Department with any officer, agent or attorney of or for the Mississippi Department of Corrections or the Mississippi Attorney General's Office.

(Not. Deposition 7–8.)

Although the VDOC did not identify any materials responsive to Topic 11, the record contains nothing to suggest that the VDOC ever contemplated utilizing a single-drug execution protocol.[26] For more than a decade Virginia has employed a three-drug protocol in its executions. *See Reid v. Johnson*, 333 F. Supp. 2d 543, 546–47 (E.D. Va. 2004). Moreover, according to Plaintiffs' Amended Complaint, the states that currently employ a single-drug protocol utilize pentobarbital. (Am. Compl. ¶ 278.) But the VDOC has not been able to obtain pentobarbital for roughly the last two years.[27] (Gray Tr. 91.)

Nevertheless, the VDOC turned over substantial material relative to the remaining topics. With respect to Topic 12 and Document Request 8, the VDOC provided Plaintiffs with the description of training for the execution team outlined in the VDOC Execution Manual and Robinson's testimony describing the execution team training. (Gray Tr. 88–90.) Many of the materials previously described were responsive to Topics 13 and 14 and Document Request 9, including the labels for drugs utilized in recent executions and the transcripts of the Gray and Prieto evidentiary hearings. (ECF No. 2–3, at 2.)

The VDOC gave Plaintiffs information relevant to Document Request 13, in which Plaintiffs sought all documents pertaining to communications from the VDOC to any employee

---

[26] The VDOC did not indicate that it was withholding documents pertinent to this request on grounds of privilege.

[27] Robinson testified that the VDOC authorized the use of midazolam in 2014 because it could not locate a commercial supplier of pentobarbital. (Gray Tr. 91–92.) The VDOC was able to obtain pentobarbital for Mr. Prieto's 2015 execution only because Texas agreed to provide the VDOC with compounded pentobarbital. (Gray Tr. 92.)

of the corrections department or attorney general's office of any other jurisdiction related to the selection, purchase, or exchange of drugs for lethal injection executions. Specifically, the VDOC supplied Plaintiffs with Robinson's testimony regarding his communications with Texas, Florida, and Alabama officials about lethal injection drugs. (Prieto Tr. 66–73, 75–78; Gray Tr. 92, 98, 104–05.) Finally, with respect to Topic 15 and Document Request 12, requesting any studies related to any problems encountered in lethal injection executions in Virginia from 2010 to the present, the VDOC offered Plaintiffs Robinson's testimony stating that he had witnessed thirteen executions, (Gray Tr. 88), that the VDOC had not "ever had an issue with IV line placement in our executions by lethal injections,"[28] (Gray Tr. 90), and that there were no problems in executing Prieto with compounded pentobarbital, (Gray Tr. 93).

The VDOC did not provide any materials responsive to Topic 16 regarding communications between VDOC officials and officials with the Mississippi DOC. The record does not establish whether that omission is attributable to the fact that no relevant communications exist, to the probability that such communications may unveil the VDOC's supplier of the lethal injections chemicals, or to something else. Under any scenario, however, the Mississippi DOC remains a party to underlying litigation, meaning that Plaintiffs should obtain such information, if discoverable, directly from the Mississippi DOC rather than VDOC in its third-party status.

### V.  Analysis

Federal Rule of Civil Procedure 45(d)(3)(A)(iv) "prohibits the discovery of information 'where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of

---

[28]  As discussed above, Mr. Gray's execution was slightly delayed while VDOC cited the IV lines. Ultimately, however, before the administration of the lethal chemical, the VDOC officials were able to place the lines so that the execution went forward without incident.

the information.'" *In re Mo. Dep't of Corr.*, 839 F.3d 732, 736 (8th Cir. 2016) (quoting *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir. 1999)), *cert. denied sub nom. Jordan v. Mo. Dep't of Corr.*, 137 S. Ct. 2180 (2017). The majority of the unanswered Topics for Deposition and the undisclosed documents requested by Plaintiffs seek information that would reveal the supplier of Virginia's lethal injection chemicals or the individuals involved in carrying out Virginia's executions. (*See, e.g.*, Notice of Dep., Topics 1–8, 9(c), 12; *Id.* Ex. A, Documents to be Produced 1–2, 5–8.) In those instances where it would not jeopardize its ability to carry out executions, the VDOC generally provided information responsive to the Plaintiffs' requests. Clearly, complying with the remaining aspects of the subpoena would pose an undue burden on the VDOC.

