**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**RICHARD JORDAN and RICKY CHASE**                                    **PLAINTIFFS**

**v.**                                              **CIVIL ACTION NO. 3:15-CV-295-HTW-LGI**

**BURL CAIN, Commissioner, Mississippi
Department of Corrections, in his Official
Capacity; MARC MCCLURE, Superintendent,
Mississippi State Penitentiary, in his Official
Capacity; THE MISSISSIPPI STATE
EXECUTIONER, in his Official Capacity;
and UNKNOWN EXECUTIONERS, in their
Official Capacities**                                                    **DEFENDANTS**

**ROBERT SIMON and ROGER ERIC THORSON**                          **INTERVENORS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs[1] and Intervenors[2] ("Plaintiffs") are inmates on death row awaiting execution by

the State of Mississippi. They filed this § 1983 lawsuit challenging the constitutionality of

Mississippi's method of execution. After the Mississippi Supreme Court set a date for the

execution of Plaintiff Richard Jordan, Plaintiffs filed a Motion for Preliminary Injunction [310].

For the reasons provided below, the Court denies the motion.

<u>**I. BACKGROUND**</u>

*A.  Procedural Background*

Plaintiffs are inmates on death row awaiting execution by the State of Mississippi. They

claim that Mississippi's method of execution violates the Eighth Amendment's[3] prohibition of

---

[1] Richard Jordan and Ricky Chase.
[2] Robert Simon; Thomas Edwin Loden, Jr. (executed); and Roger Eric Thorson.
[3] *See* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

cruel and unusual punishment. Defendants are the Commissioner of the Mississippi Department of Corrections ("MDOC") and the Superintendent of the Mississippi State Penitentiary. When Plaintiffs initiated this case, Mississippi law provided that those condemned to death should be executed by "continuous intravenous administration of a lethal quantity of an ultra short-acting barbiturate or other similar drug in combination with a chemical paralytic agent until death is pronounced." 2016 Miss. Laws Ch. 452. The Mississippi legislature amended this statute in 2022. Its current version permits the State to choose among four different methods of execution: "(a) intravenous injection of a substance or substances in a lethal quantity into the body; (b) nitrogen hypoxia; (c) electrocution; or (d) firing squad, until death is pronounced . . . ." MISS. CODE ANN. § 99-19-51(1).

Mississippi's current lethal injection protocol requires a series of three injections: an anesthetic to render the prisoner unconscious; a paralytic agent; and potassium chloride to stop the prisoner's heart. *See* Ex. 1a to Mot. for P.I. [310-2], at 6-10.[4] The protocol specifies that MDOC personnel first must establish an IV in each of the inmate's arms, with one serving as a contingency in case of a malfunction with the other IV. *Id.* at 9. Sodium pentothal is to be the first injection. If that drug is not available, MDOC must use pentobarbital. *Id.* at 6. If pentobarbital is not available, MDOC must use 500 mg of midazolam. *Id.* Four minutes after the first injection is given, MDOC personnel must determine whether the inmate is unconscious and confirm that the IV line is still functioning properly. *Id.* at 9-10. If the inmate is still conscious, the MDOC Commissioner decides

---

[4] The record contains multiple versions of MDOC's "Capital Punishment Procedures." *See* Exs. 1a, 1b, 1c, 1d to Mot. for P.I. [310-2, 310-3, 310-4, 310-5]. In recent filings, Plaintiffs informed the Court that MDOC revised its "Capital Punishment Procedures" on three separate occasions since 2017. The Court examined the various versions of the execution procedures, and it does not appear to be any changes material to Plaintiffs' claims as pleaded in the First Amended Complaint [50]. Likewise, Plaintiffs have not argued any material difference between them; rather, Plaintiffs argue that they are all constitutionally deficient because they employ a three-drug lethal injection protocol.

whether to start the execution over or stop it, but the protocol does not provide the criteria applied in making this determination. *Id.* at 10.

If the inmate is rendered unconscious, the execution team administers the second injection – pavulon. *Id.* at 6. If pavulon is not available, either vecuronium bromide or rocuronium bromide must be used. *Id.* at 7.

The last injection is potassium chloride. *Id.* Throughout the entire execution process, MDOC personnel are required "continually [to] monitor the inmate using all available means to ensure that the inmate remains unconscious and that there are no complications." *Id.* at 10.

Plaintiffs' Amended Complaint [50] asserts five causes of action. The Intervenor Complaint [208] relies upon these same five causes. Only Counts IB and III are relevant to the current motion. In Count IB, Plaintiffs attack Defendants' use of midazolam as the anesthetic in a three-drug lethal injection protocol, contending that such use would violate Plaintiffs' right to be free from cruel and unusual punishment under the United States[5] and Mississippi Constitutions.[6] *See* First Amended Complaint [50], at 43-46.

In Count III, Plaintiffs enlarge their attack to embrace the entirety of the three-drug lethal injection protocol, which they similarly argue, would violate their right to be free from cruel and unusual punishment under the United States and Mississippi Constitutions. *See* First Amended Complaint [50], at 49-52; Intervenor Complaint [208], at 33-36.

Plaintiffs previously sought and obtained a preliminary injunction. The Court found that Plaintiffs had satisfied their burden of demonstrating a substantial likelihood of success on the merits of their claim that Defendants' failure to use an "ultra short-acting barbiturate or other

---

[5] *See* U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[6] *See* MISS. CONST. art. III, § 28 ("Cruel or unusual punishment shall not be inflicted, nor excessive fines be imposed.").

similar drug" as then required by Miss. Code Ann. § 99-19-51 violated the Eighth Amendment. *Jordan v. Fisher*, No. 3:15-CV-295-HTW-LRA, 2015 WL 13119074, at *3 (S.D. Miss. Aug. 26, 2015). The Court enjoined Defendants "from using pentobarbital, specifically in its compounded form, or midazolam, [and] from executing any death row inmates . . . ." *Id.* On appeal, the Court of Appeals vacated this Court's decision and remanded for further proceedings. *Jordan v. Fisher*, 823 F.3d 805, 814 (5th Cir. 2016). Plaintiffs, though, never re-urged the motion for a preliminary injunction, and the parties proceeded with discovery.

In the fall of 2022, upon the State's motion, the Mississippi Supreme Court set a date for the execution of Thomas Loden, an Intervenor-Plaintiff in this case. *See* En Banc Order, *Loden v. State of Mississippi*, No. 2002-DP-00282-SCT (Miss. Nov. 17, 2022).[7] Plaintiffs filed a Motion for Order under the All Writs Act[8] [260], asking this Court to enjoin Defendants from executing them. Plaintiffs argued that there was a strong likelihood that they would succeed on the merits of Count III of the First Amended Complaint. They claimed that Mississippi's continued use of a three-drug protocol ran contrary to the nationwide trend toward a single-drug protocol and, therefore, violated "evolving standards of decency," citing *Trop v. Dulles*, 356 U.S. 86, 101-02 (1958), and *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).