The Eighth Circuit made that exact finding as to these Plaintiffs when they served upon the MDOC a third-party subpoena similar to that served on the VDOC. There, Plaintiffs served "a third-party subpoena for documents and a Federal Rule of Civil Procedure . . . . 30(b)(6) deposition notice seeking information regarding MDOC's use of pentobarbital in lethal injections, including the identity of MDOC's supplier of pentobarbital." *In re Mo. Dep't of Corr.*, 839 F.3d at 734. MDOC filed a motion to quash and argued that Plaintiffs' subpoena presented an undue burden under Rule 45(d)(3)(A)(iv). *Id.* MDOC relied upon the affidavit of MDOC Director George Lombardi, who asserted that "MDOC's pentobarbital suppliers 'require the assurance of confidentiality,' [and] producing the information sought by the inmates would result in the state no longer being able to obtain the drug for use in executions." *Id.* The district court concluded that Lombardi's affidavit was "'insufficient to establish that Missouri's supplier will no longer supply pentobarbital to Missouri if identified to Respondents' because Lombardi's statement was 'a bare, hearsay assertion unsupported by record evidence.'" *Id.*

30

Ultimately, the United States Court of Appeals for the Eighth Circuit granted a writ of

mandamus and prohibited the discovery when the MDOC's anonymous pentobarbital supplier,

designated as "M7," submitted a declaration wherein it stated that if its identity is disclosed, it

will not supply lethal chemicals to anyone.[29]  *Id.* at 735.  The Eighth Circuit concluded:

> A state has an interest in "exercising its sovereign power to enforce the criminal
> law." *In re Blodgett*, 502 U.S. 236, 239, 112 S. Ct. 674, 116 L.Ed.2d 669 (1992).
> As M7's declaration demonstrates, disclosure of M7's identity will certainly harm
> this interest by preventing MDOC from acquiring pentobarbital for executions
> from M7.  Without M7, Lombardi states that MDOC "would not be able to obtain
> the lethal chemicals necessary to carry out its lawful executions."

*Id.* at 736.

More recently, relying on Ohio's secrecy statute, the United States Court of Appeals for

the Sixth Circuit upheld a protective order that prevented inmate plaintiffs from obtaining the

identity of the supplier of the drugs to be used in their executions.  *In re Ohio Execution Protocol*

*Litig.*, 845 F.3d 231, 233 (6th Cir. 2016), *cert denied, sub nom. Fears v. Kasich*, No. 17-5010,

2017 WL 2854622 (U.S. Oct. 2, 2017).  "After hearing testimony and admitting evidence, the

district court found that the disclosures would cause an undue burden on and prejudice

Defendants by subjecting them to the risk of harm, violence, and harassment and by making it

difficult for them to obtain lethal-injection drugs." *Id.* at 237.  The district court observed that,

given the legality of execution by lethal injection,

> [a] court should then regard discovery that overly burdens or outright prevents a
> state from obtaining the drugs, materials, or assistance needed to execute by lethal
> injection as suspect and consequently drill down into the parties' arguments on
> each side of the issues.  The specific, albeit limited, evidence before this Court

---

[29] This reasoning echoes that of *Glossip*: in the absence of confidentiality, anti-death
penalty activists target labs or suppliers to cease the distribution of legal drugs for a
controversial, but still legal, use.  The resulting scarcity of drugs could impinge on what the
Supreme Court has identified as a state's "legitimate interest in carrying out a sentence of death
in a timely manner." *Baze v. Rees*, 553 U.S. 35, 61 (2001) (citations omitted); *see also Nelson v.
Campbell*, 541 U.S. 637, 644 (2004) (calling it a "significant interest").

and Ohio's secrecy statute together present good cause for issuance of the requested protective order.