---

[7] According to the relevant Mississippi statute, "[w]hen a judgment of death becomes final and a writ of certiorari to the United States Supreme Court has been denied or the time for filing such petition has expired, the [Mississippi Supreme Court] shall set an execution date for a person sentenced to the death penalty." MISS. CODE ANN. § 99-19-106. "Setting . . . the date of execution shall be made on motion of the state that all state and federal remedies have been exhausted, or that the defendant has failed to file for further state or federal review within the time allowed by law." *Id.* The relevant statutes do not provide a time frame for execution following the Mississippi Supreme Court's order. The execution procedures statute provides: "Whenever any person shall be condemned to suffer death for any crime . . . , such punishment shall be inflicted at 6:00 p.m. or as soon as possible thereafter within the next twenty-four (24) hours at an appropriate place designated by the Commissioner" of MDOC. MISS. CODE ANN. § 99-19-55(1).

[8] *See* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

After receiving briefs and hearing argument from the parties, this Court issued a Memorandum Opinion and Order [277] denying Plaintiffs' Motion for Order under the All Writs Act [260]. *Jordan v. Cain*, 2022 WL 17543344, at *17 (S.D. Miss. Dec. 7, 2022). The Court observed that the line of cases applying the "evolving-standards-of-decency" test did not concern challenges to particular methods of execution; rather, the cases cited by Plaintiffs involved challenges to death sentences on the basis of either the offender's characteristics, or the nature of the offense. *Id.* *12-*13.

The Court held that the appropriate standard to apply when a prisoner challenges a state's method of execution was articulated in *Baze v. Rees*, 553 U.S. 35, 52 (2008), and *Glossip v. Gross*, 576 U.S. 863, 877 (2015). *Id.* at *12. The *Baze-Glossip* analysis requires Plaintiffs to demonstrate that the risk posed by Mississippi's three-drug lethal injection protocol "creates a demonstrated risk of severe pain," and that "the risk is substantial when compared to the known and available alternatives." *Id.* at *13 (quoting *Glossip*, 576 U.S. at 877-78). Plaintiffs made no attempt to satisfy this evidentiary burden. Since then, multiple federal courts have upheld three-drug lethal injection protocols. *Id.* at *14 (citing *Glossip*, 576 U.S. at 878-92; *Jordan*, 823 F.3d at 812; *Price v. Commissioner*, 920 F.3d 1317, 1329-30 (11th Cir. 2019); *In re Ohio Execution Protocol Litigation*, 881 F.3d 447, 452 (6th Cir. 2018); *McGeehee v. Hutchinson*, 854 F.3d 488, 492 (8th Cir. 2017); *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015)). Accordingly, the Court denied Plaintiffs' Motion for an Order under the All Writs Act [260], thus declining to stay the execution of Thomas Loden. *Id.* at *17. The State of Mississippi executed Loden on December 14, 2022, using the same execution protocol that Defendants presently intend to use on Richard Jordan. *See* Notice of Withdrawal [278], at 2.[9]

---

[9] Defendants also used the same three-drug lethal injection protocol to execute David Cox on November 17, 2021. *See* Exs. 14, 15 to Mot. for P.I. [310-18, 310-19].

On October 1, 2024, the State asked the Mississippi Supreme Court to set an execution date for Richard Jordan, one of the Plaintiffs in this case. *See* Mot. to Set Execution Date, *Jordan v. State*, No. 1998-DP-901-SCT (Miss. Oct. 1, 2024). On May 1, 2025, the Mississippi Supreme Court granted the motion and scheduled Jordan's execution for June 25, 2025. *See* En Banc Order, *Jordan v. State*, No. 1998-DP-901-SCT (Miss. Oct. 1, 2024).

On June 4, 2025, Plaintiffs filed a Motion for Preliminary Injunction [310] in this § 1983 case, asking the Court to issue a preliminary injunction prohibiting Defendants "from executing Richard Jordan using a three-drug protocol consisting of successive injections of midazolam; a chemical paralytic; and potassium chloride." *See* Mot. for P.I. [310], at 4.

### B. *The Kidnapping and Murder*

In 1976, Richard Jordan gained entry to the Gulfport, Mississippi home of Edwina Marter by disguising himself as a utility worker. *Jordan v. Epps*, 740 F. Supp. 2d 802, 808 (S.D. Miss. 2010). He kidnapped her at gunpoint, leaving her three-year-old child alone in the house. *Id.* Jordan then forced Marter to drive to a secluded area in the woods outside Gulfport, Mississippi. There, he executed her with a single shot to the back of her head. *Id.* After murdering Edwina Marter, Jordan telephoned her husband, Charles Marter, a commercial loan officer at Gulf National Bank, and told Marter that his wife was still alive, but that he, the kidnapper, demanded a ransom for her safe return. *Id.* Law enforcement officials eventually apprehended Jordan during the ransom payoff, and he confessed the kidnapping and murder. *Id.*

### C. *The Trials*

The State of Mississippi subsequently tried Jordan four different times over the years. Each time, a duly constituted jury convicted him of capital murder in the course of a kidnapping and sentenced him to death. *Id.* at 809-16. After the first trial in 1976, the trial judge granted Jordan's

6

motion for a new trial because the Mississippi Supreme Court had just issued an opinion requiring bifurcated proceedings in capital murder cases. *Id.* at 810. After Jordan was found guilty and sentenced to death a second time in 1977, and after Jordan had appealed his state conviction to the federal court – first to the United States District Court, then to the appellate court, the United States Court of Appeals for the Fifth Circuit – that court granted habeas relief[10] due to an improper jury instruction. *Id.* at 811 (citing *Jordan v. Watkins*, 681 F. 2d 1067 (5th Cir. 1982)).

Jordan was then to be tried before a state trial jury a third time. And so he was. This third jury convicted and sentenced him to death a third time in 1983. Thereafter, Jordan appealed once more through the federal system, all the way to the United States Supreme Court. That Court granted Jordan's petition for a writ of certiorari, vacated the judgment on the ground that Jordan had been impermissibly limited in presenting mitigation evidence, and remanded to the Mississippi Supreme Court for further consideration. *Id.* at 812; *Jordan v. Mississippi*, 476 U.S. 1101 (1986). The Mississippi Supreme Court in turn remanded the case to the trial court for a new sentencing trial. *Jordan v. State*, 518 So. 2d 1186 (Miss. 1987). At this point, Jordan entered a plea bargain with the prosecution and agreed to accept a sentence of life imprisonment without the possibility of parole in exchange for a waiver of his right to seek collateral relief from the sentence. *Jordan*, 740 F. Supp. 2d at 812.