*In re: Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2015 WL 6446093, at *9 (S.D. Ohio

Oct. 26, 2015), *aff'd sub nom. In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir.

2016). Both these cases provide persuasive authority for this Court's decision to quash the

remainder of Plaintiff's subpoena to the VDOC. The Court's rationale follows.

### A.   Disclosure of Information Pertaining to the VDOC's Supplier of Lethal Injection Drugs and the Members of the Execution Team Poses an Undue Burden

The Circuit Courts concur that requiring disclosure of suppliers of lethal injection

chemicals and team members imposes an undue burden on states. *In re Mo. Dep't of Corr.*, 839

F.3d at 736; *In re Ohio Execution Protocol Litig.*, 845 F.3d at 239–40; *see Jones v. Comm'r, Ga.

Dep't of Corr.*, 811 F.3d 1288, 1292–93 (11th Cir.), *cert. denied*, 136 S. Ct. 998 (2016). Upon

review of the record, and considering Virginia's third-party status in receiving these discovery

requests, this Court agrees that disclosure of additional information regarding suppliers or

execution team members would be unduly burdensome. *Wyoming v. U.S. Dep't of Agric.*, 208

F.R.D. 449, 452–53 (D.D.C. 2002) (citations omitted).

The issues heard during the *Gray* motion for preliminary injunction overlap substantially

with those raised, on a third-party basis, by Plaintiffs here. Within a week of receiving their

discovery requests, the VDOC provided Plaintiffs with a copy of the *Gray* Transcript and other

evidence from the *Gray* and *Prieto* evidentiary hearings.[30] The historical record and Robinson's

testimony from the *Gray* hearing provide strong evidence that the VDOC's duty to implement

the sentences of Virginia's condemned inmates would be frustrated if the identity of the supplier

of Virginia's lethal injection drugs is revealed.

---

[30] *See supra* n.22.

Robinson testified that prior to Prieto's execution, the VDOC was experiencing difficulties obtaining lethal injection drugs. (Gray Tr. 92.) Robinson indicated that commercial suppliers of lethal injection drugs were unwilling to provide the drugs to the VDOC. (Gray Tr. 91–92.) Robinson testified that if Texas had not supplied the VDOC with the necessary drugs, the VDOC would not have had drugs to use in Prieto's execution. (Gray Tr. 92.)

After Prieto's execution, the VDOC again attempted to purchase lethal injections drugs, but was unsuccessful. (Gray Tr. 92.) In the wake of these unsuccessful efforts, Virginia passed a new secrecy statute[31] to complement its other secrecy statute.[32] Robinson explained that, "[a]fter the enactment of law, we went out and talked with numerous pharmacies throughout the

---

[31] The pertinent portions of the new statute provide:

> The identities of any pharmacy or outsourcing facility that enters into a contract with the Department for the compounding of drugs necessary to carry out an execution by lethal injection, any officer or employee of such pharmacy or outsourcing facility, and any person or entity used by such pharmacy or outsourcing facility to obtain equipment or substances to facilitate the compounding of such drugs and any information reasonably calculated to lead to the identities of such persons or entities, including their names, residential and office addresses, residential and office telephone numbers, social security numbers, and tax identification numbers, shall be confidential, shall be exempt from the Freedom of Information Act (§ 2.2-3700 et seq.), and shall not be subject to discovery or introduction as evidence in any civil proceeding unless good cause is shown.

Va. Code Ann. § 53.1-234 (West 2017) (Effective July 1, 2016).

[32] Effective July 1, 2007, Virginia's other secrecy statute provides in pertinent part:

> The identities of persons designated by the Director to conduct an execution, and any information reasonably calculated to lead to the identities of such persons, including, but not limited to, their names, residential or office addresses, residential or office telephone numbers, and social security numbers, shall be confidential, shall be exempt from the Freedom of Information Act (§ 2.2-3700 et seq.), and shall not be subject to discovery or introduction as evidence in any civil proceeding unless good cause is shown.

Va. Code Ann. § 53.1-233 (West 2017) (Effective July 1, 2007).

33

Commonwealth of Virginia. Somewhere in the neighborhood of 20 to 25." (Gray Tr. 93.)