In 1994, the Mississippi Supreme Court vacated a plea agreement in an unrelated case where the defendant had pled guilty in exchange for a sentence of life imprisonment without the possibility of parole, reasoning that the offense had been committed before that sentence was an option under the relevant statute. *Id.* (citing *Lanier v. State*, 635 So. 2d 813 (Miss. 1994)). So informed, Jordan filed a motion to amend his own sentence to remove the stipulation that he could

---

[10] *See* 28 U.S.C. § 2254.

not seek nor receive parole. *Id.* The Mississippi Supreme Court vacated Jordan's sentence, but it held that the State could still seek the death penalty in another sentencing trial. *Jordan v. State*, No. 95-KP-113-SCT, 697 So. 2d 1190 (Miss. July 17, 1997).

Jordan thus was the subject of a fourth and final sentencing trial in 1998. *Jordan*, 740 F. Supp. 2d at 813-16. The trial jury once again returned a death sentence. *Id.* at 816. The Mississippi Supreme Court affirmed, *Jordan v. State*, 786 So. 2d 987 (Miss. 2001), and the United States Supreme Court denied Jordan's petition for a writ of certiorari, *Jordan v. Mississippi*, 534 U.S. 1085 (2002). The Mississippi Supreme Court then denied his petition for post-conviction relief.[11] *Jordan v. State*, 912 So. 2d 800 (Miss. 2005). This Court, too, denied Jordan's petition for a writ of habeas corpus. *Jordan*, 740 F. Supp. 2d at 899. The Fifth Circuit affirmed, *Jordan v. Epps*, 756 F.3d 395 (5th Cir. 2014), and the United States Supreme Court again denied Jordan's petition for a writ of certiorari, *Jordan v. Fisher*, 576 U.S. 1071 (2015).

Now – almost fifty years after Richard Jordan kidnapped and murdered Edwina Marter, and after multiple trials, appeals, post-conviction proceedings, and habeas petitions over the decades – Plaintiffs herein filed a Motion for Preliminary Injunction [310] asking this Court to stay Jordan's execution. The Court received the parties' briefs and heard their argument on an expedited schedule. The motion is now ripe for review.

## II. JURISDICTION

Plaintiffs invoke the jurisdiction of this federal court under Title 28 U.S.C. § 1331, which states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs' causes of action, as stated *infra*, arise under: Title 42 U.S.C. § 1983, for alleged and threatened violations of

---

[11] *See* MISS. CODE ANN. § 99-39-1, *et seq.*

Plaintiffs' rights to due process and to be free from cruel and unusual punishment under the Eighth and Fourteenth[12] Amendments to the United States Constitution; Title 28 U.S.C. § 1367(a);[13] and the Mississippi State Constitution.

### III. DISCUSSION

Plaintiffs want this Court to issue an order "prohibiting Defendants from executing Richard Jordan using a three-drug protocol consisting of the successive injections of midazolam, a chemical paralytic, and potassium chloride." *See* Mot. for P.I. [310], at 4. Federal courts consider four factors when deciding whether to issue an order staying an execution: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Johnson v. Collier*, 137 F.4th 376, 381 (5th Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Ramirez v. Collier*, 595 U.S. 411, 421 (2022).

With respect to the first factor, the petitioner must establish "more than a mere possibility of" success on the merits. *Nken*, 556 U.S. at 434. With respect to the third and fourth factors, where the State "is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken*, 556 U.S. at 435).

This is a "stringent" burden, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975), and the petitioner must satisfy each element "by a clear showing," *Mazurek v. Armostrong*, 520 U.S.

---

[12] U.S. Const. amend. XIV, § 1 states, in relevant part: "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[13] Title 28 U.S.C. § 1367(a) provides, in relevant part: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."

968, 972 (1997) (per curiam). But "[w]here the movant cannot 'present a substantial case on the merits,' the stay of execution must be denied, and the court need not consider additional factors." *Wood v. Patton*, 130 F.4th 516, 520 (5th Cir. 2025) (quoting *White v. Collins*, 959 F.2d 1319, 1322 (5th Cir. 1992)). Likewise, the Court may deny a motion for a stay of execution based solely on the petitioner's failure to demonstrate that the balance of equities weighs in his favor. *See, e.g., Mills v. Hamm*, 734 F. Supp. 3d 1226, 1244-45 (M.D. Ala. 2024); *Frazier v. Hamm*, 2025 WL 361172, at *14-*15 (M.D. Ala. Jan. 31, 2025).

"A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433-34 (cleaned up). Indeed, the "issuance of a preliminary injunction is the exception rather than the rule." *Barber v. Governor of Ala.*, 73 F.4th 1306, 1317 (11th Cir. 2023). "Last-minute stays should be the extreme exception, not the norm, and the last-minute nature of an application that could have been brought earlier . . . may be grounds for denial of a stay." *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019).

Plaintiffs argue that they are likely to succeed on the merits of Counts IB and III of the First Amended Complaint. *See* Plfs. Mem. [313], at 2-3, 44. The Court will address each count in turn.

### A. Count IB

In Count IB, Plaintiffs claim that the use of midazolam in a three-drug lethal injection protocol violates their right to be free from cruel and unusual punishment under the United States and Mississippi Constitutions. *See* First Amended Complaint [50], at 43. Plaintiffs contend that Defendants' plan to use midazolam as the first drug in a three-drug protocol "creates a substantial and intolerable risk that [they] will not be anesthetized and insensate prior to the administration of

the second and third drugs, resulting in . . . a torturous death by . . . suffocation and cardiac arrest."
*Id.* at 44. Plaintiffs claim that benzodiazepines such as midazolam have a "ceiling effect" which
"restricts the magnitude of pharmacological effects" they produce. *Id.* at 45. Therefore, according
to Plaintiffs, an increased dose of midazolam – such as that prescribed by MDOC's execution
protocol – would not increase the efficacy of the drug, and it "cannot be relied upon to render a
person anesthetized and insensate to pain." *Id.* Plaintiffs propose the use of an "ultra short-acting
barbiturate" in a single-drug protocol as a feasible and available alternative which would
significantly reduce the substantial risk of severe pain presented by MDOC's use of midazolam in
a three-drug protocol. *Id.* at 41, 45.

    *1. The* Glossip *Test*

    The Fifth Circuit recently described the requirements to succeed on a § 1983 claim
challenging a method of execution under the Eighth Amendment:

> [A] prisoner must meet two requirements. First, the prisoner must prove that the
> method of execution presents a risk that is *sure or very likely* to cause serious illness
> and needless suffering. Second, the prisoner must show a feasible and readily
> implemented alternative method of execution that would significantly reduce a
> substantial risk of severe pain and that the State has refused to adopt without a
> legitimate penological reason. Failure on either requirement dooms the prisoner's
> challenge.

*Hoffman v. Westcott*, 131 F.4th 332, 335-36 (5th Cir. 2025) (citing *Glossip*, 576 U.S. at 877;
*Bucklew*, 587 U.S. at 134) (cleaned up).