Eventually, the VDOC found a compounding pharmacy willing to provide the drugs. (Gray

Tr. 93.) "The VDOC was required to enter into a Memorandum of Understanding with a

compounding pharmacy before the pharmacy agreed to provide the VDOC with the necessary

drugs. (ECF No. 21–2.) Total confidentiality about the pharmacy's identity was an essential

term of that agreement. (Prelim. Inj. Hr'g Tr. 95.)" *Gray v. McAuliffe*, No. 3:16CV982–HEH,

2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017).[33] Robinson explained that his "[e]xperience

has shown that if the pharmacy or pharmacist was to be revealed, . . . they would not provide the

drugs that were necessary just because of potential outside pressure to that organization." (Gray

Tr. 95.)

Robinson's testimony confirms that Virginia's ability to secure the drugs necessary to

carry out lethal injections would be jeopardized, if not totally frustrated, should the supplier of

those drugs be disclosed. Thus, the VDOC contends here that "Virginia's ability to obtain lethal

injection drugs and conduct executions would be greatly damaged, if not completely eliminated,"

if the identities of its supplier of lethal injection drugs and the members of the execution team

were revealed. (VDOC's Reply 6, ECF No. 13.) This contention is borne out by the historical

record and the experience of other states currently attempting to obtain lethal injection drugs.

*Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015) (detailing how anti-death penalty advocates

---

[33] The *Gray* Court also noted:

> In light of the pressure waged by death penalty opponents, it has become
> increasingly difficult to obtain the drugs Virginia traditionally used to render a
> prisoner unconscious during the initial stage of the execution process. . . .
> Because death penalty opponents have made it difficult to obtain FDA–approved
> drugs customarily used in executions, Virginia has recently resorted to obtaining
> drugs from compounding pharmacies instead of traditional suppliers.

*Gray*, 2017 WL 102970, at *7.

pressured pharmaceutical companies to stop supplying sodium thiopental and pentobarbital for use in executions).

Virginia, like Ohio, passed a statute to keep secret the identity of the pharmacy that supplies the drugs to be utilized in the lethal injection process. Va. Code § 53.1–234; *see In re Ohio Execution Protocol Litig.*, 845 F.3d at 237 (observing that the Ohio secrecy statute was enacted out of concern for "the burden on and prejudice to the state that disclosure presents" (quoting *In re: Ohio Execution Protocol Litig.*, 2015 WL 6446093, at *7)). This Court, like the Sixth Circuit, views the statute as an evidentiary "add-on" to the reasons counseling against disclosure: "the same concerns that apparently led to the creation of the statute [exist]: the burden on and prejudice to the state that disclosure presents." *In re Ohio Execution Protocol Litig.*, 845 F.3d at 237 (internal quotation marks omitted) (citation omitted). Thus, without deciding whether the state statute creates any privilege in federal court, and even in the absence of a specific threat against an Ohio-connected pharmacy, the district court recognized that disclosure would pose "a tangible burden on Defendants and would be unduly prejudicial." *In re: Ohio Execution Protocol Litig.*, 2015 WL 6446093, at *2.

In addition to noting the statute's existence, the VDOC, like the Ohio Defendants, try to demonstrate danger posed by disclosure of the pharmacy by citing a threatening email sent to an apothecary that supplied execution drugs to the state of Missouri, which states in pertinent part:

> Still, were I you I'd at least want to beef up my security now that you've been put
> in the spotlight as a likely supplier and failed to issue a flat denial. As the folks at
> the federal building can tell you, it only takes one fanatic with a truckload of
> fertilizer to make a real dent in business as usual.

(Mem. Supp. Mot. Quash Ex. 5, at 14.) The Ohio district court opined that, "[i]f the question is whether a reasonable pharmacy owner or compounder would feel burdened by receiving such an email, the answer is likely if not certainly yes. And by burdened this Court means likely scared

to the point of electing not to help Ohio" in assisting in executions. *In re: Ohio Execution Protocol Litig.*, 2015 WL 6446093, at *3.