    "[T]he Eighth Amendment does not guarantee a prisoner a painless death – something that,
of course, isn't guaranteed to many people, including most victims of capital crimes." *Bucklew*,
587 U.S. at 132-33; rather, "the Eighth Amendment only bars those methods of execution that
'intensify the sentence of death with a (cruel) superaddition of terror, pain, or disgrace.'" *Hoffman*,
131 F.4th at 335 (quoting *Bucklew*, 587 U.S. at 133). In fact, the Supreme Court has "yet to hold

that a State's method of execution qualifies as cruel and unusual," and even methods of execution which are now rarely, if ever, practiced – such as hanging, electrocution, and firing squad – have been categorically upheld as constitutional. *Bucklew*, 587 U.S. at 132-33; *see also In re Kemmler*, 136 U.S. 436 (1890) (upholding electrocution); *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1879) (upholding firing squad); *In re Ohio Execution Protocol Litigation*, 946 F.3d 287, 290 (6th Cir. 2019) ("[H]angings have been considered constitutional for as long as the United States have been united.").

### 2. Dueling Experts

To satisfy the first element of the *Glossip* test, Plaintiffs argue that "midazolam cannot cause general anesthesia, thus increasing the risk that a condemned prisoner will consciously experience severe pain from the ensuing injections of rocuronium bromide and potassium chloride." Plfs. Mem. [313], at 8. In support, Plaintiffs present declarations and reports from their expert, Dr. Craig Stevens. *See* Exs 7, 8, 9, 57 to Mot. for P.I. [310-11, 310-12, 310-13, 320-2]. Stevens, a pharmacologist, maintains that midazolam "does not produce a greater pharmacological effect with greater doses of the drug." Ex. 57 to Mot. for P.I. [320-2], at 6. It has a "ceiling effect." *Id.* He also opined that midazolam "cannot produce the same anesthetic effects" as a barbiturate, such as thiopental or pentobarbital. Ex. 7 to Mot. for P.I. [310-11], at 27. Accordingly, he concludes that "[m]idazolam cannot render a person insensate to pain, even at high doses." Ex. 57 to Mot. for P.I. [320-2], at 9. He summarized his opinions thusly: "Midazolam is not an appropriate anesthetic or sedative because it cannot render the condemned inmate unconscious and impervious to pain," and "Mississippi's use of midazolam as the first drug in the three-drug lethal injection protocol entails a substantial risk of severe pain for the prisoner." Ex. 8 to Mot. for P.I. [310-12], at 5-6.

In response, Defendants argue that a 500 mg dosage of midazolam, as prescribed by MDOC's current protocol, "will render an inmate unconscious and insensate to pain." Defs. Mem. [321], at 15. They present in support a declaration from their own expert, Dr. Joseph F. Antognini, an anesthesiologist. *See* Ex. 7 to Resp. [321-7]. He states that while midazolam is generally used as a sedative during some minor medical procedures, higher dosages can cause unconsciousness, and it has been used "for the induction of anesthesia." *Id.* at 7. He observed that a 500 mg dose "is about 100-200 times the normal therapeutic dose." *Id.* at 8. He concluded:

> [A] person given 500 mg midazolam would be rendered completely unconscious and insensate to pain and noxious stimuli. Therefore . . . there is only an exceedingly small risk that a person administered a 500 mg dose of midazolam would experience any pain as a result of . . . the administration of drugs, including vecuronium bromide and potassium chloride.

*Id.* at 8-9. Defendants also argue that the Supreme Court has upheld the constitutionality of a three-drug execution protocol using the same drugs as Mississippi intends to use to execute Richard Jordan. *See* Defs. Mem. [321], at 14 (citing *Glossip*, 576 U.S. at 878-92). They note that numerous lower courts "have held that the use of midazolam in a three-drug protocol does not violate the Eighth Amendment" following *Glossip*. *Id.* (citing cases).

In *Glossip v. Gross*, the United States Supreme Court specifically addressed the constitutionality of a three-drug lethal injection protocol using the same drugs that MDOC intends to use to execute Richard Jordan – midazolam, vecuronium bromide, and potassium chloride – and affirmed a district court's finding that "midazolam is highly likely to render a person unable to feel pain during an execution." 576 U.S. at 881. In doing so, the Court observed that "numerous courts have concluded that the use of midazolam as the first drug in a three-drug protocol is likely to

render an inmate insensate to pain that might result from administration of the paralytic agent and potassium chloride." *Id.* at 881-82 (listing cases).[14]

The United States Supreme Court specifically addressed the two factual issues raised by Plaintiffs: whether midazolam can induce and maintain unconsciousness while the second and third drugs are administered, and whether the drug's "ceiling effect" diminishes its efficacy. *Id.* at 882-883. On the first issue, Oklahoma presented credible expert testimony that "midazolam can render a person insensate to pain," and that a high dosage of midazolam could "keep a person insensate to pain after the administration of the second and third drugs." *Id.* at 884-85. As for the ceiling effect, the Supreme Court observed that "all drugs essentially have a ceiling effect," and the "relevant question here is whether midazolam's ceiling effect occurs below the level of a 500-milligram dose and at a point at which the drug does not have the effect of rendering a person insensate to pain caused by the second and third drugs." *Id.* at 887. The Court noted that the record contained no evidence "that the ceiling effect negated midazolam's ability to render an inmate insensate to pain caused by the second and third drugs in the protocol." *Id.* at 887-88.

Likewise, in *Johnson v. Hutchinson*, the Eighth Circuit addressed the same arguments Plaintiffs present here. 44 F.4th 1116 (8th Cir. 2022). Faced with dueling experts, the Eight Circuit held: "With no scientific consensus and a paucity of reliable scientific evidence concerning large doses of midazolam on humans, the district court did not clearly err in finding that the prisoners failed to demonstrate that the . . . execution protocol is sure or very likely to cause severe pain." *Id.* at 1120. The Supreme Court has also held that plaintiffs challenging a method of execution

---

[14] *See also Arthur v. Comm'r, Ala. Dep't of Corrs.*, 695 F. App'x 418, 427-28 (11th Cir. 2017) (observing that, among other reasons, inmate had not shown a substantial likelihood of success on merits of § 1983 challenge to method of execution because evidence showed that "midazolam worked as intended"); *In re Ohio Execution Protocol*, 860 F.3d 881 (6th Cir. 2017) (specifically upholding three-drug protocol using a 500 mg dose of midazolam as the first drug).

were not entitled to a preliminary injunction where both they and the government had produced expert testimony supporting their respective positions. *Barr v. Lee*, 591 U.S. 979, 981 (2020).

   *3. Consciousness Check*

   Plaintiffs counter that MDOC's execution procedures do not include specific safeguards adopted by Oklahoma and relied upon by the Supreme Court in *Glossip*. Plfs. Mem. [313], at 11. Among other things, Plaintiffs note that Oklahoma's protocol included a consciousness check after administration of the first drug, and they contend that, while Mississippi's protocol includes a consciousness check, MDOC personnel did not conduct a check during the last two executions. *Id.* at 12-18.