When assessing whether a subpoena imposes an undue burden courts balance "the need for discovery against the burden imposed on the person ordered to produce documents." *Wyoming*, 208 F.R.D. at 452 (citation omitted). The remaining outstanding discovery largely deals with information that would disclose the identity of the VDOC's execution team and the supplier of its lethal injection drugs. On this record, the Court must find that disclosure of the team and suppliers would be unduly burdensome because it would impede the VDOC's significant interest in carrying out lawfully imposed sentences. Similar to the MDOC in the Eighth Circuit, the VDOC has produced evidence that total confidentiality is essential to maintain the supply of lethal injection drugs. As in the Sixth Circuit, the Court evaluates a request from a state whose legislature has enacted a statute to protect such information from disclosure. Unlike either circuit, the Court faces a record in which the VDOC has disclosed considerable information while, largely, excepting out only information about team members and suppliers. In light of the foregoing, the Court finds that requiring the VDOC to further respond to the Notice of Deposition and Subpoena Duces Tecum imposes an undue burden upon the VDOC. Disclosure of this information would place a real and significant burden on the VDOC. Conversely, Plaintiffs have shown little, if any, need for the information.

**B.     Disclosure of Additional Information Would Be Unduly Burdensome for Other Reasons**

Other factors this Court should assess when evaluating the burden on VDOC also weigh in favor of quashing additional disclosure. *See Wyoming*, 208 F.R.D. at 452–53 (citation omitted). First, the VDOC's non-party status is one of the factors the Court considers in assessing the burden of imposing further discovery from the VDOC. *Id.* at 452 (citation

omitted).  VDOC has provided documents beyond that required of Missouri or Georgia, and

nothing on this record clearly establishes the current state of what Mississippi has or has not

provided.  The law does not require further disclosure from the VDOC as a third-party

respondent.

Second, it does not appear that Plaintiffs seek relevant information beyond that provided

already by Virginia.  A requirement to provide additional, irrelevant information would be

unduly burdensome.  *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, 2016

WL 1071016, at *5; *see also Wyoming*, 208 F.R.D. at 453.  Unlike the suppliers of pentobarbital

to Georgia and Mississippi, which Plaintiffs tout as a superior drug for lethal injection purposes,

the VDOC's anonymous compounding pharmacy supplies the VDOC with midazolam, which

according to Plaintiffs, is an inferior drug for use in lethal injections.  Thus, disclosure of this

information would not be relevant to demonstrating an alternative method of execution that is

"known and available" as well as "feasible, readily implemented, and in fact significantly [likely

to] reduce a substantial risk of severe pain."  *Glossip*, 135 S. Ct. at 2737 (quoting *Baze v. Rees*,

553 U.S. 35, 52 (2008)).  To the extent that pentobarbital and compounding issues are relevant to

Plaintiffs' claim, they deserve nothing more than the significant information that already has

been supplied.  That information reflects, among other things:  that the VDOC switched to

compounded midazolam because it could not obtain pentobarbital; how the VDOC tests and

stores its compounded midazolam; and, the detailed procedures the VDOC employs for ensuring

that an execution by lethal injection goes smoothly.

Third, Plaintiffs' requests for additional materials are overbroad and unduly burdensome

to the extent that they seek information dating back to 2010.[34]  *Wyoming*, 208 F.R.D. at 453

---

[34] Plaintiffs were obliged to "narrowly craft[ ]" the subpoena "to relevant subject matter
in the underlying litigation" in order to avoid imposing an undue burden on a third-party like the

(citation omitted).  The VDOC has supplied Plaintiffs with almost all the information it supplied

to Prieto and Gray, the two most recent challengers to the Virginia lethal injection procedures.[35]

This material provides a full picture of how the VDOC currently carries out an execution.

Plaintiffs fail to suggest how material related to the VDOC's storage of pentobarbital or labels

from pentobarbital and other drugs the VDOC can no longer obtain would advance their

underlying Eighth Amendment claim.  The time frame and the overbreadth of any additional

information requested by Plaintiffs demonstrate that any further production by VDOC would be

unduly burdensome.  *Id.* (citation omitted).