   In support of this argument, Plaintiffs present a declaration from one of David Cox's attorneys, Humphreys McGee. *See* Ex. 15 to Mot. for P.I. [310-19]. A witness to the Cox execution, McGee states that the consciousness check required by the execution protocol "absolutely did not happen during the execution of David Cox." *Id.* at 4. Additionally, argue Plaintiffs herein, MDOC records of the execution show this failure of protocol: the execution team gave Cox the injection of midazolam at 6:03 p.m., the injection of vecuronium bromide at 6:05 p.m., and the injection of potassium chloride at 6:07 p.m., certainly violative of the execution protocol at the time which required a consciousness check to be conducted four minutes after the first injection. *Compare* Ex. 14 to Mot. for P.I. [310-18], at 2, *to* Ex. 1c to Mot. for P.I. [310-4], at 9-10.

   Stacy Ferraro, one of Thomas Loden's attorneys, declares that no one conducted a consciousness check after administration of the first drug during Loden's execution. *See* Ex. 17 to Mot. for P.I. [310-21], at 3. MDOC records indicate that the execution team gave Loden the injection of midazolam at 6:02 p.m., the injection of vecuronium bromide at 6:03 p.m., and the

injection of potassium chloride at 6:05 p.m. *See* Ex. 16 to Mot. for P.I. [310-20], at 2. The execution protocol at the time did not require a consciousness check after administration of the first drug; instead, it required a consciousness check four minutes after administration of the last drug. Ex. 1b to Mot. for P.I. [310-3], at 9-10.[15]

Plaintiffs also argue that the MDOC protocol should include other safeguards, but they devote significantly less argument to those issues. *See* Plfs. Mem. [313], at 19. Plaintiff's expert, Dr. Mark Heath, listed procedures included in the Oklahoma execution protocol at issue in *Glossip* that are not included in the MDOC protocol. *See* Ex. 6 to Mot. for P.I. [310-10], at 4-13; *see also* Ex. 58 to Mot. for P.I. [322-1], at 3.

Defendants contend that Plaintiffs have not demonstrated that the MDOC protocol's alleged lack of any specific safeguards creates a substantial risk of severe pain. Defs. Mem. [321], at 20. They also argue that the Court should defer to the State's choice of execution procedures, citing *Bucklew. Id.*; *see Bucklew*, 587 U.S. at 134 (The "Constitution affords a measure of deference to a State's choice of execution procedures and does not authorize courts to serve as boards of inquiry charged with determining best practices for executions.").

Defendants deny Plaintiffs' accusation that MDOC personnel failed to conduct consciousness checks after the administration of midazolam during the Cox and Loden executions. They presented a declaration from Leonard Vincent, general counsel for MDOC who was "in the execution chamber standing next to Commissioner Cain during the executions of both David Cox and Thomas Loden." Ex. 2 to Resp. [321-2], at 1. Vincent stated:

> In both executions, the inmate closed his eyes a few seconds after the administration of the first drug and then began snoring heavily. The IV Team Leader then entered the chamber from the injection room. The door to the injection room is located to the side of the chamber near the inmate's head and is difficult to be seen by all

---

[15] Defendants admitted that this was an error, and it has been corrected in the latest version of the protocol. *See* Ex. 1 to Resp. [321-1], at 2; Ex. 1a to Mot. for P.I. [310-2], at 9-10.

witnesses. The IV Team Leader walked a few feet into the chamber and observed whether the inmate was conscious. After visually confirming that the inmate was unconscious, the IV Team Leader exited the execution chamber and began to administer the second drug.

*Id.* at 2. Vincent did not "observe either inmate exhibit any signs of consciousness after they closed their eyes immediately following the administration of the first drug. Nor did [he] observe either inmate exhibit any signs of pain or suffering at any point during the lethal injection procedure."

*Id.* Likewise, MDOC Commissioner Burl Cain stated, via affidavit:

> The IV Team Leader did perform a consciousness check on Mr. Loden after the administration of the first drug. I was standing in the execution chamber right next to Mr. Loden and witnessed the IV Team Leader enter the chamber from the injection room. He walked a few feet into the chamber and observed whether Mr. Loden was unconscious. The door to the injection room is located to the side of the chamber near the inmate's head and is difficult to be seen by all witnesses.

> Within seconds of the administration of the first drug, Mr. Loden closed his eyes and then began snoring. Mr. Loden did not move or exhibit any signs of consciousness after the administration of the first drug. Once the IV Team Leader confirmed that Mr. Loden was unconscious, the IV Team Leader left the chamber and proceeded to administer the second drug.

Ex. 1 to Resp. [321-1], at 3.

In reply, Plaintiffs presented a declaration from their expert, Dr. Mark Heath. Ex. 59 to Mot. for P.I. [322-1]. He said: "[T]he actions described by Mr. Cain and Mr. Vincent are not in any way adequate to determine if an individual is unconscious, and not capable of being arousable by the pain and agony caused by the injection of a chemical paralytic and potassium chloride." *Id.* at 2. He said that the "goal of the consciousness check cannot be achieved by visually confirming that the inmate was unconscious" because "[n]othing in that visual process gives information about whether the prisoner, while in some state of sedation, could be aroused by the intense sensation of suffocation caused by the chemical paralytic and intravenous burning pain caused by potassium chloride." *Id.* Heath described an appropriate consciousness check as "the application of graded

(gradually increasing) stimuli in the area of the body where the surgery will occur, beginning with gentle stimuli, and increasing up to and including a stimulus that is at least as painful as would be expected from the impending surgical procedure." *Id.*

Moreover, Heath maintains that the apparently successful, uncomplicated executions of David Cox and Thomas Loden do not prove that MDOC's execution protocol is painless. *Id.* at 3. He said: "[B]ecause the prisoner is paralyzed by the administration of the second drug, he may be suffering . . . torturous pain . . . without the ability to move or communicate distress. To outward observers, the execution may appear to be 'smooth' and painless when it is in fact inflicting gratuitous and extreme agony." *Id.*

Defendants admitted that MDOC personnel did not strictly follow the execution protocol during the Cox and Loden executions by waiting until four minutes after the first drug had been administered to conduct a consciousness check. Transcript [324], at 31. Cain acknowledged the error in his affidavit, and represented to the Court that he would ensure things were done right this time:

> I recognize the importance of the consciousness check and its timing. Accordingly, I will personally ensure that, in all future executions during my tenure as Commissioner, the IV Team Leader waits a full four minutes after the administration of the first drug before performing the consciousness check, as mandated by the protocol. Moreover, I will require the IV Team Leader to perform the consciousness check by rubbing the sternum of the condemned inmate.