### C.    Quashing the Subpoena Is the Appropriate Remedy

Plaintiffs suggest that the Court need not quash the subpoena, but could enter

a protective order [that] would allow Jordan and Chase access to the documents
and testimony requested, but would require them to file any privileged

---

VDOC.  *In re Subpoenas for Documents Issued to ThompsonMcMullan, P.C.*, No. 3:16–MC–1, 2016 WL 1071016, at *6 n.6 (E.D. Va. 17, 2016) (citing *Theofel v. Farey-Jones*, 359 F.3d 1066, 1071–72 (9th Cir. 2004); *In re Subpoena Duces Teucm to AOL, LLC*, 550 F. Supp. 2d 606, 612 (E.D. Va. 2008)).  Nevertheless, Plaintiffs disregarded this obligation and demanded that the VDOC produce *all* documents dating back to 2010.  This hardly constitutes an effort to narrowly craft the subpoena and, in this respect, makes the subpoena overly broad and unduly burdensome.  *U.S. Dep't of Agric.*, 208 F.R.D. at 453 (citation omitted) (observing that courts consider the time period covered by the document request in assessing undue burden).

[35] It may be that Plaintiffs' attempt to ascertain the VDOC's supplier of lethal injection drugs is a roundabout effort to discover the supplier of the lethal injection drugs for the Mississippi DOC.  Such information is marginally relevant to their claim.  Nevertheless, when Ricky Gray, a Virginia inmate, in a direct challenge to his imminent execution sought to obtain the identity of the pharmacy supplying lethal injection drugs to the VDOC, the *Gray* Court concluded Mr. Gray had no right to such information.  *Gray v. McAuliffe*, No. 3:16CV982–HEH, 2017 WL 102970, at *20 (E.D. Va. Jan. 10, 2017) (citing *Jones*, 811 F.3d at 1292–93; *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016); *Zink v. Lombardi*, 783 F.3d 1089, 1109 (8th Cir.), *cert. denied*, 135 S. Ct. 2941 (2015); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014)).  Plaintiffs certainly have less need for the identity of the VDOC's supplier of lethal injection drugs than did Mr. Gray.  If Plaintiffs wish to discover the Mississippi DOC's supplier of lethal injection drugs, they should do so through the normal discovery procedures in the underlying litigation.  For all the reasons previously stated, requiring the VDOC to disclose the supplier of its lethal injection drugs is unduly burdensome and far outweighs Plaintiffs need for that information.

> information under seal in the underlying case. Similarly, no party to the
> underlying case in Mississippi would have a right of access to the privileged
> materials without being willing to be bound by the terms of the protective order.

(Resp. 20.) In nearly identical contexts, other courts have observed that such protective orders

are not adequate to protect a state's interest in shielding the identities of individuals and entities

that assist the state in carrying out executions. *See In re Ohio Execution Protocol Litig.,*

845 F.3d at 238–39 (observing that "the district court did not err in rejecting Plaintiffs' request to

designate certain information subject to the protective order as 'attorney's eyes only'"); *In re*

*Mo. Dep't of Corr.,* 839 F.3d at 737. Indeed, just as they do here, these same Plaintiffs argued

that Missouri's interest in limiting the disclosure of its supplier of lethal injection drugs could be

adequately accommodated by including "a provision requiring third parties to agree to be bound

by the terms of a protective order as a condition precedent to receiving documents produced

under such an order." *In re Mo. Dep't of Corr.,* 839 F.3d at 737. The Eighth Circuit flatly

rejected that argument:

> [I]n *In re Lombardi,* [741 F.3d 888 (8th Cir. 2014)], we granted a writ [of
> mandamus] to prevent disclosure of the lethal chemical supplier's identity instead
> of requiring a protective order. 741 F.3d at 897. . . .
>     . . . [E]ven assuming that the district court can issue such an order directed
> at [third parties], the inmates fail to distinguish this case from *In re Lombardi.*
> There, we granted a writ based on Lombardi's assertion that "it is likely that
> active investigation of the physician, pharmacy, and laboratory will lead to further
> disclosure of the identities." 741 F.3d at 894. The inmates do not offer any
> assurances that they will be able to investigate the supplier any more subtly than
> the inmates in *In re Lombardi.*

*Id.*

In Virginia, after much effort, the VDOC located a pharmacy that agreed to provide the

chemicals necessary to carry out its executions. *Gray,* 2017 WL 102970, at *7. "Total

confidentiality about the pharmacy's identity was an essential term of that agreement." *Id.*

Revelation of the pharmacy's identity to Plaintiffs, even if Plaintiffs revealed the pharmacy's

identity to no one else, would jeopardize that agreement and frustrate the VDOC's lawful duty to carry out the sentences of execution imposed by the Virginia courts.