Ex. 1 to Resp. [321-1], at 3. During oral argument, Defendants' attorney described the procedure: "The IV Team Leader will enter the room. After four minutes, take his knuckles and rub them on [Jordan's] sternum very vigorously for a number of seconds to see if he responds." Transcript [324], at 33. Counsel explained Defendants' reasoning: "All the other methods that the other states use are . . . less painful, so this one is designed to elicit . . . the pain reflex" to see if the first drug has rendered Jordan sufficiently unconscious. *Id.*

18

During oral argument, the Court asked Defendants' counsel if Defendants would agree to stop the execution if the consciousness check revealed that Jordan was still conscious of pain, and not attempt to execute him until the parties had an opportunity to come before the Court and present argument as to how the State should proceed. *Id.* at 66. Defendants' counsel represented that he would consult with his clients and respond to the Court via correspondence. *Id.* at 66, 80. Defendants later filed correspondence with the Court, stating:

> Consistent with MDOC's current Capital Punishment Procedures . . . , in the event that the IV Team Leader informs the Commissioner that the inmate remains conscious after performing the consciousness check, the Commissioner will, as the protocol allows, restart the execution, and the inmate will be administered another 500 mg dose of midazolam. If the IV Team Leader informs the Commissioner that the inmate still remains conscious after performing a second consciousness check, the Commissioner will stop the execution and notify the Court and counsel opposite in writing not later than the following day.

Defs. Notice of Correspondence [325], at 3.

During oral argument, Plaintiffs argued that the Court should not rely on the representations of Defendants or their counsel in addressing the Motion for Preliminary Injunction 310], and that Defendants' purported modification of the execution protocol did not reduce the risk posed by using midazolam as the first drug. Transcript [324], at 69, 72. Still, Plaintiffs did not object to stopping the execution if the consciousness check showed that the midazolam was ineffective, until the parties could appear before the Court to determine a course of action. *Id.* at 73. In correspondence to the Court, Plaintiffs' counsel later argued that the Court cannot trust MDOC personnel to conduct an appropriate consciousness check, and that a "sternum rub," by itself, does not render the three-drug midazolam protocol safe. Ex. A to Plfs. Notice of Correspondence [326-1].

19

*4. The Court's Conclusions*

Having considered all the facts, argument, and law discussed above and presented in the parties' briefing and oral argument, the Court concludes that Plaintiffs have not made "a strong showing that [they are] likely to succeed on the merits" of Count IB of the First Amended Complaint [50]. *Johnson*, 137 F.4th at 381. Specifically, the Court finds that Plaintiffs have not made a strong showing that they are likely to succeed on the first prong of the *Glossip* analysis, which requires them to prove that Defendants' chosen "method of execution presents a risk that is *sure or very likely* to cause serious illness and needless suffering." *Hoffman*, 131 F.4th at 335-36.

First, numerous federal courts have held that a three-drug lethal injection protocol using midazolam as the first drug does not violate the Eighth Amendment. *See, e.g., Glossip*, 576 U.S. at 878-93; *Johnson*, 44 F.4th at 1120; *Price*, 920 F.3d at 1329-30; *Arthur*, 695 F. App'x at 427-28; *Jordan*, 823 F.3d at 812; *In re Ohio Execution Protocol*, 860 F.3d at 889-90. Plaintiffs attempt to distinguish these cases, but the volume of precedent expressly permitting a three-drug midazolam protocol is persuasive.

Second, even if the relevant caselaw were not contrary to Plaintiff's position, they have only demonstrated that there are genuine disputes of material fact relevant to the first prong of the *Glossip* analysis, rather than made a "strong showing that [they are] likely to succeed on the merits." *Johnson*, 137 F.4th at 381. Both Plaintiffs and Defendants presented credible expert testimony in support of their respective positions. In similar cases of dueling experts, federal courts have found that the party seeking a preliminary injunction had not sufficiently demonstrated their likelihood of success on the merits. *Barr*, 591 U.S. at 981; *Johnson*, 44 F.4th at 1120.

Third, it is undisputed that Defendants executed David Cox and Thomas Loden using the same three-drug series they intend to use on Richard Jordan, and the record contains no evidence

20

that either Cox or Loden suffered "serious" pain or "needless suffering" prior to death. Plaintiffs dismiss this practical observation by claiming that even if Cox and Loden had suffered pain, there would be no evidence of it due to the chemical paralytic administered after the midazolam. But Plaintiffs have the burden of proof, and Defendants are not required to prove that Cox and Loden did not suffer. Ultimately, the record contains no evidence that either David Cox or Thomas Loden needlessly suffered prior to death by the same method of execution at issue here, and the Court finds that to be persuasive evidence against the issuance of a stay.

This point is bolstered by Defendants' assurance on the record that – despite two prior successful executions using the same three-drug series – they will wait at least four minutes after administration of the midazolam before conducting a consciousness check. They have further agreed to modify the protocol to include a "sternum rub" in accordance with Dr. Heath's suggestions, and they have assured the Court that they will stop the execution if it appears Jordan is still conscious after two doses of midazolam and two failed consciousness checks. Defendant Cain declared under penalty of perjury that he will personally ensure that these procedures are followed. As the Court stated during the hearing on the present motion, it considers these representations "binding on the State at this point." Transcript [324], at 68. As such, failure to observe these agreed safeguards carries the possibility of sanctions.

The Court also notes that, in a past challenge to Mississippi's method of execution, the Fifth Circuit was not inclined to micromanage the step-by-step details of the execution protocol. *See Thorson v. Epps*, 701 F.3d 444 (5th Cir. 2012). To be sure, every case is judged on its own record, but *Thorson* provides guidance as to how the Fifth Circuit would approach this case. There, the plaintiffs complained of several alleged shortcomings in Mississippi's execution protocol. *Id.* at 447. The Fifth Circuit held that the mere possibility of an Eighth Amendment violation "does

21

not qualify as an objectively intolerable risk," and it cited affidavits from MDOC officials who had attended past executions as evidence of "a degree of training and familiarity with the process that militates against a successful § 1983 claim." *Id.*

The Fifth Circuit also observed that although the dosage of anesthetic administered under the protocol at that time did "not conform to anesthesiology standards," it was still "five to eight times the dosage required." *Id.* at 448. Thus, the plaintiffs could not demonstrate that using a higher dosage of anesthetic – as other states did – "would *significantly* reduce a *substantial* risk of severe pain." *Id.* (quoting *Baze*, 553 U.S. at 52). Similarly, Plaintiffs here complain that Mississippi does not use the same execution method that many other states have elected to use, and they have presented evidence indicating a *possibility* of severe pain. That is not enough to carry their burden in seeking a stay of execution.