## VI. The VDOC's Invocation of Privilege

The VDOC also filed a privilege log with respect to 12 categories of documents that it asserted were protected by, *inter alia*, Virginia Code §§ 53.1–233 and 53.1–234 ("the Virginia Secrecy Statutes"), executive privilege, attorney-client communication, and an individual's right to privacy in their health care records. (Reply Ex. 10, ECF No. 12–10.) Plaintiffs contest the VDOC's assertion of privilege under the Virginia Secrecy Statutes. (Reply 15–19.) The VDOC invoked the Secrecy Statute as a privilege with respect to documents that revealed the identities of the execution team or the lethal drug supplier. (Reply Ex. 10, at 2–4.) This Court, like the Sixth Circuit, need not address that issue. Disclosure of these documents would pose an undue burden on the VDOC, and the need behind Virginia's secrecy statute merely serves as additional evidence that a concern of harm exists. The Court does not rest its undue burden finding on privilege.

Plaintiffs note that the privilege log "raises claims of privilege based on other state statutory sources." (Reply 13 n.26.) Plaintiffs assert that "[b]ecause VDOC did not brief the applicability of these other claims of privilege, they are waived in connections with the VDOC's Motion to Quash." (*Id.*) Plaintiffs, however, fail to provide any legal authority for this proposition or otherwise contest the VDOC's invocation of privilege. Moreover, review of the privilege log indicates that the VDOC identified privileged documents with sufficient particularity to allow Plaintiffs to launch an individualized, rather than this sweeping, challenge to the information withheld.[36] Because the Court does not rely on privilege in quashing the

---

[36] For example, in one entry in the Privilege Log, the VDOC invoked "Attorney-client communication" with respect to an "August 2013 letter authored by the Director of the Virginia

subpoena, and because Plaintiffs do not challenge the VDOC's detailed and substantive description of which documents are subject to privilege, the Court need not and will not consider the issue of privilege further.

## VII. Conclusion

After receiving Plaintiffs' subpoena, the VDOC promptly provided Plaintiffs with a plethora of information responsive to Plaintiffs' requests. Although Plaintiffs contend their need for additional information is substantial, they fail to reveal what information they have received during discovery from the defendants in the underlying civil rights litigation to provide context for this contention. In contrast, it is plain that ordering the VDOC, a non-party to underlying litigation, to provide the additional documents sought would pose a substantial and undue burden. *See Ohio Execution Protocol Litigation*, 845 F.3d 231, 238–39 (6th Cir. 2016); *In re Mo. Dep't Corr.*, 839 F.3d 732, 737 (8th Cir. 2016).

Federal Rule of Civil Procedure 45(c)(1) emphasizes that "[a] party or attorney responsible for issuing . . . a subpoena must take reasonable steps to avoid imposing undue burden . . . on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Plaintiffs have failed to honor this obligation, and requiring further compliance with the subpoena would present an undue burden for the VDOC. Given the amount of information timely tendered, and especially considering the VDOC's non-party status, the Court will not require the VDOC to tender further information in response to these discovery requests.

---

Department of Corrections, directed to an attorney at the Office of Attorney General, discussing previously-provided legal advice on executions by lethal injection. Marked as confidential communication. 2 pages." (Reply Ex. 10, at 2.)

For the reasons discussed above, the Motion to Quash (ECF No. 1) any information in addition to that already tendered by the VDOC will be GRANTED.

An appropriate Order will accompany this Memorandum Opinion.

M. Hannah Lauck
United States District Judge

Date: 11|3|17
Richmond, Virginia