Finally, the Court notes that Plaintiffs repeatedly framed the present motion as if the question presented were whether midazolam would render Jordan "insensate" to pain,[16] but "the Eighth Amendment does not guarantee a prisoner a painless death . . . ." *Bucklew*, 587 U.S. at 132-33. "[T]he Eighth Amendment only bars those methods of execution that 'intensify the sentence of death with a (cruel) superaddition of terror, pain, or disgrace.'" *Hoffman*, 131 F.4th at 335 (quoting *Bucklew*, 587 U.S. at 133). Phrased differently, the Eighth Amendment bars "wanton exposure to objectively intolerable risk, not simply the possibility of pain." *Baze*, 553 U.S. at 61-62 (cleaned up). The use of lethal injection as a method of execution is the result of States "search[ing] for less painful modes of execution," rather than seeking to add "terror, pain, or disgrace." 587 U.S. at 133 (quoting *Baze*, 553 U.S. at 48). Plaintiffs argue that one particular form of lethal injection creates a higher risk of pain than another one. But more gruesome forms of

---

[16] *See, e.g.,* Plfs. Mem. [313], at 11, 22; Plfs. Reply [322], at 5-6, 13; Transcript [324], at 10-11, 18, 21, 87.

capital punishment have been categorically upheld as constitutional, and a previously utilized method of execution does not become "unconstitutional as soon as an arguably more humane method . . . becomes available." *Bucklew*, 587 U.S. at 132-33.

For all these reasons, the Court finds that Plaintiffs have not made "a strong showing that [they are] likely to succeed on the merits" of Count IB, *Johnson*, 137 F.4th at 381, with respect to the first prong of the *Glossip* analysis, which requires them to prove that Defendants' chosen "method of execution presents a risk that is *sure or very likely* to cause serious illness and needless suffering," *Hoffman*, 131 F.4th at 335-36.

## B. Count III

In Count III of the First Amended Complaint [50], Plaintiffs claim that Mississippi's continued use of a three-drug protocol violates their right to be free from cruel and unusual punishment under the United States and Mississippi Constitutions. *See* First Amended Complaint [50], at 49. More specifically, Plaintiffs contend that Mississippi's continued use of a three-drug protocol "runs contrary to the trend towards single-drug anesthetic-only protocols employed successfully by other states in recent years." *Id.* at 50. Plaintiffs claim that "forty-seven of the fifty states punish murder without undertaking the risk of conscious, torturous pain and suffocation which is raised by the use of a chemical paralytic agent and potassium chloride in the three-drug protocol." *Id.* at 51. Thus, Plaintiffs contend that Mississippi's continued use of a three-drug protocol violates the "evolving standards of decency that mark the progress of a maturing society" in violation of the Eighth Amendment. *Id.* at 49. Effectively, this is the same argument the Court rejected when it declined to issue a writ staying the execution of Thomas Loden in 2022. *See Jordan*, 2022 WL 17543344 at *10-*13. The applicable law has not changed since the Court previously rejected this argument.

Plaintiffs maintain that Count I and Count III are each governed by its own distinct line of cases – Count I by *Glossip*[17] and *Bucklew*,[18] and Count III by *Trop*,[19] *Kennedy*,[20] and *Graham*.[21] Plaintiffs suggest that the controlling plurality opinion in *Baze*[22] implicitly distinguishes these two threads of Eighth Amendment reasoning.

In *Baze*, the petitioners argued that Kentucky's lethal injection protocol was "unconstitutional under the Eighth Amendment's ban on 'cruel and unusual punishments,' because of the risk that the protocol's terms might not be properly followed, resulting in significant pain. They propose[d] an alternative protocol, one that they concede[d] ha[d] not been adopted by any State and ha[d] never been tried." *Id.* at 41.

In the controlling plurality opinion, Chief Justice Roberts wrote: "[T]o prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, n. 9 (1994)). In other words, "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Id.* (quoting *Farmer*, 511 U.S. at 842).

Accordingly, "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative;" rather, the challenged execution method must present "a 'substantial risk of serious harm,'" and the proposed "alternative

---

[17] *Glossip*, 576 U.S. 863.
[18] *Bucklew*, 587 U.S. 119.
[19] *Trop*, 356 U.S. 86.
[20] *Kennedy*, 554 U.S. 407.
[21] *Graham v. Florida*, 560 U.S. 48 (2010).
[22] *Baze*, 553 U.S. 35.

procedure must be feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 51-52. Applying this analysis to the facts, Chief Justice Roberts found that the petitioners had not shown "that the risk of an inadequate dose of the first drug is substantial," or that the "Eighth Amendment require[d] Kentucky to adopt the untested alternative procedures petitioners . . . identified." *Id.* at 54. Therefore, the petitioners had not "carried their burden of showing that the risk of pain from maladministration of a concededly humane lethal injection protocol, and the failure to adopt untried and untested alternatives, constitute cruel and unusual punishment." *Id.* at 41.

Chief Justice Roberts' plurality opinion in *Baze* did not rely on *Kennedy v. Louisiana*'s appeal to the "evolving standards of decency that mark the progress of a maturing society." *See Kennedy*, 554 U.S. at 419. Chief Justice Roberts instead noted as an aside that "[t]hirty states, as well as the Federal Government, use[d]" the same execution protocol challenged by the petitioners, and that no state had ever used the alternative protocol they proposed. *Baze*, 553 U.S. at 53. He explicitly stated: "This consensus is probative but not conclusive with respect to that aspect of the alternatives proposed by petitioners." *Id.* To successfully challenge a state's method of execution, a condemned prisoner must show that the challenged method of execution presents "a substantial risk of serious harm," and that there is an "alternative procedure" that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 52. The phrase "evolving standards of decency" does not appear in the controlling plurality opinion. *See id.* at 40-62.

Moreover, the Supreme Court summarized *Baze*'s holding in a later case:

The controlling opinion in *Baze* outlined what a prisoner must establish to succeed on an Eighth Amendment method-of-execution claim. . . . [It] first concluded that prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is "sure or very likely to cause serious illness

and needless suffering, and give rise to sufficiently imminent dangers." To prevail on such a claim, "there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment" . . . [P]risoners "cannot challenge a State's method of execution merely by showing a slightly or marginally safer alternative." Instead, prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain."

*Glossip*, 576 U.S. at 877 (punctuation and citations omitted) (quoting *Baze*, 553 U.S. at 50-52).

Therefore, to succeed on a § 1983 method-of-execution claim, a prisoner must establish "that the State's lethal injection protocol creates a demonstrated risk of severe pain. And he must show that the risk is substantial when compared to the known and available alternatives." *Id.* at 877-78 (quoting *Baze*, 553 U.S. at 61). The Supreme Court and multiple Courts of Appeals have consistently and recently applied this standard to § 1983 challenges to a method of execution. *See, e.g. Nance v. Ward*, 597 U.S. 159, 164 (2022); *Hoffman*, 131 F.4th at 335-36; *Creech v. Tewalt*, 94 F.4th 859, 863 (9th Cir. 2024); *Smith v. Comm'r, Ala. Dept. of Corr.*, No. 24-10095, 2024 WL 266027, at *6 (11th Cir. Jan. 24, 2024); *Johnson*, 44 F.4th at 1118-19; *Middlebrooks v. Parker*, 22 F.4th 621, 624 (6th Cir. 2022); *Jones v. Crow*, No. 21-6139, 2021 WL 5277462, at *5-*6 (10th Cir. Nov. 12, 2021); *Whitaker v. Collier*, 862 F.3d 490, 497 (5th Cir. 2017); *Wood v. Collier*, 836 F.3d 534, 540 (2016); *Bible v. Davis*, 739 F. App'x 766, 771-72 (5th Cir. 2018).

The cases cited by Plaintiffs in support of their proposed "evolving-standards-of-decency" analysis do not address § 1983 challenges to a method of execution. In *Trop*, the Supreme Court addressed "whether or not denationalization may be inflicted as a punishment" on a United States citizen for desertion during a time of war. *Trop*, 356 U.S. at 94. The Supreme Court found that the "soldier committed a crime for which he should be and was punished, but he did not involve himself in any way with a foreign state," and there "was no dilution of his allegiance to this country." *Id.* at 92. It held: "[D]eprivation of citizenship is not a weapon that the Government may

use to express its displeasure at a citizen's conduct, however reprehensible that conduct may be." *Id.* at 92-93. Alternatively, the Court held that the "use of denationalization as a punishment is barred by the Eighth Amendment." *Id.* at 101. The Court noted that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," and that "civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime." *Id.* at 101-02.

In *Kennedy*, the Supreme Court held that the Eighth Amendment barred a state from imposing the death penalty on a prisoner convicted of raping a child, where the crime did not result, and was not intended to result, in the child's death. *Kennedy*, 554 U.S. at 412. The Court cited *Trop*'s language regarding the "evolving standards of decency that mark the progress of a maturing society," *id.* at 419, and noted its previous holding "that the death penalty can be disproportionate to the crime itself where the crime did not result, or was not intended to result, in death of the victim." *Id.* at 420 (citing *Coker v. Georgia*, 433 U.S. 584 (1977)). The Court reasoned that it was "guided by 'objective indicia of society's standards, as expressed in legislative enactments and state practice with respect to executions,'" *id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005)); however, "[c]onsensus is not dispositive. Whether the death penalty is disproportionate to the crime committed depends as well upon the standards elaborated by the controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose." *Id.* at 421.

Finally, in *Graham*, the Supreme Court summarized the *Trop-Kennedy* line of cases. There, the Court held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham*, 560 U.S. at 82. The Court noted that there were two lines of cases in which it had "consider[ed] punishments

challenged not as inherently barbaric but as disproportionate to the crime." *Id.* at 59. "The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty." *Id.*

The second line of cases, involving the death penalty, can be further broken down into "two subsets, one considering the nature of the offense, the other considering the characteristics of the offender." *Id.* at 60. In the first subset, the Court has forbidden imposition of the death penalty "for nonhomicide crimes against individuals." *Id.* at 61. In the second subset, the Court "has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18, or whose intellectual functioning is in a low range." *Id.* "In the cases adopting categorical rules, the Court . . . considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue." *Id.* "Next, guided by the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.*

In summary, neither *Trop*, *Kennedy*, nor *Graham* involved a claim challenging a particular method of execution. Each involved a challenge to a sentence. In contrast, *Baze*, *Glossip*, and *Bucklew* each involved a challenge to a method of execution – rather than the death sentence – and they make clear that "[a] stay of execution may not be granted . . . unless the prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. . . . [H]e must show that the risk is substantial when compared to the known and available alternatives." *Glossip*, 576 U.S. at 877-78 (quoting *Baze*, 553 U.S. at 61); *see also Hoffman*, 131 F.4th at 335-36.

Therefore, Count III of Plaintiffs' First Amended Complaint [50] – in which they claim that the use of a three-drug lethal injection protocol is prohibited by the Eighth Amendment – is governed by the *Baze-Glossip* analysis.

For the same reasons provided above in the Court's discussion of Count IB, the Court finds that Plaintiffs have not made "a strong showing that [they are] likely to succeed on the merits" of Count III, *Johnson*, 137 F.4th at 381, with respect to the first prong of the *Glossip* analysis, which requires them to prove that Defendants' chosen "method of execution presents a risk that is *sure or very likely* to cause serious illness and needless suffering." *Hoffman*, 131 F.4th at 335-36.

## IV. CONCLUSION

"Where the movant cannot 'present a substantial case on the merits,' the stay of execution must be denied, and the court need not consider additional factors." *Wood*, 130 F.4th at 520.[23] For the reasons stated above, the Court finds that Plaintiffs have not made a strong showing that they are likely to succeed on the merits of either Count IB or Count III. Accordingly, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction [310].

This Court notes that the State has acknowledged on the record that in the past it has not followed its own execution protocol with respect to the consciousness check required after administration of the first drug in the three-drug sequence, a 500 mg dose of midazolam.

---

[23] Although the Court need not consider additional factors, the balance of equities here weighs against granting a stay of Richard Jordan's execution. Richard Jordan kidnapped and murdered Edwina Marter in 1976. Over almost fifty years, he has received the benefit of multiple trials, multiple appellate proceedings, post-conviction proceedings, and a federal habeas proceeding. *See Jordan*, 740 F. Supp. 2d at 808-16. His case has been reviewed on multiple occasions by the Mississippi Supreme Court, this Court, the Fifth Circuit Court of Appeals, and the United States Supreme Court. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence . . . ." *Johnson*, 137 F.4th at 384 (quoting *Bucklew*, 587 U.S. at 149). When a capital case has proceeded beyond appeals, post-conviction relief, and habeas proceedings, "finality acquires an added moral dimension. Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (cleaned up). Staying an execution this late in the process – after an inmate has received the full gamut of due process available to him under our system of justice – would "inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.*; *see also Johnson*, 137 F.4th at 384; *United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020).

Moreover, in response to the Court's inquiry, the State admitted that the written execution protocol does not provide any firm criteria by which Commissioner Cain would determine whether to continue, stop, or restart the execution in the event that the first dose of midazolam failed to render Jordan unconscious and insensate.

The State represented to the Court that MDOC personnel would give Jordan a second 500 mg dose of midazolam if the first consciousness check revealed he was still conscious/sensate. It further represented that Commissioner Cain would stop the execution if a second consciousness check revealed that the second dose of midazolam similarly failed fully to sedate Jordan, until the parties could return to the Court to determine how to proceed. Neither Plaintiffs nor Defendants, however, have addressed the effect that a second 500 mg dose (1000 mg total) of midazolam would have on Plaintiff Jordan, i.e. whether a second 500 mg dose would kill him, cause him unconstitutional pain, or find him to be resistant to midazolam altogether.

Therefore, convinced that this approach is not discouraged judicial micromanaging, but instead an effort to provide for a possible future undesirable consequence, this Court orders the State to stop Jordan's execution if the first consciousness check reveals that Jordan is still conscious/sensate after the first 500 mg dose of midazolam. The parties, in that eventuality, are directed to contact this Court for further instructions.

IT IS SO ORDERED on this, the 20th day of June, 2025.

/s/HENRY T. WINGATE
UNITED STATES DISTRICT JUDGE